ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
CHRISTOPHER BRUNWIN
Assistant United States Attorney
Deputy Chief, Violent & Organized Crime Section
STEVEN R. WELK
California State Bar No. 149883
Assistant United States Attorney
Chief, Asset Forfeiture Section
   1400 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-6166
   Facsimile: (213) 894-7177
   E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR 08-1201-1 ODW |
| Plaintiff, ) | **PLAINTIFF'S TRIAL BRIEF RE HEARING ON ANCILLARY PETITION; DECLARATION OF STEVEN R. WELK; EXHIBITS** |
| v. ) | |
| RUBEN CAVAZOS, ) aka "Doc", et al., ) | DATE: June 20, 2011 TIME: 9:30 am CTRM: 11 |
| Defendants. ) | |
| MONGOLS NATION ) MOTORCYCLE CLUB, INC., ) | |
| Petitioner. ) | |

/ / /

/ / /

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    CRIMINAL FORFEITURE PROCEDURE . . . . . . . . . . . . . . . . . . . . . 2

    A.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    *In Personam* Nature of Criminal Forfeiture . . . . . . . . . . . . . . . . . . . 2

    C.    Property Subject to Forfeiture Pursuant to 18 U.S.C. § 1963 . . . . . . 4

    D.    Entry of the Preliminary Order of Forfeiture . . . . . . . . . . . . . . . . . 5

    E.    Issues to Be Determined in the Ancillary Proceeding . . . . . . . . . . . 6

III    MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    The admissions of Cavazos with respect to the Marks . . . . . 10

    B.    The Title History of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    The Nature of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.    The Guevara and MNMC Depositions, and the Unchanged Nature of the Mongols OMG . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    Guevara's individual testimony . . . . . . . . . . . . . . . . . . . . 18

        2.    Guevara's testimony as PMK . . . . . . . . . . . . . . . . . . . . . 21

IV    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A.    MNMC Was Not a Bona Fide Purchaser for Value Without Notice of the Forfeitability of the Marks . . . . . . . . . . . . . . . . . . . . 26

        1.    MNMC acquired its purported interest in the Marks after the acts giving rise to the forfeiture . . . . . . . . . . . . . . 26

        2.    MNMC was not a bona fide purchaser for value . . . . . . . . . 27

        3.    MNMC had reason to believe that the Marks were subject to forfeiture when it accepted the assignment . . . . . 28

    B.    The January 2009 Assignment Was Invalid Because the Marks Still Belonged to Shotgun Productions . . . . . . . . . . . . . . . . . 29

        1.    The Marks were not the association's to give because Shotgun Productions was never divested of title . . . . . . . . 29

i

2. MNMC's unclean hands................................ 32

C. MNMC Cannot Establish a Superior Right, Title or Interest
in the Marks........................................... 34

1. MNMC is not a converted association under
California law..................................... 34

2. The filings with the USPTO and the "Trademark
Assignment"....................................... 36

D. Equitable Considerations Compel Denial of MNMC's Petition.... 36

V CONCLUSION ........................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES                                          PAGES

*Alexander v. United States*,
  509 U.S. 544 (1993) ............................................................ 6

*Aloe Creme Laboratories, Inc. v. American Society for Aesthetic
Plastic Surgery, Inc.*,
  192 U.S.P.Q. 170 (TTAB 1976) ...................................... 13

*Board Of Trustees v. Tyco Intern. Ltd.*,
  253 F.R.D. 524 (C.D. Cal. 2008) .................................... 24

*Great American Insurance Co. Of New York v. Vegas Const. Co., Inc.*,
  251 F.R.D. 534 (D. Nev. 2008) ....................................... 24

*In re International Flavors & Fragrances, Inc.*,
  183 F.3d 1361 (9th Cir. 1999) .......................................... 4

*Libretti v. United States*,
  516 U.S. 29 (1995) ............................................................ 6

*Russello v. United States*,
  464 U.S. 16 (1983) ..................................................... 4, 38

*Ex parte Supreme Shrine of the Order of the White Shrine of Jerusalem*,
  109 U.S.P.Q. 248 (Comm'r Pats. 1956) ......................... 15

*In re Triangle Club of Princeton University*,
  138 U.S.P.Q. 332 (TTAB 1963) ..................................... 15

*United States v. 198 Training Field Road*,
  2004 WL 1305875 (D. Mass. 2004) ............................... 29

*United States v. 392 Lexington Parkway South*,
  386 F. Supp. 2d 1062 (D. Minn. 2005) ........................... 28

*United States v. Andrews*,
  530 F.3d 1232 (10th Cir. 2008) ........................................ 8

*United States v. Angiulo*,
  897 F.2d 1169 (1st Cir. 1990) ........................................... 4

*United States v. BCCI Holdings (Luxembourg) (Petition of ICIC Investments)*,
  795 F. Supp. 477 (D.D.C. 1992) ................................. 3, 38

*United States v. Brooks*,
  112 F. Supp. 2d 1035 (D. Haw. 2000) ........................... 28

*United States v. Busher*,
  817 F.2d 1409 (9th Cir. 1987) .......................................... 4

iii

*United States v. Capoccia*,
    503 F.3d 103 (2d Cir. 2007). ............................................................ 5

*United States v. Caporale*,
    806 F.2d 1487 (11th Cir. 1986). ....................................................... 9

*United States v. Creighton*,
    52 Fed. Appx. 31 (9th Cir. 2002). ..................................................... 5

*United States v. DeFries*,
    129 F.3d 1293 (D.C. Cir. 1997). ....................................................... 3

*United States v. Evanson*,
    2008 WL 3107332 (D. Utah 2008). ................................................... 5

*United States v. Frykholm*,
    362 F.3d 413 (7th Cir. 2004). ......................................................... 30

*United States v. Gaskin*,
    2002 WL 459005 (W.D.N.Y. 2002), *aff'd*,
    364 F.3d 438 (2d Cir. 2004). ........................................................... 8

*United States v. Gilbert*,
    244 F.3d 888 (11th Cir. 2001). .................................................... 7, 27

*United States v. Ginsberg*,
    773 F.2d 798 (7th Cir. 1985). ......................................................... 38

*United States v. Guerra*,
    216 Fed. Appx. 906 (11th Cir. 2007). ............................................. 29

*United States v. Harris*,
    246 F.3d 566 (6th Cir. 2001). ......................................................... 28

*United States v. Hernandez-Escarsega*,
    886 F.2d 1560 (9th Cir. 1989). ......................................................... 4

*United States v. Kennedy*,
    201 F.3d 1324 (11th Cir. 2000). ..................................................... 27

*United States v. Lavin*,
    942 F.2d 177 (3d Cir. 1991). ......................................................... 28

*United States v. Lazarenko*,
    575 F. Supp. 2d 1139 (N.D. Cal. 2008). ........................................... 6

*United States v. Lazerenko*,
    476 F.3d 642 (9th Cir. 2007). ........................................................... 8

*United States v. Lazarenko*,
    2008 WL 3925656 (N.D. Cal,. 2008). ......................................... 27, 28

iv

*United States v. McCorkle,*
    143 F. Supp. 2d 1311 (M.D. Fla. 2001)...................................................... 28

*United States v. McHan,*
    345 F.3d 262 (4th Cir. 2003). ........................................................... 7, 27

*United States v. Morgan,*
    224 F.3d 339 (4th Cir. 2000). ............................................................... 7

*United States v. Najjar,*
    300 F.3d 466 (4th Cir. 2002). ............................................................... 3

*United States v. Nava,*
    404 F.3d 1119 (9th Cir. 2005). ..................................................... passim

*United States v. Ox,*
    575 F.3d 352 (4th Cir. 2009). ............................................................. 29

*United States v. Porchay,*
    533 F.3d 704 (8th Cir. 2008). ............................................................. 27

*United States v. Saccoccia,*
    354 F.3d 9 (1st Cir. 2003)................................................................... 29

*United States v. Segal,*
    339 F. Supp. 2d 1039 (N.D. Ill. 2004). ............................................... 3

*United States v. Shryock,*
    342 F.3d 948 (9th Cir. 2003). ............................................................... 3

*United States v. Simmons,*
    154 F.3d 765 (8th Cir. 1998). ............................................................... 3

*United States v. Taylor,*
    2000 WL 715916 (D. Or. 2000). ........................................................ 3

*United States v. Timley,*
    507 F.3d 1125 (8th Cir. 2007). ........................................................... 27

*United States v. Totaro,*
    345 F.3d 989 (8th Cir. 2003). ............................................................... 3

*United States v. Yeje-Cabrera,*
    430 F.3d 1 (1st Cir. 2005)..................................................................... 8

**STATE CASES**

*White Dragon Productions, Inc. v. Performance Guarantees, Inc.,*
    196 Cal. App. 3d 163 (1987). ............................................................. 32

# FEDERAL STATUTES AND RULES

15 U.S.C. § 1115(a). ................................................................................ 4

18 U.S.C. § 1962(d). ................................................................................ 9

18 U.S.C. § 1963 ................................................................ 2, 4, 27, 38

18 U.S.C. § 1963(a). ........................................................................ 2, 11

18 U.S.C. § 1963(b)(2). ............................................................................ 4

18 U.S.C. § 1963(c). ........................................................................ 3, 27

18 U.S.C. § 1963(l). ........................................................................ 6, 8

18 U.S.C. § 1963(l)(6)(A) ........................................................................ 9

18 U.S.C. § 1963(l)(6)(B). .................................................................. 9, 27

18 U.S.C. § 1963(l)(7). ............................................................................ 9

21 U.S.C. § 853 ........................................................................................ 4

Fed. R. Civ. P. 30(b)(6). .................................................................. 1, 24

Fed. R. Crim. P. 32.2. .............................................................................. 2

Fed. R. Crim. P. 32.2(b)(1)(A). .............................................................. 5

Fed. R. Crim. P. 32.2(b)(2)(A). .............................................................. 6

Fed. R. Crim. P. 32.2(b)(1)(B) ................................................................ 5

Fed. R. Crim. P. 32.2(b)(4)(B). .............................................................. 2

Fed. R. Crim. P. 32.2(c). .......................................................................... 2

Internal Revenue Code § 501(c)(7) ...................................................... 23

# STATE STATUTES

California Corporations Code § 1157. .................................................. 35

California Corporations Code § 1157(b). .............................................. 35

California Corporations Code § 1157(c). ............................................... 35

California Corporations Code § 1158. .................................................. 35

California Corporations Code § 1158(a) .......................................... 34, 35

California Corporations Code § 1158(f). ................................................. 35

**MISCELLANEOUS**

116 Cong. Rec. 18955 (1970)    ............................................................. 38

Advisory Committee Notes to Federal Rules of Criminal Procedure 32.2
     (2000 Adoption). ........................................................................... 6

Cassella, *Asset Forfeiture Law in the United States*,
     §23-16, at 714 (JurisNet)  (2007). ............................................... 28

# I
## INTRODUCTION

Plaintiff submits this brief in anticipation of the final evidentiary hearing on the third-party ancillary petition of Mongols Nation Motorcycle Club, Inc. ("Petitioner" or "MNMC") to amend the Preliminary Order of Forfeiture re Trademarks entered on June 15, 2010 (the "POF-TM").  The brief sets out a comprehensive overview of the law relating to criminal forfeiture and the evidence before the Court.  The government believes that such an overview is necessary because of the confusion and false complexity that MNMC has attempted to force into this case.

From its refusal to acknowledge its own legal form to its refusal to reveal its defense, the petitioner has presented a moving target throughout these proceedings.  It has refused to acknowledge even the most basic concepts of settled substantive and procedural forfeiture law.  Having first refused to produce witnesses for Court-ordered depositions, it proceeded to produce a Rule 30(b)(6) (person most knowledgeable) witness who was unable to state whether MNMC has ever had any directors or identify the current officers of the corporation.  In this proceeding in which petitioner bears the burden of proof, MNMC has opted to argue that it is proceeding under *both* of two statutory affirmative defenses, despite the fact that they are mutually exclusive.  It has asserted that it has existed as a single entity for more than 30 years despite the existence of formal legal documents which it created in which it unambiguously describes itself as two different entities.

Part II of this brief summarizes the procedural law applicable to criminal forfeiture, particularly the issues to be determined in this ancillary proceeding.  Part III sets out the material procedural history and facts, including the timing of the various assignments of the Marks relative to the creation of the petitioner, and a detailed  discussion of the evidence obtained through the depositions ordered by

the Court.  Of particular significance in that regard is the discussion of the depositions of Martin Guevara (at pages 15-24), who testified both as an individual and the person most knowledgeable concerning the incorporation and operation of MNMC (Guevara was the last national President of the Mongols unincorporated association and the first president of MNMC).  Part IV sets out the government's argument.

The Marks at issue here have already been found to be subject to forfeiture by this Court.  The only issue to be determined in this ancillary proceeding is whether MNMC can satisfy its affirmative burden of proving one of the statutory defenses by a preponderance of the evidence.  For the reasons explained below, it is incapable of doing so.  The government is entitled to a final order of forfeiture with respect to the Marks.

## II
## CRIMINAL FORFEITURE PROCEDURE

### A.    Governing Law

Criminal forfeiture is a remedy governed entirely by statute and rule, both substantively and procedurally.  In this RICO case, the applicable governing statute is 18 U.S.C. § 1963; the applicable governing procedural rule is Rule 32.2 of the Federal Rules of Criminal Procedure ("Rule 32.2").

### B.    *In Personam* **Nature of Criminal Forfeiture**

Criminal forfeiture is *in personam*, as compared to civil forfeiture, which is *in rem*, meaning that property may be criminally forfeited only if it is the property of a convicted defendant.  *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005).  Criminal forfeiture is part of the defendant's sentence.[1]  Forfeiture cannot

---

[1]    *Id.;* 18 U.S.C. § 1963(a) ("The court, in imposing sentence on such person shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this subsection."); and Rule 32.2(b)(4)(B) ("The court must include the forfeiture order

be avoided by the defendant's titling the forfeitable property in the name of a straw or nominee owner or alter ego, or by transferring the property to another party during or after the illegal activity which gave rise to the forfeiture.[2]  This is due in part to the "relation back" doctrine, which provides that the forfeitability of property, once attached, cannot be swept away except under the specific circumstances described in the statute.  The relation back doctrine has the legal effect of giving the government a vested interest in the property subject to forfeiture at the time of the illegal act, which interest is perfected by the preliminary and final orders of forfeiture.

> All right, title, and interest in [forfeitable property] vests in the United States upon the commission of the act giving rise to forfeiture . . . .  Any such property that is subsequently transferred to a third person other than the defendant . . . shall be ordered forfeited to the United States . . . .

18 U.S.C. § 1963(c); *Nava*, 404 F.3d at 1124.  The applicable standard of proof in criminal forfeiture proceedings is preponderance of the evidence.[3]

---

when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing.  The court must also include the forfeiture order, directly or by reference, in the judgment.").

[2]     *See Nava*, 404 F.3d at 1129-30 and *United States v. Totaro*, 345 F.3d 989 (8th Cir. 2003) (bare legal title does not establish ownership for purposes of the forfeiture determination).  A corporate (or corporate-like) form may be disregarded to forfeit property actually owned or controlled by an individual defendant.  *United States v. Taylor*, 2000 WL 715916, at *5 (D. Or. 2000) (corporate president of defendant can agree to criminal forfeiture of property nominally held by the corporation, and property can be forfeited even though corporation is not a defendant); *United States v. Simmons*, 154 F.3d 765, 771 (8th Cir. 1998); *United States v. Segal*, 339 F.Supp.2d 1039, 1050 n.14 (N.D. Ill. 2004); *United States v. BCCI Holdings (Luxembourg) (Petition of ICIC Investments)*, 795 F.Supp. 477, 479 (D.D.C. 1992) (alter ego).

[3]     *See United States v. Najjar*, 300 F.3d 466, 485-86 (4th Cir. 2002) (RICO); *United States v. Shryock*, 342 F.3d 948, 991 (9th Cir. 2003) (following *Najjar*); *United States v. DeFries*, 129 F.3d 1293, 1312 (D.C. Cir. 1997) (RICO); (continued...)

3

## C.    Property Subject to Forfeiture Pursuant to 18 U.S.C. § 1963

Section 1963 provides for the forfeiture of a wide variety of property[4], and includes the Marks at issue here.[5]  The forfeiture provisions of the RICO statute are to be broadly interpreted, in order to give effect to the its broad remedial purposes.  *See Russello v. United States*, 464 U.S. 16, 26 (1983) (Congress enacted RICO "to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots").[6]

Of the three bases for criminal forfeiture in § 1963, two apply here:

(a)  Whoever violates any provision of section 1962 of this chapter . . . shall forfeit to the United States, irrespective of any provision of State law -

(1) any interest the person has acquired or maintained in violation of section 1962; [or]

---

[3] (...continued)
and *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1576-77 (9th Cir. 1989) (interpreting identical language in 21 U.S.C. § 853).

[4]    *See* 18 U.S.C. § 1963(b)(2): "Property subject to criminal forfeiture under this section includes . . . tangible and intangible personal property, including rights, privileges, interests, claims, and securities."

[5]    A registered mark represents an identifiable property interest.  *See* 15 U.S.C. § 1115(a) (registration of a mark shall be prima facie evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . ."); *In re International Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1366 (9th Cir. 1999) ("Trademark owners who register their marks with the PTO are afforded additional protection [*i.e.,* rights and privileges] not provided by the common law," including the right to prevent others from using the mark).

[6]    *See also United States v. Busher*, 817 F.2d 1409, 1413 (9th Cir. 1987) (the forfeiture provisions of §1963 are "purposely broad . . .[,] "designed to totally separate a racketeer from the enterprise he operates") and *United States v. Angiulo*, 897 F.2d 1169, 1211 (1st Cir. 1990) ("any interests in an enterprise, including the enterprise itself, are subject to forfeiture in their entirety, regardless of whether some portion of the enterprise is not tainted by the racketeering activity").

(2) any -

    (A) interest in;
    (B) security of;
    (C) claim against; or
    (D) property or contractual right of any kind affording a
    source of influence over; . . .

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

## D.   Entry of the Preliminary Order of Forfeiture

Following the defendant's conviction, the Court must determine whether the evidence before it is sufficient to establish a nexus between the criminal charge(s) for which the defendant was convicted and the property sought for forfeiture.[7] That determination may be based upon "evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."  Rule 32.2 ((b)(1)(B).  The evidence relied upon by the court need not satisfy the Rules of Evidence, and may include hearsay, as the forfeiture determination is part of the sentencing process.[8]

---

[7]  *See* Rule 32.2(b)(1)(A) (emphasis added):

Forfeiture Determinations.  As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, *the court must determine whether the government has established the requisite nexus between the property and the offense.*

[8]  *See United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007); *United States v. Evanson*, 2008 WL 3107332, at *2 (D. Utah 2008); *United States v. Creighton*, 52 F. App'x 31, 35-36 (9th Cir. 2002).

Once the requisite nexus is found, forfeiture is mandatory and a preliminary order forfeiting the defendant's interest in the property must promptly be entered.[9]  Actual ownership of the property described in the preliminary order by the defendant against whom it is entered is *not* an element of proof required for entry of the preliminary order.[10]   Third parties who claim an interest in the property described in the preliminary order must wait until the entry of the preliminary order to proceed with their claims.

### E.   Issues to Be Determined in the Ancillary Proceeding

The third-party ancillary process described in § 1963(l) is the exclusive means by which a third party may claim any interest in property subject to criminal forfeiture. *Libretti v. United States*, 516 U.S. 29, 44 (1995) ("third-party claimants can establish their entitlement to a return of assets only by means of [the ancillary process]"); *Nava*, 404 F.3d at 1125.  As noted above, it is not a forum for re-litigating the forfeitability of the property described in the preliminary order. *See* note 10*, supra; Nava*, 404 F.3d at 1125; *United States v. Lazarenko,* 575 F. Supp.

---

[9]   *See* Rule 32.2(b)(2)(A) ("If the court finds that the property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture . . . directing the forfeiture of specific property . . . ."); *Alexander v. United States*, 509 U.S. 544, 562 (1993) ("a RICO conviction subjects the violator not only to traditional, thought stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963"); *Nava*, 404 F.3d at 1124.

[10]   *See* Advisory Committee Notes to Rule 32.2 (2000 Adoption): Under [the statutory forfeiture scheme first enacted in 1984, including 18 U.S.C. § 1963(l)], the court orders the forfeiture of the defendant's interest in the property -- whatever that interest may be -- in the criminal case.  At that point, the court conducts a separate proceeding in which all potential third party claimants are given an opportunity to challenge the forfeiture by asserting a superior interest in the property.  This proceeding does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property.

2d 1139, 1147 (N.D. Cal. 2008) ("Put simply, the criminal forfeiture statutes do not afford the third party any right to challenge the underlying basis of the forfeiture.") (internal citation omitted) and 1148 ("an ancillary proceeding 'does not involve relitigation of the forfeitability of the property.'") (quoting Advisory Committee Notes). The "sole legal issue before the court [in an ancillary proceeding] is the ownership interests of the [petitioners]." *Nava*, 404 F.3d at 1124.

The applicable standard of proof in the ancillary proceeding remains preponderance of the evidence, and the Court should consider the entire record in the criminal action, including its prior findings concerning forfeitability. *United States v. Morgan*, 224 F.3d 339, 345 (4th Cir. 2000). The burden of proof is on the petitioner. *United States v. McHan*, 345 F.3d 262, 275 (4th Cir. 2003) (the ancillary proceeding is not a civil forfeiture proceeding whereby the government is seeking to forfeit a third party's purported interest; it is incumbent on the petitioner to prove that its claimed interest is *not* subject to forfeiture).[11]

The ancillary proceedings cannot result in the dismissal or vacating of the preliminary order, which is entered against the convicted defendant and forfeits his interest in the forfeitable property. That order is part of the defendant's sentence. The sole purpose of the ancillary proceeding is to adjudicate the claimed interests of *third parties* in the property described in the preliminary order in order to determine whether the government should forfeit *all* right, title and interest in

---

[11] *See Nava*, 404 F.3d at 1125, quoting *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001):

> Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden or proving that the defendant's interest in the property was subject to forfeiture during the criminal trial.

the forfeitable property.[12]   The forfeiture of the defendant's interest in the property, as well as the potential interests of any *other* third parties, remains in place.[13]

There are two ways for a third-party petitioner to prevail, depending on when it claims to have acquired its interest in the forfeitable property.  Where the petitioner had an interest in the property at the time it was involved in the criminal

---

[12]   *See United States v. Andrews,* 530 F.3d 1232, 1236 (10th Cir. 2008) (once forfeitability is determined, the court does not -- "and indeed may not" -- determine ownership; that issue is deferred to the ancillary proceeding); *United States v. Lazerenko*, 476 F.3d 642, 648 (9th Cir. 2007); *United States v. Yeje-Cabrera,* 430 F.3d 1, 15 (1st Cir. 2005) (primary purpose of Rule 32.2 is to preserve the resources of the court and third parties by deferring ownership issue to the ancillary proceeding, thus avoiding duplicative litigation); *United States v. Gaskin*, 2002 WL 459005, at *9 n.4 (W.D.N.Y. 2002) (ownership is a question for the court alone to determine in the ancillary proceeding), *aff'd*, 364 F.3d 438 (2d Cir. 2004).

[13]   This Court stated in an order of September 21, 2010 that it was vacating the POF-TM, but later vacated that order on October 8, 2010 (DN 4159).  The October order provided that this ancillary proceeding should go forward.  While the Court stated in the later order that it was not reinstating the POF-TM, the plain language of the order (and the fact of subsequent proceedings) suggests that the Court actually intended only to limit the POF-TM by vacating any portion which authorized seizure of property bearing the Marks.  *See* October 8 Order: "the Government's request to reinstate the Preliminary Order of Forfeiture [3854], *which authorized the seizure of the property at issue*, is denied."  (Emphasis added).  In fact, the POF-TM contained no specific seizure authority for property bearing the Marks.  The only reference in the POF-TM to seizure of tangible property is in paragraph II(A), which provides that the government may seek a separate seizure warrant for such property.

Ancillary proceedings, by their very nature, cannot proceed in the absence of a preliminary order of forfeiture, and the fact that the Court is conducting the hearing required by § 1963(l) and Rule 32.2(c) necessarily means that the POF-TM survived both the September 21 and October 8 orders.  As a preliminary matter to the adjudication of MNMC's petition, the government respectfully requests that the Court clarify the continuing viability of the POF-TM.

activity triggering the forfeiture, the petitioner must prove by a preponderance of the evidence that it had

> a legal right, title or interest in the property, and such right title or interest renders the order of forfeiture invalid in whole or in part because the right, title or interest was vested in the petitioner rather than the defendant or was superior to any right, title or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section.

18 U.S.C. § 1963(l)(6)(A).  Where, as here, the petitioner acquired its purported interest in the forfeitable property *after* the commission of the acts giving rise to the forfeiture, the petitioner must prove by a preponderance of the evidence that it

> was a bona fide purchaser for value of the right, title or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

18 U.S.C. § 1963(l)(6)(B).  If no third-party petitioner is able to establish its purported interest under one of these standards, the petition must be denied, and the government is entitled to a final order of forfeiture, awarding it clear title to the forfeitable property.  18 U.S.C. § 1963(l)(7).

## III
## MATERIAL FACTS

### A.    Procedural History

On January 23, 2009, Ruben Cavazos ("Cavazos") entered a plea of guilty to Count One of the Indictment, alleging violation of 18 U.S.C. § 1962(d) (RICO conspiracy).[14]  In Count Eighty-Five, the government gave notice that it would seek the forfeiture of certain property upon any defendant's conviction of one or both of Counts One and/or Two, including the Marks.  *See* Indictment at 173.[15]

---

[14]    Forfeiture is properly ordered not only in connection with substantive RICO Act violations, but also in connection with a conspiracy conviction.  *United States v. Caporale*, 806 F.2d 1487, 1509 (11th Cir. 1986).

[15]    The verbal mark was specifically descried in the Indictment; the government gave notice of its intent to seek forfeiture of the "symbolic mark" by
(continued...)

As part of his guilty plea, Cavazos agreed to the forfeiture of all right, title and interest in the Marks, and admitted that the Marks were subject to forfeiture to the United States.  The government submitted an unopposed application for entry of the POF-TM on June 11, 2010.  (DN 3840).  The POF-TM was entered on June 15, 2010.  (DN 3854).

### 1.   The admissions of Cavazos with respect to the Marks[16]

Cavazos was a member of the Mongols outlaw motorcycle gang ("OMG") for approximately twelve years, from 1996 until 2008, and was the national President of the Mongols for approximately six years immediately preceding the filing of the Indictment in this case, from approximately 2002 until June of 2008. *See* Declaration of Ruben Cavazos ("Cavazos Decl.") attached as exhibit Y to the Declaration of AUSA Steven R. Welk ("Welk Decl."), at ¶2; Cavazos Deposition Transcript ("Cavazos depo"), excerpts of which are attached as an exhibit S to the Welk Decl., at 13-14.[17]  Cavazos was personally responsible for the registration of the two marks identified in the POF-TM.  Cavzos Decl. at ¶4.

The Marks were initially registered in the name of "Mongol Nation, an unincorporated association," but Cavazos subsequently assigned them, with the knowledge and consent of the Mongols leadership, to Shotgun Productions, a

---

[15] (...continued)
Bill of Particulars filed on November 5, 2008 (Docket no. 521).

[16]   The facts in this section have been admitted by Cavazos, either as part of his plea agreement, in a subsequent sworn (and previously filed) declaration, or as part of his testimony given at a deposition on April 22, 2011.

[17]  For purposes of clarity, the exhibits attached to the current Welk Declaration, to the extent they have been attached to prior filings, are identified with the same exhibit letters previously used -- thus, for example, the incorporation documents for MNMC are attached to the Welk Decl. as exhibit I because they were so designated in earlier filings.  New exhibits are designated according to where the government left off in its last filing.  This causes gaps in the exhibit letters in some cases.

corporation created and completely controlled by him.  Cavazos Decl. at ¶6; Cavazos depo at 28.  This transfer was within the scope of his authority as national President of the organization, and did not require any other authorization or permission.  Cavazos depo at 34-36.  During his tenure as national President, Cavazos personally controlled the distribution and use of the registered marks, also with the knowledge and consent of the gang membership.  Cavazos Decl. at ¶6.

While national President of the Mongols, Cavazos (1) knowingly entered into a conspiracy to form a racketeering enterprise knowing of its object and intending to accomplish that object; (2) oversaw and controlled the use of the Marks as a means to identify members of the enterprise and intimidate rivals, law enforcement and the public; and (3) acquired and owned the Marks, and allowed their use by Mongols members, during and in furtherance of the offenses of the enterprise.  *See* Cavaozs plea agreement.  Cavazos's admissions establish both that he acquired and maintained the Marks as part of his participation in and control over the RICO enterprise described in the Indictment, and that the Marks afforded a source of influence over the enterprise.  On the basis of these admissions and the record in the case, the Court entered the POF-TM on June 15, 2010.  (Docket no. 3854), finding that (1) the government had established the requisite nexus between the Marks and the offenses alleged in Count One of the Indictment; and (2) the Marks were therefore subject to forfeiture pursuant to 18 U.S.C. § 1963(a).

### B.    The Title History of the Marks

The verbal mark (consisting of the word "Mongols")  was first registered with the United States Patent & Trademark Office ("USPTO") on January 11, 2005.[18]  The registration was taken in the name of "Mongols Nation, an

---

[18]  Welk Decl., exhibit C (USPTO abstract of title for verbal mark).  The registration application was first made on July 28, 2003.  *Id.*

unincorporated association" on the basis of an application made by Cavazos, the national President, and was supported by a sworn statement from Cavazos.[19]  The symbolic mark (an image of a stylized motorcycle rider) was first registered with the USPTO on April 4, 2006.[20]  Like the application for the verbal mark, the registration was taken in the name of "Mongols Nation, an unincorporated association" and supported by the sworn statement of Cavazos, the national president of the Mongols.[21]  According to Cavazos, he registered the Marks "to ensure that [he] and the Mongols could prevent others from using [their] name and symbol." Cavazos Decl., ¶6.

On April 3, 2008, both Marks were assigned in their entirety by Cavazos (in his capacity as the national President of the unincorporated association) to Shotgun Productions, a corporation created, owned and controlled entirely by Cavazos.  Shotgun Productions was the alter ego of Cavazos.  *See* Cavazos depo at 18 ("It was the LLC I was using for all my bills"; "Everything was under Shotgun Productions") and 28:

Q: Shotgun Productions is your personal company?

A: Yes.

Q: You transferred the Marks to your personal control?

A: They were in my personal control to begin [with]. Mongol Nation is mine.  Went from one to another.

Q: So you're saying the marks were always yours.  That you owned the

---

[19]   Welk Decl., exhibit B (registration application materials for verbal mark).

[20]   Welk Decl., exhibit F (USPTO abstract of title for symbolic mark).  The registration application for the symbolic mark was first made on April 15, 2005.  *Id.*

[21]   Welk Decl., exhibit E (application materials for symbolic mark).

marks?

A: Yes.[22]

Both the decision by Cavazos to transfer the Marks and his subsequent exercise of unlimited dominion and control over the Marks were undertaken with the full knowledge and consent of the Mongols leadership, who were responsible for making decisions for the enterprise. Cavazos Decl., ¶6; Cavazos depo at 35:

> Q: Now, you mentioned that the officers of the Mother Chapter subsequently agreed that, in order to further ensure the protection of the marks from usage by others, the marks should be assigned to Shotgun Productions, LLC, a corporation that you owned and controlled.
>
> A: Well, I don't need their agreement. I have absolute power. You have power over -- when you're national President, you have absolute power. I didn't need for them to agree. They were informed of what I was doing, but they didn't necessarily have to agree.
>
> Q:  Did they agree?
>
> A: Yes, they did.

Cavazos further testified that there were no questions from the other national officers concerning his plans to transfer the Marks, nor was there any dissent. The matter was open for discussion but drew none. Cavazos depo at 36-38. Neither the other officers of the Mongols Mother Chapter nor any other members of the Mongols had any control over or participation in the creation or operation of Shotgun Productions, a fact of which those officers and members were aware when they consented to the assignment of the Marks. Cavazos Decl, ¶ 6.

The Marks were next purportedly assigned on October 14, 2008, five days after the filing of the sealed indictment, and one week before the arrests in this case and the unsealing of the indictment. Welk Decl., exhibit G (purported

---

[22]  MNMC does not dispute that Shotgun Productions was Cavazos's alter ego. *See* Welk Decl., exhibit T, (transcript of March 14, 2011 hearing) at 6, in which counsel for MNMC  stated, when asked by the Court whether Shotgun Productions was the owner of the Marks, "Shotgun was an alter ego by Ruben Cavazos. [ ] that is just Ruben Cavazos."

13

assignment of Marks to Mongol Nation).  Hector Gonzalez, another defendant in this case (who recently entered a plea of guilty to Count One of the Indictment)[23] and who succeeded Cavazos as the national President of the Mongols in the summer of 2008, filed an assignment with the USPTO purporting to assign the Marks from Shotgun Productions back to "Mongol Nation, an unincorporated association."  *Id.*

However, as discussed in more detail below, there is no evidence suggesting that Gonzalez had any authority to divest Shotgun Productions of its undisputed ownership of the Marks following the April 3, 2008 assignment by Cavazos.[24]  In any event, the titled owner of the Marks at the time of the filing of the indictment was Shotgun Productions, ***not*** the unincorporated association (and certainly not Petitioner, which did not come into existence until two months later).

MNMC was incorporated on December 17, 2008[25] and, on January 22, 2009, the unincorporated association -- through then national President Martin Guevara -- purported to assign the Marks in their entirety to the new corporation.[26]

---

[23]  A true and correct copy of the plea agreement entered into by Hector Gonzalez is attached to the Welk Decl. as exhibit U.

[24]  Gonzalez claimed in his USPTO filing that Cavazos had lacked the authority to effect the April 2008 Shotgun Productions transfer (Welk Decl., exhibit G), but the government will present evidence at the hearing demonstrating that not only did Gonzalez know in August 2008 that Cavazos had made a valid transfer of the Marks to Shotgun Productions, but he had engaged in negotiations with Cavazos to get them back and Cavazos had refused.  Cavazos and Gonzalez had even discussed whether Cavazos would license the Marks to the Mongols so that they could continue to use them.

[25]  Welk Decl., exhibit I (California Secretary of State filings re incorporation of MNMC).

[26]  This purported assignment is evidence by two documents: a "Trademark Assignment" entered into between Mongol Nation, an unincorporated association

(continued...)

Neither the papers filed with the Secretary of State nor the Trademark Assignment include any suggestion that the corporation was a converted entity within the meaning of California law.  To the contrary, the unincorporated association and corporation are explicitly described as separate parties in the Assignment, which includes a false recitation of consideration received.

### C.    The Nature of the Marks

The Marks are federally-registered collective membership marks.  *See* Welk Decl., exhibit B (letter supporting registration application - "the application was to register a collective membership mark");  exhibit J (Guevara Decl.), ¶¶ 8-10; MNMC Petition at 2, ¶7.  As a result, each of the Marks is

> a mark adopted for the purpose of indicating membership in an organized collective group . . . .  Neither the collective nor its members uses the collective membership mark to identify and distinguish goods or services; rather, *the sole function of such a mark is to indicate that the person displaying the mark is a member of the organized collective group*.

*Aloe Creme Laboratories, Inc. v. American Society for Aesthetic Plastic Surgery, Inc.,* 192 USPQ 170, 173 (TTAB 1976) (emphasis added).  Collective membership marks do not involve the production or distribution of goods or the provision of services.  They are not trademarks in the ordinary sense, as they are not used in business or trade, but they allow organizations to protect their marks and prevent their use by others.  *See Ex parte Supreme Shrine of the Order of the White Shrine of Jerusalem,* 109 USPQ 248 (Comm'r Pats. 1956).  The holder of a collective membership mark exercises *total* control over its use; and because the sole purpose of a membership mark is to indicate membership, use and possession of the mark is strictly limited to members of the collective.  *See In re Triangle Club of Princeton University,* 138 USPQ 332 (TTAB 1963).

---

[26](...continued)

and MNMC, a copy of which is attached to the Welk Decl. as exhibit V; and documents from the USPTO, attached to the Welk Decl. as exhibit G.

Cavazos had sole control over the Marks for virtually the entire period described in the Indictment (Cavazos Decl., ¶6), and he exercised that control, in part, by using the Marks as a reward system for members who committed acts of violence for the benefit of the gang. *See* Revised App for POF-TM (DN 3840), Welk Decl., exhibit A (Ciccone Decl.), ¶¶ 9, 24(15), (172), (202), (229) and (231). The nature of and control over the Marks continued after the unsealing of the indictment, and continues today. *See* MNMC Petition at 2, ¶¶ 4, 7 and 8. Martin Guevara, who was national president of petitioner MNMC at the time, stated the following in a declaration filed in this case:

> The Club [*i.e.*, the Mongols OMG] grants its members a limited license to use the [Marks] (and similar variations on the [Marks]) by wearing them on clothing items and displaying them on other items of personal property, including vests and motorcycles . . . .
>
> Individual members of the Club do not own any rights in the Marks (or the registration of the Marks) other than their limited license rights.
>
> The limited license granted to the Club's members prohibits wearing or displaying personal items bearing any of the Club's Marks, *and requires return of any removable items bearing the Club's Marks*, once any member is no longer in good standing with the Club. . . . All club members are required to agree to these terms as part of their membership and limited license.
>
> The Club also permits certain non-members (primarily the family and friends of members) to wear the [Marks] on clothing items or display the [Marks] on other personal property, but certain uses of the [Marks] (*such as patches*) are limited to members. None of these non-members own any rights in the [Marks] (or the registration of the [Marks]).

Welk Decl., exhibit J (Guevara Decl.) at ¶¶ 8-11 (emphasis added).

The use of the Marks as a reward system by Cavazos was not the sole basis for the finding that they afforded a source of influence over the enterprise. The testimony of ATF Special Agent Darrin Kozlowski, who was one of the undercover agents who infiltrated the Mongols, becoming a full-patch member of the gang, establishes that the Marks served as unifying symbols of an enterprise dedicated to intimidating and terrorizing everyone who is not a member, and

assaulting and killing those who have sworn their loyalty to *other* OMGs.  The
Mongols engage in violent, illegal activity that they would almost certainly not
engage in were they not a part of the enterprise.  While this Court has seen
defendants weep during sentencing hearings and renounce the Mongols and its
purposes, it is not reasonable to assume that the defendants were the "bad apples"
of an otherwise benevolent social club.  The evidence collected during this
investigation -- particularly that evidence gathered by the agents who infiltrated
the gang -- and the admissions of the defendants who have entered guilty pleas,
establish that the Marks were an important component of and had a direct nexus to
the racketeering activities of the Mongols enterprise.

The predominant legal rights that flow from ownership of a registered mark
are the ability to control the possession, use and distribution of the Marks, and to
limit that possession, use and distribution to persons of the owner's choosing.
MNMC has conceded that once the Marks are forfeited, the government will have
the exclusive right to control their possession, distribution and use.  *See* Docket
No. 2083 at 9 ("[O]wnership rights give the Club, *and consequently the*
*government if forfeited*, the right to use the mark and to prevent third parties from
using a confusingly similar mark.") (emphasis added).  It is likewise undisputed
that patches of the Marks were (and are) issued only to Mongols prospects and
members, who wear and display them in a variety of ways, but primarily affixed to
jackets or vests.  *See* Welk Decl., exhibits J (Guevara declaration) and K (patch
chart).

### D.    The Guevara and MNMC Depositions, and the Unchanged Nature of the Mongols OMG

On April 7, 2011, the government took two depositions of Martin Guevara.
The first was in his individual capacity; the second in his capacity as the person
designated by MNMC as the person most knowledgeable ("PMK") concerning the
facts and circumstances of MNMC's incorporation and operation, and the

ownership and assignments of the Marks.[27]  Those depositions (full copies of which will be lodged with the Court prior to the June 20th hearing) revealed that MNMC is and always was a sham, created for the purpose of frustrating the government's forfeiture of the Marks, and never maintained as a viable, legitimate corporate entity.

### 1.   Guevara's individual testimony

Guevara was a member of the Mongols OMG from approximately October 1997 until late 2010, when he claims to have "retired."  Welk Decl., exhibit W (Guevara Ind. depo), at 14, 53.  He was a member of the So Cal (aka Mother) chapter from the summer of 2008 until July 2009.  He joined the Mother Chapter at the request of Hector Gonzalez, who assumed the national Presidency of the Mongols after Cavazos stepped down.  *Id.* at 18, 47.  He testified that he agreed to join the Mother Chapter in summer 2008 because Gonzalez told him that going forward, "everything was going to have to be above board."  *Id.* at 72-73.

Guevara was appointed national vice-president by Gonzalez when he joined the Mother Chapter (*id.* at 58), and became national President in October 2008 when Gonzalez was arrested in connection with this case (*id.* at 59).  He remained the national President until July of 2009 (*id.* at 63).  During his tenure as national President, Guevara exercised precisely the type of authority that Cavazos describes in his declarations and deposition testimony.  He made decisions for the Mongols without asking permission or seeking the input of the other national officers or the membership in general (*id.* at 63).  He was free to incur obligations or take any other actions on behalf of the gang at his sole discretion, without consulting with anyone (*id.* at 68-70, 77).

---

[27]   Excerpts from the individual deposition transcript are attached to the Welk Decl. as exhibit W, and are referred to as the "Guevara Ind. Depo"; excerpts from the PMK depo are attached as exhibit X to the Welk Decl., and are referred to as the "Guevara PKMdepo."

Guevara, in his capacity as national President, authorized the creation of MNMC, and he made that decision without asking the other national officers or the general membership. *Id.* at 102, 109. Most significantly, however, it was Guevara, in his capacity as national President (and again without consultation with any other Mongols national officers or members) who purported to assign the Marks in January 2009 to MNMC. In other words, Guevara's position as national President -- *standing alone* -- gave him the actual authority to dispose of property of the Mongols as he saw fit.

Q: Going back to exhibit [V], the trademark assignment, did you discuss this with any of the national officers before you signed it?

A: No.

Q: You just told them after you had done it?

A: I don't think they really cared, you know? It wasn't - as long as I was getting the job done or heading in the right direction to get our patches back and our property back, that was okay.

Q: So in your view this was within the scope of your authority as national president?

A: Yes.

Guevara Ind. Depo at 105. This is exactly what Cavazos has testified he was allowed to do when he assigned the Marks to Shotgun Productions. Like Cavazos, Guevara was permitted to decide what he wanted to do with respect to the Marks and then take action without obtaining explicit authorization, including assignment of the Marks. *Id.* at 102.[28]

Guevara testified that he was replaced as national President of the Mongols in July of 2009 (*id.* at 70), but he inexplicably invoked the Fifth Amendment and refused to answer when asked who succeeded him in that position (*id.* at 71-72).

---

[28]    Of the two, only Cavazos advised the other national officers of his plans to effect a transfer of the Marks beforehand, obtaining their consent to the transfer to Shotgun Productions even though he did not believe that he was required to do so.

In fact, Guevara invoked the Fifth Amendment numerous times during his deposition, refusing to state whether he believed the Mongols have ever been an outlaw motorcycle club (*id.* at 38-39) and to explain the meaning of the individual patches issued to Mongols members and displayed on their vests, including the skull and cross-bones patch, the 2002 Laughlin shooting patch, the "Respect Few, Fear None" patch, and the colored wing patches. *Id.* at 40-43. He invoked on whether all members paid the same amount of dues to the gang (*id.* at 47); who he talked to when he "retired" from the Mongols (*id.* at 54-55); who was appointed the new national vice-president following the arrests in this case (*id.* at 62); who was his national sergeant-at-arms while he was national President (*id.* at 138); whether he had spoken with Gonzalez since his arrest (*id.* at 70); whether he read and understood the October 2008 restraining order; and whether the incorporation of MNMC had any significance other than changing the name of the organization (*id.* at 95-96).

Guevara testified that even though he stated in a sworn declaration (*see* Welk Decl., exhibit J) that the rules of the Mongols organization require that a member who is convicted of a serious violent crime will have his membership terminated (*id* at 137), a felony conviction actually would not result in termination if the member had a good reason for taking the conviction. *Id.* at 140-42.[29] He testified that he was aware of one member who had been convicted of murder, but did not know whether the membership had been terminated as a result. He then invoked the Fifth Amendment when asked the name of that member. *Id.* at 143. He invoked again when asked if pleading guilty to RICO conspiracy would result in termination of membership. *Id.* at 144. Toward the end of the deposition, it became clear that termination of Mongols membership was not based on being

---

[29] "It depends on what violent - if - what you consider violent might not be what I consider violent." Guevara Ind. Depo at 142.

arrested for or convicted of a serious crime.  Rather, it was based on whether a member was believed to have cooperated with the government following his arrest.

> Q: Now, you said something earlier that made it sound like the reason you wanted to revoke their membership was because you thought they were cooperating.
>
> A: That's one of the reasons.
>
> Q: So it wasn't a guilty plea.  It's because you thought they were cooperating.
>
> A: Cooperating.  Guilty.  Not following the rules.

*Id.* at 173-74.  The following exchange occurred a short time later, on page 175:

> Q: So if somebody was to tell law enforcement the truth about other members violating the law, would you consider that to be a violation of the club rules?
>
> A: I'll take the Fifth.

### 2.   Guevara's testimony as PMK

Guevara's testimony as the PMK of MNMC was a virtual masterpiece of obfuscation.  He testified during his individual deposition that he did not know if MNMC was a corporation (*id.* at 50-51) or whether he was ever a director of MNMC (*id.* at 125).  He acknowledged that as a "retired" Mongols member, he does not pay dues and is not allowed to attend meetings (*id.* at 53); and that he has had no conversations with anyone associated with the Mongols about how the organization is being run since late 2010 (*id.* at 55-56).  He further testified that to his knowledge, MNMC had never issued any stock or had any shareholders (*id.* at 125).

In his testimony as the person most knowledgeable concerning the facts surrounding the incorporation of MNMC and its operations since that time, Guevara admitted that he was not currently an officer, director or employee of MNMC.  Guevara PMK depo at 6-7.  He initially invoked the Fifth Amendment when asked for the name of the current president (as he had when deposed in his

individual capacity), but then relented and provided the name through his attorney. *Id.* at 7-8.  He was unable to name any of the current directors or any of the other officers of MNMC (*id.* at 8-9), and did not know whether the corporation had any employees.  *Id.* at 10.  He admitted that he was the president of the corporation at the time it was incorporated, but when asked if he was also a director, he replied "I don't know what that means."  *Id.* at 14.[30]  He invoked the Fifth Amendment -- as PMK of the corporation -- when asked for the name of the corporation's first vice-president.   His basis for testifying that the original secretary-treasurer had been replaced was that he had "heard it around."  *Id.* at 15.  When asked from whom he had heard it, he invoked the Fifth Amendment.  *Id.*

Guevara did not know if there were currently any directors of the corporation, or who was the current chief financial officer.  *Id.* at 16.  He "believed" the corporation was a non-profit because "what [they] were trying to achieve" was "non-profit status."  *Id.*  The purpose of the organization was described as "social networking."  Guevara was unable to identify anything of substance that had changed after the incorporation, and admitted that nothing really changed in terms of the operation of the organization as a result of the incorporation.  *Id.* at 20.

Guevara was unable to say when the corporation's first board meeting occurred; he never attended any shareholders' meetings; to his knowledge, there were no shareholders; the corporation was "looking to get" an accountant, but had never actually had one; he did not know if the corporation had filed state or federal tax returns for 2008 or 2009; he did not know whether the corporation had ever issued any stock or who the shareholders were or might currently be; and he did not know if the corporation maintained a corporate minutes book or if there were

---

[30]   Minutes later, he testified that while he was an officer of the corporation, it had no directors (*id.* at 16).

bylaws.  *Id.* at 29-33.

He did not know if the corporation paid any consideration for the January 2009 assignment of the Marks; what the corporation's taxpayer ID number was; or whether it was a Section 501(c)(7) nonprofit organization.  *Id.* at 34.  He did not know whether the corporation had filed a California state tax exemption application or had ever filed any papers with the IRS to gain tax-exempt status. *Id.*  There was no corporate resolution authorizing the corporation to participate in this lawsuit.  *Id.* at 39.  He did not know if the corporation had received a designation letter from the California Franchise Tax Board designating it as non-profit corporation under California law, or a written acknowledgment from the IRS that it was qualified as a nonprofit organization under federal law.  He admitted that the corporation engages in sales of goods in the City and County of Los Angeles, but has never requested a tax exemption for those sales.  He did not know the first day of the corporation's fiscal year.  *Id.* at 40-41.

The corporation's principal address when he was president was his house, but he did not maintain the corporate bylaws or corporate minutes there.  *Id.* at 42. He refused to provide a copy of the corporation's original or current bylaws.  *Id.* at 44-45.  At the time of the corporate deposition, Guevara had not held any position with MNMC since July 2009 -- nearly two years earlier.  He had been authorized to testify for the corporation a week or two before the date of the deposition, but had talked to no one involved with the corporation.  He had talked to no one other than Mr. Steele.  *Id.* at 13.

The testimony of a person designated as the person most knowledgeable for a corporation is the testimony of the corporation.  *Bd. Of Trustees v. Tyco Intern. Ltd.*, 253 F.R.D. 524, 525 (C.D. Cal. 2008).  In choosing a deponent to speak on behalf of the corporation, "companies have a duty to make a conscientious, good faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated

subject matter." *Id.* at 526.  A Rule 30(b)(6) deponent has "an affirmative obligation to educate himself as to the matters known or reasonably available to [the corporation] and, therefore, implicitly requires persons to review all matters known or reasonably available to [the corporation] in preparation for the 30(b)(6) deposition." *Id.*  Counsel for the corporation being deposed has a limited role -- he is "prohibited from acting as an intermediary, interpreting questions, assisting deponent with formulation of the answers or deciding which questions can be answered." *Id.* at 527.

Here, neither MNMC, its designated deponent nor its counsel fulfilled its legal obligations.  MNMC designated a person (Guevara) who was essentially a stranger to it; Guevara did nothing whatsoever to learn even the most basic facts concerning the corporation's status or identity; and Mr. Steele was obstructionist and evasive throughout the deposition.  "Producing an unprepared witness is tantamount to a failure to appear, and sanctionable under Rule 37(d)." *Great American Ins. Co. Of New York v. Vegas Const. Co., Inc.*, 251 F.R,D. 534, 542 (D. Nev. 2008).  "A Rule 30(b)(6) witness who is unable to give useful information is no more present for deposition than would be a deponent who physically appears for the deposition but sleeps through it." *Id.* (internal quotation omitted).

There are two possible reasons for the colossal waste of time that was the MNMC deposition: the first is that the production of an ignorant witness was a deliberate attempt by MNMC to sandbag the government by refusing to provide any information at all during a Court-ordered deposition; the second, and more likely in the government's view, is that Guevara is as good a witness as any for MNMC because MNMC is (and from its inception was) a sham corporation created for the sole purpose of frustrating the government's forfeiture efforts.  The government contends that there is no witness who can provide information concerning MNMC's compliance with the requisite corporate formalities because MNMC has never in fact complied with basic corporate formalities.  MNMC does

not have an accountant -- or need one -- because MNMC has never filed a tax return and has no intention of doing so. MNMC has no documentation showing that it is recognized by either the state of California or the IRS as a tax-exempt nonprofit organization because it has never taken the steps necessary to apply for such status. There is no evidence that MNMC, which bears the burden of proof here, did anything more than file articles of incorporation and open a bank account.

Ultimately, the deposition of MNMC was nothing more than an exercise in absurdity and evasion, as amply demonstrated by the following exchange between counsel:

> WELK: I'm sorry. I cannot comprehend how a person most knowledgeable to give a corporate deposition doesn't know if the corporation has officers.
>
> STEELE: Because the issues that were supposed to be addressed are those relating to the trademark. You're asking him about things that are far, far field from that.
>
> WELK: What is your defense? What is MNMC's defense in this matter?
>
> STEELE: I'm not telling you.
>
> WELK: Well, I thought it was that you - that it was an innocent owner. You're not going -
>
> STEELE: I'm not telling you.
>
> WELK: What?
>
> STEELE: I'm not telling you. I mean, what do you want to know? What do you want to talk about?
>
> WELK: Are you serious?
>
> STEELE: Yeah. Right now. I'm not going to tell you. What? Is there some rule that says I got to do that? I don't have to do that.

Geuvara PMK depo at 10.

Based on Guevara's testimony in both depositions, the only apparent differences between the Mongols before the arrests and now is that they now have a corporate bank account and a federal tax identification number. Guevara Ind. Depo at 105. Guevara admitted that the reason for the incorporation was to "get . .

. the feds or government off our back." *Id.* at 91, 97.  He further stated that he expected the incorporation to prevent the forfeiture of the Marks (*id.* at 101), and that was the goal he was trying to accomplish by authorizing the creation of MNMC.  *Id.* at 111.  When asked to explain the Mongols' ideology and purpose, he said it was to "party," "have a good time," and "be a brotherhood."  *Id.* at 149-50.  When he said in a sworn declaration that the public understood the Marks as representing the club's purpose, he defined that purpose as "hav[ing] a good time."  *Id.*

**IV**
**ARGUMENT**

In order for MNMC to prevail on its petition, it must prove either that (1) it acquired the Marks as a bona fide purchaser for value from the unincorporated association without reason to believe that the Marks were subject to forfeiture; or (2) if it contends that it has superior ownership interest, that its right, title and interest in the Marks was never divested prior to the incorporation of MNMC ***and*** that it is a converted corporation within the meaning of California law, ***and*** the ownership of the Marks passed to MNMC by operation of law.  As noted above, MNMC is not willing to reveal what defense it intends to pursue, but for the reasons explained below, it cannot establish either.

**A.   MNMC Was Not a Bona Fide Purchaser for Value Without Notice of the Forfeitability of the Marks**

**1.   MNMC acquired its purported interest in the Marks after the acts giving rise to the forfeiture**

The following facts are undisputed: (1) on April 3, 2008, when Cavazos assigned the Marks to Shotgun Productions, he was the national President of the Mongols; (2) Shotgun Productions was Cavazos's personal corporation, over which he exercised total dominion and control, and his alter ego; (3) at the time the Indictment was filed on October 9, 2008, the Marks remained the property of Shotgun Productions; (4) MNMC was incorporated on December 17, 2008; and

(5) MNMC did not receive the purported assignment of the Marks from Mongols Nation until January 21, 2009.  Based on these facts, MNMC acquired its interest in the Marks, if any, well after the criminal activity that gave rise to the forfeiture. The proper standard is therefore whether MNMC was "a bona fide purchaser for value of the right, title or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under [§ 1963]."  18 U.S.C. § 1963(l)(6)(B); *Nava*, 404 F.3d at 1125; *United States v. Porchay*, 533 F.3d 704, 709 (8th Cir. 2008); *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001).  This affirmative defense includes three separate elements: (1) a justiciable legal interest in the Marks; (2) that petitioner was a bona fide purchaser of the Marks for value; and (3) that petitioner was without reason to believe that the Marks were subject to forfeiture at the time it acquired them.  *United States v. Timley*, 507 F.3d 1125, 1130-31 (8th Cir. 2007); *United States v. Lazarenko*, 2008 WL 3925656, at *11 (N.D. Cal,. 2008).

## 2.   MNMC was not a bona fide purchaser for value

While the "Trademark Assignment" purporting to transfer the Marks from the unincorporated association to MNMC includes a recitation that consideration was paid for the Marks, MNMC and Guevara (who signed the document) have admitted that no consideration was actually paid.  In order to satisfy the bona fide purchaser for value ("BFP") requirement, MNMC must prove that it actually gave consideration for the Marks.  This requirement exists for two reasons: first, the BFP provision provides a limited exception to the relation back doctrine found at § 1963(c), and the relation back doctrine was enacted to prevent frustration of forfeiture by transfers not supported by consideration, requiring any exception to the doctrine to be narrowly construed.  *See United States v. Kennedy*, 201 F.3d 1324, 1335 (11th Cir. 2000); *McHan*, 345 F.3d at 279 (wife who acquired property from husband-defendant in less than arm's-length transaction not a bona fide purchaser); *See also*, Cassella, *Asset Forfeiture Law in the United States*, §23-16,

at 714 (JurisNet 2007) ("Donees and family members who receive property from the defendant by inheritance [*i.e.*, by operation of law] or as a gift are not bona fide purchasers for value because they give nothing of value in exchange for the property.").

Secondly, the BFP provision finds its roots in commercial law, and therefore only protects third parties who provided consideration for the forfeited property. *United States v. Harris*, 246 F.3d 566, 575 (6th Cir. 2001); *United States v. Lavin*, 942 F.2d 177, 185-86 (3d Cir. 1991); *United States v. McCorkle*, 143 F.Supp.2d 1311, 1325 (M.D. Fla. 2001). While MNMC's petition includes two boilerplate statements that it was a BFP (at pages 2 and 7, simply tracking the language of the statute in both instances), it has produced no evidence that actual consideration was paid, and both Guevara and MNMC acknowledged in their depositions that no consideration was paid. The BFP requirement is satisfied only by a showing that the claimed interest was acquired through an arms' length transaction in which the party acquiring the interest gave something of value. *Lazarenko,* 2008 WL 3925656 at *11;  *United States v. Brooks*, 112 F. Supp. 2d 1035, 1041 (D. Haw. 2000).

MNMC's legal inability to establish that it was a BFP for value makes it legally impossible for it to prevail on its petition, since proof of BFP status is a necessary element of its affirmative defense.

> 3.    MNMC had reason to believe that the Marks were subject to forfeiture when it accepted the assignment

Even if MNMC had paid consideration for the Marks, it would be unable to prove that it had no reason to believe that the Marks were subject to forfeiture when it acquired its purported interest in them. *See United States v. 392 Lexington Parkway South*, 386 F.Supp.2d 1062, 1068, 1070-71 (D. Minn. 2005) ("without reason to know" is a separate element from bona fide purchaser element). To prevail on this element, MNMC must show that it did not know the forfeiture of

the Marks was being sought.  *United States v. Saccoccia*, 354 F.3d 9, 13 (1st Cir. 2003).

On this point, MNMC's and Guevara's own factual and judicial admissions make it impossible for MNMC to meet its burden.  Not only had both Marks been identified as property subject to forfeiture in the indictment (verbal mark) and the subsequent November 5, 2008 Bill of Particulars (symbolic mark), but the assignment of the verbal mark had been restrained by the October 2008 restraining order specifically *because* it was being sought for forfeiture.  Guevara, the national President of the association following the arrests of the defendants, and the first CEO of MNMC, admitted during his deposition he knew of the restraining order and assigned the Marks to MNMC anyway.  That knowledge makes it impossible as a matter of law for MNMC to establish the requisite lack of knowledge.  *See United States v. Guerra*, 216 Fed. App'x 906, 910 (11th Cir. 2007) (spouse of defendant who attended hearings in which the government requested a restraining order against property cannot prevail where interest was acquired thereafter); *United States v. 198 Training Field Road*, 2004 WL 1305875, at *3 (D. Mass. 2004) (claimant could not prove the "without reason to know" element where (1) she knew of illegal use of property before acquiring interest, and (2) the inclusion of the property in a publicly-filed indictment gave her constructive notice); *United States v. Ox*, 575 F.3d 352 (4th Cir. 2009); *United States v. Frykholm*, 362 F.3d 413, 416 (7th Cir. 2004).

**B.     The January 2009 Assignment Was Invalid Because the Marks Still Belonged to Shotgun Productions**

1.     The Marks were not the association's to give because Shotgun Productions was never divested of title

Regardless of which defense MNMC may opt to pursue here, its defense depends upon neutralizing the April 2008 assignment of the Marks to Shotgun Productions, but the evidence makes it impossible for it to do so.  Cavazos has testified that as national President of the Mongols, he had the actual authority to

take whatever action he deemed appropriate, and there were literally no limitations on that authority.  MNMC has produced no evidence suggesting that there were any such limitations.  To the contrary, the testimony of Martin Guevara, who was the national President of the Mongols between October 2008 and July 2009, was that he had precisely the same type of authority when he was national President of the organization.

By the time he joined the Mother chapter at Gonzalez's invitation in the summer of 2008, Guevara had been a member of the Mongols OMG for more than 10 years.  He had been a chapter officer for most, if not all of that time.  Welk Decl., exhibit W (Guevara Ind. depo), at 14, 53.  He was the national vice-President from the time he joined the Mother chapter until he became national President in October 2008 (*id.* at 58, 59), and he remained the national President until July of 2009 (*id.* at 63).  He appears to have had a very good understanding of the powers of the national President, and his description of those powers is consistent with the description given by Cavazos.  He was free to incur obligations or take any other actions on behalf of the gang at his sole discretion, including hiring lawyers to represent the Mongols, without consulting anyone (*id.* at 68-70, 77).

However, Guevara went further than Cavazos ever did, authorizing the creation of MNMC, a separate legal entity, and he testified that he made that decision without asking the other national officers or the general membership.  *Id.* at 102, 109.  Most significantly, however, it was Guevara, in his capacity as national President and without consultation with any other Mongols officers or members, who corroborated Cavazos's testimony when he admitted that he had purported to assign the Marks in January 2009 to MNMC.  In other words, Guevara believed that his position as national President -- *standing alone* --  gave him the actual authority to make the assignment of what he thought was property of the Mongols.

Q: Going back to exhibit [V], the trademark assignment, did you discuss this with any of the national officers before you signed it?

A: No.

Q: You just told them after you had done it?

A: I don't think they really cared, you know? It wasn't - as long as I was getting the job done or heading in the right direction to get our patches back and our property back, that was okay.

Q: So in your view this was within the scope of your authority as national president?

A: Yes.

Guevara Ind. Depo at 105. This is exactly what Cavazos has testified he was allowed to do when he assigned the Marks to Shotgun Productions. Like Cavazos, Guevara was permitted to decide what he wanted to do with respect to the Marks, including assigning them, and then take action without obtaining explicit authorization. *Id.* at 102. It would be drawing too fine a line to say that there was a meaningful difference between Cavazos's assignment to Shotgun Productions and Guevara's assignment to the newly-formed MNMC. Each of them assigned the Marks to a separate corporate entity over which he exercised control. Of the two, only Cavazos actually obtained the consent of the Mother chapter before making the assignment.

But that does not end the analysis. While Guevara believed that he had the authority to assign the Marks, his attempt to do so in January 2009 nevertheless failed. First, the Marks were not his to assign because they did not belong to the unincorporated association, but to Shotgun Productions. Second, there was a restraining order in place that specifically barred transfer or assignment of the verbal mark.

While Gonzalez claimed in his October submission to the USPTO (Welk Decl., exhibit G) that Cavazos had lacked the authority to make the April 2008 assignment to Shotgun Productions, his mere statement in that regard did not make it so. At best, the April 2008 transfer was voidable under California law, but it

was not, as suggested by Gonzalez's submission, necessarily void, especially in light of the fact that Gonzalez also appears to have assumed that *he* was entitled to effect a transfer of the Marks on his own authority as national President.[31]   At the hearing on this matter, the government will submit compelling evidence that Gonzalez had particular knowledge of the status of the ownership of the Marks, and that he did not believe the statements in the October 2008 papers submitted to the USPTO to be true.  Rather, he understood that Cavazos still had ownership of the Marks through Shotgun Productions.  At no time did either Gonzalez, Guevara, or their successor take the legal steps that would have been necessary to void the April 2008 assignment.

### 2.   MNMC's unclean hands

Following the arrests of the defendants in October 2008, Martin Guevara became the national President of the Mongols. Welk Decl., exhibit W (Guevara Ind. Depo) at 59.  In that capacity, he visited some lawyers to find out whether the Mongols could obtain relief from the October 2008 restraining order (*id.* at 66-67).[32]   He was aware of the restraining order within days of the arrests (*id.* at 78-79) and understood that it allowed law enforcement to seize items bearing the word "Mongols."  *Id.* at 80.  Guevara invoked his Fifth Amendment rights when asked if he read and understood the portion of the restraining order that prohibited assignment of the verbal mark.  *Id.* at 81-82.

---

[31]   "A voidable act takes its full and proper legal effect unless and until it is disputed and set aside by some tribunal, entitled to do so.  Voidable means subject to be avoided by judicial action of a court of adequate jurisdiction.  And a voidable contract is one which is void as to the wrongdoer but not void as to the wronged party unless he elects to so treat it.  A voidable contract is one which may be rendered null at the option of one of the parties, but is not void until so rendered."  *White Dragon Productions, Inc. v. Performance Guarantees, Inc.*, 196 Cal.App.3d 163, 172 (1987) (internal quotes and citations omitted).

[32]   A true and correct copy of the October 2008 restraining order is attached to the Welk Decl. as exhibit H.

That invocation was presumably triggered by Guevara's unwillingness to acknowledge that in January 2009, he, as national President of the Mongols, purported to assign the verbal mark to the recently-formed MNMC, in patent violation of the restraining order.  Welk Decl., exhibit C (Abstract of Title for verbal mark).[33]  MNMC thereafter took the position in filings in this case that it was the sole owner of the Marks.  *See, e.g.,* Docket No. 2083, at 9 (MNMC "is the sole owner of the [Marks] and is the record title holder of the [Marks'] Registration.").

Guevara and MNMC's knowing violation of the October 2008 restraining order is not in dispute; MNMC acknowledged it in its initial filing in this case, and Guevara admitted it his declaration.  *See* Docket No. 2083 at 14 n.8; Welk Decl., exhibit J.  Petitioner and Guevara attempted to minimize their conduct by stating that the assignment was "technically a violation of the Court's Order, [but] was not intended as such," but that did not justify the violation.  Nor did their assertion in the same filing that "no violation of the purpose underlying that Order [had] occurred."  MNMC's argument is essentially that it was justified in violating the restraining order because it believed that it needed to do so in order to have the right to defend against the forfeiture of the Marks.  But the plain purpose of the restraining order was to prevent the Mongols from transferring the Marks to a third party in an attempt to frustrate the government's efforts to perfect the forfeiture of the verbal mark.  MNMC's intent in accepting the assignment, and Guevara's intent in giving it, was to do *precisely* that.  When Guevara was asked during his deposition about what he meant when he said that the January 2009 assignment did not violate the purpose of the restraining order, his lawyer stopped

---

[33]  The symbolic mark was also assigned that same date to MNMC (*id.*, exhibit F (Abstract of Title for symbolic mark)), but that assignment was not in violation of the restraining order because the order applied only to the verbal mark, despite the fact that both Marks were sought for forfeiture.

the deposition and took him outside the room to talk.  When he returned and was asked again, he responded "I can't think of an answer," and ultimately proved incapable of responding to the question beyond saying that he was following the advice of his lawyer.  Guevara Ind. Depo at 156-159.

### C.    MNMC Cannot Establish a Superior Right, Title or Interest in the Marks

In federal criminal forfeiture proceedings, ownership of property subject to forfeiture is determined according to state law.  Whether that interest is subject to forfeiture is determined according to federal law  *Nava*, 404 F.3d at 1129. Petitioner's argument that it has superior title to the Marks rests upon its claim that it is the same entity as the unincorporated association that registered the Marks, and that it enjoyed uninterrupted title from 1969 until the present.  It has claimed specifically that it "converted" from an unincorporated association to its current corporate form pursuant to the California *Corporations Code* in December 2008. This claim finds no support in the evidence.

### 1.    MNMC is not a converted association under California law

In an earlier filing (DN 4005) at 19-20, MNMC claimed that it has been the same legal entity since 1969 because it was converted from an unincorporated association to a corporation under California *Corporations Code* § 1158(a), and that it therefore enjoyed uninterrupted ownership of the Marks since its formation in 1969.  This argument fails primarily because it does not account for the April 2008 assignment to Shotgun Productions at all -- it simply ignores it as if it did not occur.  Given the testimony of Guevara concerning the scope of the national President's authority, and the evidence to be offered at the hearing concerning Gonzalez's acknowledgment of the legal validity of the April 2008 transfer, MNMC cannot simply disregard the undisputed evidence of that assignment.

Nor does MNMC's conversion argument find any support in California law. "Conversion" is a term of art under the section relied upon by petitioner, which

provides that "an entity that converts into another entity pursuant to this chapter is . . . the same entity that existed before the conversion." However, the statute includes specific requirements for conversion, and the undisputed evidence here demonstrates that there was not even an attempt to meet those requirements.

The conversion of non-corporate entities (such as unincorporated associations) is governed by *Corporations Code* § 1157, and is subject to the following requirements: (1) the converting entity (*i.e.*, the unincorporated association) must "approve a plan of conversion" for approval (§ 1157(b)); (2) the converting entity must obtain approval from the required number of its members as established by applicable law (§ 1157(c)); and (3) the converting entity must file with the Secretary of State "the articles of incorporation of the converted corporation, *containing a statement of conversion that complies with subdivision (e)*." (Emphasis added).[34]   MNMC's Articles of Incorporation are part of the record in this case. *See* Welk Decl., exhibit I. There is no statement of conversion in the articles, nor any reference to either the unincorporated association or the conversion provisions of the *Corporations Code*. Petitioner's originating documents do not suggest that MNMC was a successor in interest to another entity of any kind, much less that it represented a converted entity within the meaning of § 1158(a).[35]

---

[34]   Subdivision (e) requires that the statement of conversion include "(1) the name, form and jurisdiction of organization of the converting entity; and (2) the Secretary of State's file number, if any, of the converting entity."

[35]   Further evidence that there was no conversion pursuant to § 1158 is MNMC's failure to comply with the formalities of such a conversion, including the requirement at § 1158(f) that "the converted entity shall cause notice of the conversion to be given by mail within 90 days after the effective date of the conversion to all known creditors and claimants . . . of the converting entity."

2.    <u>The filings with the USPTO and the "Trademark Assignment"</u>

Conclusive evidence that the unincorporated association and MNMC were completely separate legal entities (rather than one converted entity) is found in the attorney-prepared documents used to carry out the purported assignment of the Marks in January 2009, specifically the papers filed with the USPTO (as evidenced by exhibits C and F to the Welk Decl.) and the contract titled "Trademark Assignment" dated January 21, 2009.  *See* exhibit V to the Welk Decl. Like the articles, the Trademark Assignment contains no language suggesting that the unincorporated association and MNMC were the same entity.  There is nothing in that document to suggest or imply that either party believed that MNMC had assumed ownership of the Marks by operation of law.  To the contrary, the Assignment clearly purports to memorialize a formal assignment of the Marks from one legal entity to another.  The association and MNMC are unambiguously designated as separate parties -- the association is identified as the "Assignor" and Petitioner as the "Assignee" -- and there are references throughout the document to the "parties."  This language cannot be reconciled with Petitioner's argument that its interest in the Marks was automatically vested in the allegedly converted corporation.  The same is true of the papers submitted to the USPTO, which identify Mongol Nation as an "an unincorporated association" at the time of the transfer, and MNMC as a separate corporation.  *See* Welk Decl., exhibits C and F (trademark abstracts).

**D.    Equitable Considerations Compel Denial of MNMC's Petition**

MNMC has made much of the fact that Mongols members first started using the Marks in or about 1969 to identify themselves as members of the gang.  It has described itself in innocuous terms, seeking to make itself appear to be some kind of misunderstood social club.  The truth is that more than 70 of the defendants in this case entered guilty pleas to Count One of the Indictment.  That count describes hundreds of acts of deliberate cruelty and terror. In truth, the Mongols

are a decades-old organization dedicated to lawlessness and mayhem.  Their symbols, particularly the Marks, are earned through the victimization of others. The Marks represent exactly the type of property interests that Congress intended to target in enacting the RICO forfeiture provisions.

In 2003, Cavazos, acting within the scope of his authority as national President of the Mongols, took affirmative steps to obtain additional legal rights and protections which would allow the gang to use legal process to protect its rights in the Marks.  The registrations provided a means by which the Mongols could ensure that others would not be permitted to possess, use or display the Marks without the gang's permission.  The government did not require or encourage the registration of the Marks.  The decision to register was made by Cavazos and his fellow governing members of the gang.

In early 2008, Cavazos, again exercising the authority granted to him by the Mongols, determined that it would be beneficial to assign the ownership of the Marks to Shotgun Productions, a corporation that he created, owned and controlled, enhancing the unfettered control he already enjoyed over the Marks, their use and distribution, and giving him all of the rights of ownership.  No one objected to the assignment or even asked any questions of Cavazos.  The gang leadership was advised of and consented to the assignment of the Marks to Cavazos's corporation, and the purpose of the assignment was to give Cavazos personal control of the Marks.

When the Indictment was unsealed in October 2008, the Court issued an order intended to prevent the Mongols from taking steps to defeat the forfeiture pending the conclusion of the criminal case.  The Mongols, of their own volition, opted to disregard that order, created a new legal entity and assigned the Marks to that entity.  They did so for the purpose of defeating the forfeiture and with the expectation that the creation of MNMC would accomplish that purpose.  But that entity is a sham, and it has never functioned as a legitimate corporation.

The Supreme Court has held that in enacting the RICO forfeiture provision in § 1963, Congress selected general terms in describing property subject to forfeiture because those terms were fully consistent with the pattern of the RICO statute, which used terms and concepts of great breadth so as to serve the legislative purpose to "punish, deter, incapacitate, and . . . directly remove the corrupting influence from the channels of commerce." *Russello v. United States*, 464 U.S. 16, 21, 28 (1983) ( quoting 116 Cong. Rec. 18955 (remarks of Sen. McClellan)).  "The RICO statute is replete with words and phrases of extraordinary breadth further evidencing congressional intent to enact a statute of exceedingly broad scope." *United States v. Ginsberg*, 773 F.2d 798, 802 (7th Cir. 1985). *See also, United States v. BCCI Holdings (Luxembourg), S.A.*, 795 F.Supp. 477, 480 (D.D.C. 1992) ("In light of the deliberately broad language of § 1963 and the ambitious purpose of RICO, interpretation of the term 'interest' to include the assets of a racketeering corporation's alter ego is warranted.").

Cavazos enjoyed unlimited control over the use and display of the Marks for most or all of the period of time described in the Indictment.  During that entire time, the marks were used to promote the RICO enterprise and facilitate the accomplishment of its purposes and goals.  It was only when they realized that they might lose the Marks that the Mongols opted to incorporate and transfer the Marks.  They decided to try to assign the Marks in January 2009, betting that their efforts would frustrate the government's attempts at forfeiture.  That they bet wrong in their attempts to manipulate the system is not a defense to criminal forfeiture.

/ / /

/ / /

/ / /

/ / /

/ / /

# V
## CONCLUSION

For all of the reasons set out above, MNMC's petition to amend the POF-TM should be denied.  The government is entitled to a Final Order of Forfeiture awarding it all right, title and interest in the Marks.  A proposed Final Order of Forfeiture re Trademarks is lodged contemporaneously herewith.


DATED: June 14, 2011

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

_____/S/ Steven R. Welk_____
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section