ORIGINAL

# STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

UNITED STATES OF AMERICA,     )
         )
     Plaintiff,    )
         )
   vs.      )  Case No. CR08-1201-ODW
         )
RUBEN CAVAZOS, aka "Doc," et  )
al.         )
         )
     Defendants.   )
         )

## DEPOSITION OF MARTIN GUEVARA
### Los Angeles, California
### Thursday, April 7, 2011



THE HUNTINGTON BUILDING, SUITE 100
1450 WEST COLORADO BLVD.
PASADENA, CA 91105
GSA APPROVED VENDOR-GS-07F-0169V
626/792-6777
FAX 626/792-8760
E-Mail : reports@huntingtocr.com
Website: http://www.huntingtoncr.com

REPORTED BY:
BARBARA NILES
CSR NO.: 13542

MARTIN GUEVARA APRIL 7, 2011

STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
           Plaintiff,                )
                                     )
      vs.                            )   Case No. CR08-1201-ODW
                                     )
RUBEN CAVAZOS, aka "Doc," et         )
al.,                                 )
                                     )
           Defendants.               )
_____ )

DEPOSITION OF MARTIN GUEVARA, taken on behalf of

the Plaintiff, at 312 North Spring Street, Room 1302, Los

Angeles, California, commencing at 3:10 p.m., on Thursday,

April 7, 2011, reported by BARBARA NILES, CSR No. 13542, a

Certified Shorthand Reporter for the State of California,

pursuant to Notice.

MARTIN GUEVARA APRIL 7, 2011

1    APPEARANCES:

2    For Plaintiff:

3    UNITED STATES ATTORNEY'S OFFICE - CRIMINAL DIVISION
     BY:  STEVEN WELK, Assistant U.S. Attorney
4    Chief Asset Forfeiture Section
     1400 United States Courthouse
5    312 North Spring Street
     Los Angeles, California  90012
6    (213) 894-6166/5710

7
     For Defendants:

8
     LAW OFFICES OF GEORGE L. STEELE
9    BY:  GEORGE L. STEELE
     Attorneys at Law
10   127 North Madison Ave., Suite 24
     Pasadena, California  91101
11   (626) 405-4910
     (626) 405-4860

12
     Also present:  ATF Special Agent John Ciccone
13                  Rachel Rossi

14

15

16

17

18

19

20

21

22

23

24

25

MARTIN GUEVARA APRIL 7, 2011

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MARTIN GUEVARA | By Mr. Welk | 4 |

1
2
3
4
5
6
7
8
9

E X H I B I T S

(None)

10
11
12
13
14
15

INFORMATION REQUESTED

(None)

16
17
18
19
20
21
22
23
24
25

MARTIN GUEVARA APRIL 7, 2011

Los Angeles, California, Thursday, April 7, 2011

3:10 p.m.

MARTIN GUEVARA,

called as a witness on behalf of the Plaintiff, having been administered an oath in accordance with C.C.P. Section 2094, was examined and testified as follows:

EXAMINATION

BY MR. WELK:

Q    Good afternoon, Mr. Guevara.

A    Good afternoon.

Q    I'm still Steve Welk, Assistant U.S. Attorney. This is a separate deposition from the one we conducted this morning.  And even though you are still going to be testifying, you're here to testify on behalf of the petitioner in this case, which is Mongols Nation Motorcycle Club.

A    Okay.

Q    Do you understand that?

A    Yes.

Q    Now, at the beginning of the last deposition, I went through a long list of rules and protocols that apply to the taking of a deposition.

Do you remember when I went through all those?

MARTIN GUEVARA APRIL 7, 2011

1    A    Yes.

     Q    Would you like me to go through those again?
2
     A    No.
3
     Q    Okay.  Now, the primary difference between your
4
deposition this morning and your deposition this afternoon
5
is that the deposition you gave earlier, you were testifying
6
about information that was known to you or experiences that
7
you had as an individual, things that you knew because you
8
did them, you said them, or you experienced them yourself.
9
          The purpose of this deposition is to take the
10
deposition of the corporation known as Mongols Nation
11
Motorcycle Club, Inc.  But since that corporation doesn't
12
have a -- we can't sit that corporation down and ask them
13
questions, the corporation has designated you as the person
14
who has the most knowledge to answer the questions that are
15
going to be addressed today.
16
          The questions that I am going to address to you
17
today have to do with the incorporation of MNMC and the
18
activities of that company since it was incorporated.  So
19
that's the subject matter of this deposition.
20
          I will make a very strenuous effort not to repeat
21
too much of what we did earlier, but there is going to be
22
some repetition because there are some questions that I
23
didn't ask you earlier because they're more properly
24
addressed to the corporation.
25

1   Are you on any medication, or have you consumed

2   anything that would affect your ability to testify fully and

3   truthfully this afternoon?

4        A    No.

5        Q    Is there any reason why we cannot go forward with

6   this deposition?

7        A    No.

8        Q    All right.  Do you currently, as of today, have

9   any position with MNMC?

10       A    I'm -- I'm a retired member.

11       Q    Are you currently an officer of MNMC?

12       A    No.

13       Q    Are you currently a director of the corporation?

14       A    No.

15       Q    I'm going to refer to it as the corporation, if

16   that's okay?

17       A    That's fine.

18       Q    Are you an employee of the corporation?

19       A    No.

20       Q    Have you ever been an employee of the corporation?

21       A    Meaning, I receive a salary?

22       Q    Yes.

23       A    No.

24       Q    Okay.  Did you ever receive any money for any

25   reason from the corporation?

MARTIN GUEVARA APRIL 7, 2011

1    A    Other than dues?  No.

2    Q    Well, hang on.  Did you receive dues from the

3  corporation?

4    A    No.  The -- my chapter did.

5    Q    All right.  Who's the current president of the

6  corporation?

7    A    I'll take the Fifth.

8    Q    Okay.  Now, you understand that you're testifying

9  not on behalf of yourself but on behalf of the corporation.

10  The corporation does have a Fifth Amendment privilege, I

11  suppose.

12    MR. WELK:  But are you going to instruct him --

13    MR. STEELE:  Yeah, yeah because he's still got the

14  concern of whatever comes out of his mouth, if it's, you

15  know, incriminates him, he's still going to be facing them.

16  So it's of no -- with respect to the Fifth Amendment, I

17  don't see -- unless you're going to stipulate that you're

18  not going to use any of this for any other purpose, which I

19  don't think you'll do.

20  BY MR. WELK:

21    Q    Is there someone who knows who the president of

22  the corporation is?

23    MR. WELK:  Isn't this a public filing?  This is public

24  record.

25    MR. STEELE:  This might be public record.  I'm going to

MARTIN GUEVARA APRIL 7, 2011

1    stipulate that the president of the Mongols is Dave

2    Santillion.

3      MR. WELK:  Okay.

4      MR. STEELE:  Yeah, we can stipulate to that.

5      MR. WELK:  I'll take that.

6      MR. STEELE:  Yeah.

7       You're fine.  Don't worry.

8   BY MR. WELK:

9      Q   Who are the current directors of the corporation?

10     A   I don't know.

11     MR. WELK:  Are you willing to stipulate as to who the

12   directors of the corporation are?

13     MR. STEELE:  No, I don't know who they are.  I do know

14   it's a nonprofit, though.  So a lot of what you're running

15   towards, I think, may not be applicable here.

16     MR. WELK:  You don't think a nonprofit has to have

17   directors?

18     MR. STEELE:  I'm not going to put my knowledge of

19   corporate law on the line here, but I do know that I don't

20   know who they are.

21   BY MR. WELK:

22     Q   Do you think there's someone in the world who

23   knows whether the corporation has any directors?

24     A   I -- sure.  Yes.

25     Q   Who do you think that person might be?

MARTIN GUEVARA APRIL 7, 2011

1  A    I believe it's public record, if there is one.

2  Q    Do you think there's anyone involved in the

3  corporation who knows if it has directors or not?

4  A    Other than its officers, I would assume.

5  Q    Okay.  And who are the other officers besides

6  Mr. Santillion?

7  A    I do not know.

8  Q    Do you know if there are other officers of the

9  corporation currently?

10  A    Yes.  There should be.

11  Q    Do you know whether there are?

12  A    Yes, I believe so.

13  Q    Why do you believe so?

14  A    I believe there's got to be somebody to take care

15  of the dues, the paperwork -- that would require one office

16  position -- and handling applications and such.  And that's

17  another -- that's another position.

18  Q    Is there currently a secretary of the corporation?

19  A    I would assume so.

20  Q    You don't know?

21  A    I don't know.

22  Q    Is there currently a treasurer of the corporation?

23  A    I believe there should be.

24  Q    Do you know?

25  A    I don't know for sure who it is.

MARTIN GUEVARA APRIL 7, 2011

Q    Do you know if the corporation has any employees?

A    I do not know.

MR. WELK:  I'm sorry.  I cannot comprehend how a person most knowledgable to give a corporate deposition doesn't know if the corporation even has officers.

MR. STEELE:  Because the issues that were supposed to be addressed are those relating to the trademark.  You're asking him about things that are far, far field from that.

MR. WELK:  What is your defense?  What is MNMC's defense in this matter?

MR. STEELE:  I'm not telling you.

MR. WELK:  Well, I thought it was that you -- that it was an innocent owner.  You're not going --

MR. STEELE:  I'm not telling you.

MR. WELK:  What?

MR. STEELE:  I'm not telling you.  I mean, what do you want to know?  What do you want to talk about?

MR. WELK:  Are you serious?

MR. STEELE:  Yeah.  Right now.  I'm not going to tell you.  What?  Is there some rule that says I got to do that? I don't have to do that.

But -- I mean, the point of this thing is, is that -- and I'm reading through your petition, your ex parte right now as we speak.  And this was not part of what the deposition was granted to address.  I mean --

MARTIN GUEVARA APRIL 7, 2011

MR. WELK:  This is through the looking glass, man.
Really ridiculous.

MR. STEELE:  Look --

MR. WELK:  When --

MR. STEELE:  Can we go off the record?

MR. WELK:  No -- sure.  Let's go off the record.

(A recess was taken from 3:19 p.m. to 3:27 p.m.)

BY MR. WELK:

Q    At the time that the corporation was incorporated,
you were the president; correct?

A    Yes.

Q    And you remained the corporation president until
approximately July of 2009?

A    Yes.

Q    Is it true that you were still authorized to speak
on behalf of the corporation as late as August of 2009?

A    August of 2009, no.

Q    You were not authorized to speak on behalf of the
corporation in August of 2009?

A    Right.

Q    That's correct?

A    Correct.

Q    I'm going to refer you back to a document that was
attached as an exhibit to your individual deposition,
Exhibit 4A.  I'm going to ask you first to look at Paragraph

MARTIN GUEVARA APRIL 7, 2011

No. 1 on the second page.  Can you read that paragraph for

me to yourself?

A    Okay.

Q    Does that say that you -- I'm sorry.

Does that say that Martin Guevara, as an

individual, is authorized by the club to provide the

declaration on its behalf?

A    I've been authorized, yes.

Q    Does that mean that you're authorized to speak on

behalf of the club?

A    According to this document, yes.

Q    What's the signature date on the last page of that

declaration?

A    8/17.

Q    That would be August 17th, 2009?

A    Yes.

Q    So were you authorized to speak on behalf of the

corporation after you ceased being president of the

corporation?

A    I guess so.  Yes.

Q    At what point did you stop -- did you lose that

authorization to speak on behalf of the corporation?

A    I believe -- I thought it was in July, but this

is -- I'm sorry.  It was two weeks into -- yes.  I guess it

did go into August, not too long after this.

MARTIN GUEVARA APRIL 7, 2011

Q     Were you still president of the corporation when you signed this declaration?

A     I believe so.  That was -- we were transferring stuff over.  So it took about two weeks to transfer.

Q     So when did you stop being the club's president?

A     It must have been the last weekend of July, so two weeks after that.  Approximately about two weeks after that.

Q     You're authorized to speak on behalf of the corporation -- to speak for the corporation today; right?

A     Yes.

Q     When were you granted that authority?

A     About a week ago, two weeks ago.  Something like that.

Q     Who granted you that authority?

A     I got a call from an attorney.

Q     From an attorney?

A     Yes.

Q     Who was it that called you?

A     George Steele.

Q     So your authority to testify for the corporation was granted to you by Mr. Steele?

A     Correct.

Q     You didn't talk to anybody involved with the corporation about that?

A     Correct.

MARTIN GUEVARA APRIL 7, 2011

Q     When the company was first incorporated, were you a director?

A     I was the president.

Q     Were you a director?

A     I don't know what that means.

Q     To your knowledge, were you ever a director of the corporation?

A     No.  I don't know what that means.

Q     You testified this morning about the election of someone as president when you left office.

      At that time was there also a vice president elected?

A     No.

Q     It was just the president that was elected?

A     Yes.

Q     And that was in June of 2009?

A     July.

Q     July of 2009.  In December of 2008 when the corporation was first incorporated, who was the vice president at that time?

A     I'll take the Fifth.

Q     When the company was incorporated in December of 2008, who was the secretary?

A     Jason McDonugh.

Q     Who was the treasurer?

MARTIN GUEVARA APRIL 7, 2011

A    Same.

Q    McDonugh?

A    Yes, I believe so.

Q    Do you think it might have been somebody else?

A    No, I don't think so.

Q    Was McDonough still the secretary and the treasurer when you ceased being president in 2009?

A    I believe so.

Q    Do you know whether he's still the secretary or treasurer?

A    I do not think he is.

Q    Why don't you think he is?

A    I believe he's no longer a member.

Q    What makes you think that?

A    I heard it around.

Q    From who?

A    Members.

Q    Who in particular?

A    I'll take the Fifth.

Q    Taking the Fifth on behalf of the corporation?

A    Yes.

Q    I'm asking you this question as a representative of the corporation:  Are there currently any directors of the corporation?

A    I do not know.

MARTIN GUEVARA APRIL 7, 2011

Q    Have there ever been any directors of the corporation?

A    Not while I was there.

Q    When the company was incorporated in December 2008, who was the chief financial officer?

A    I believe it was me.  I don't know.  I'd have to look at the paper.

Q    What paper would you need to look at?

A    The -- the -- yeah.  I think it's on the paper, CSO, on the State something.

Q    The incorporation documents?

A    Possibly.  That one.  Is that it?

MR. STEELE:  It's right there.

THE WITNESS:  Jason McDonugh.

BY MR. WELK:

Q    Do you know how long he remained the chief financial officer of the corporation?

A    No, I don't.

Q    I'm asking you that question on behalf of the corporation.  Do you know how long Jason McDonugh remained the chief financial officer?

A    No, I don't.

Q    Was the corporation an "S" corporation?

A    I don't know what that means.

Q    Was it a "C" corporation?

MARTIN GUEVARA APRIL 7, 2011

A    I'm not exactly sure what that means.

Q    Was it an "LLC"?

A    I don't know what that means.

Q    Was it a nonprofit mutual benefit corporation?

A    I believe it was a nonprofit.

Q    Why do you think that?

A    That's what we were trying to achieve, was nonprofit status.

Q    Why were you trying to achieve that?

A    Because we -- I believe we are not -- nonprofit.

Q    What type of business does the corporation conduct?

A    Other than collecting dues from its members and getting attorneys or --

MR. STEELE:  No.  I think it means:  What's the point of the organization.

THE WITNESS:  Oh, for social networking.  We -- we have Clean and Sober.

BY MR. WELK:

Q    What does that mean, you have Clean and Sober?

A    Clean and Sober Chapter.  It helps members that have a dependency.

Q    How does that work?

A    If a member comes to us or we've seen that a member has -- has -- is just going downhill because of drugs

MARTIN GUEVARA APRIL 7, 2011

alcohol, we try to -- as one of our steps, we try to get them in a -- in the Clean and Sober Chapter.

Q    Do they leave their current chapter if they go into the Clean and Sober Chapter?

A    Yes.

Q    How many members are in the Clean and Sober chapter right now?

A    I don't know.

Q    When was the Clean and Sober Chapter commenced?

A    I -- I -- I don't know.

Q    Did it happen when you were president?

A    Before that.

Q    It was initiated before you were president?

A    Yes.

Q    Was it initiated before the incorporation?

A    Yes.  Before the incorporation?  Yes.

Q    Uh-huh.  So it existed before December 2008?

A    Yes.

Q    So that wasn't something that the corporation did on its own?

A    No.

Q    Is there anything --

MR. STEELE:  Objection.  That's vague.  I object to move to strike.

MR. WELK:  Since you move to strike, I'm inquiring

MARTIN GUEVARA APRIL 7, 2011

about the basis for your motion.

MR. STEELE:  It's not responsive to the question.

BY MR. WELK:

Q    Did the Clean and Sober Chapter exist as part of the Mongols organization prior to December 2008?

A    I believe so.

Q    Okay.  So it wasn't initiated as part of the incorporation; right?

MR. STEELE:  Objection.  Now that misstates the evidence because you're trying to separate the two things when, in fact, it's a successor.  All the activities of the corporation succeeded from that of the previous form of the organization.

MR. WELK:  Okay.  But that wasn't my question.  My question is --

MR. STEELE:  Well, you're misstating the evidence --

MR. WELK:  No.

MR. STEELE:  -- is what you're doing.  That's why I'm objecting.

MR. WELK:  No, I'm not.  No, I'm really not.  I just asked a simple -- it's a timeline question.  At some point the Clean and Sober Chapter came into existence.  It either happened before the incorporation or after.  That's the only question.

MR. STEELE:  Continue.

MARTIN GUEVARA APRIL 7, 2011

MR. WELK:  Okay.

BY MR. WELK:

Q    Is that accurate, that it was initiated before the incorporation?

A    Yes.

Q    Okay.  So the fact that it continued -- it wasn't a result -- it wasn't started as a result of the incorporation.  It was already in place; right?

A    Yes.

Q    Just like you guys were -- had a whole bunch of other chapters that stayed in place after you incorporated?

A    Correct.

Q    In fact, is it fair to say that really in terms of the operation of the organization, nothing really changed from when you incorporated?

Isn't that true?

MR. STEELE:  Objection.  That's argumentative.  Misstates the prior testimony.

BY MR. WELK:

Q    Is that true?

A    I believe so.

Q    I mean, if anything was different, it seems like what you've testified to, what you testified to as an individual and what you seem to be saying now, is the organization was running a certain way.

MARTIN GUEVARA APRIL 7, 2011

And let's just say after the arrests took place in November of 2008, the organization was running a certain way. And then in December it incorporated. As far as the operation of the organization, it just continued the same after the incorporation; right?

A    Well, I mean, the way we collected money was different, and we handed out receipts for any money collected.

Q    Okay.

A    And I believe the money was deposited to banks which had never been done before.

Q    Okay. So other than that, were there any other changes about the way the organization operated?

A    Nothing I can think of.

Q    Were the dues schedules -- did they stay the same? Did people still pay the same amount of dues?

A    Pretty much.

Q    What changed about the way you collected money?

A    It was now logged, and receipts were handed out for any money that was exchanged between hands. I don't believe it was doing it before. I actually never had to pay -- I -- I mean, I never went to go pay the bill. So I don't know how they did it prior to me being president.

Q    Okay. Now, there's the collection of dues. That's from the members; right?

MARTIN GUEVARA APRIL 7, 2011

A    Yes.

Q    When you collected dues, when that was part of your responsibilities, did you keep a record of what you collected?

A    When I was the treasurer in Pico?

Q    Yeah.

A    I kept the -- a notebook, yes.

Q    Okay.  So that was something that you were doing. Do you know if that was common practice amongst the chapters, to keep records of that?

A    We were told to.  So --

Q    So everyone was supposed to keep track of what dues were being paid; right?

A    It should have been law.

Q    When you came in, in the summer of 2008 as an officer of the So Cal Chapter, did your responsibilities include keeping track of the money?

A    No.

Q    Do you know whether the So Cal Chapter was supposed to be keeping track of how much money was received by that chapter from all of the other chapters?

A    I believe so.

Q    Was that being done?

A    I think so, yes.

Q    Okay.  So records were already being kept of how

Washington Court Report

MARTIN GUEVARA APRIL 7, 2011

much money was being collected.  And how did that change in terms of the incorporation?  After the incorporation what was different about that?

A    Nothing.

Q    Okay.  And then you were talking about paying money.  Are you saying that the -- sometimes the organization had to pay money out to vendors or to people like that?

A    Yes, yes.

Q    And how were payments handled by the So Cal Chapter when you were the president of the organization?

A    I'm sorry.  Repeat the question.

Q    Well, you said that the dues would come in to the So Cal Chapter.  You were the president; right?  So you knew about those moneys coming in; right?

A    Right.

Q    They come in on a monthly basis?

A    Yes.

Q    And what happened to that money when it came in to you, to the So Cal Chapter every month?

A    It was just put away.  I mean, they -- it was held onto until we needed it.

Q    Was it all cash?

A    I believe so.

Q    And by "cash," I mean currency.  It was actual

MARTIN GUEVARA APRIL 7, 2011

bills?

    A    Right, right.  I didn't -- I didn't collect it.
So I wasn't -- I wasn't there to see how it was -- was
given.

    Q    But somebody collected it for the So Cal Chapter;
right?

    A    Yes.

    Q    And that was the gang, the -- I'm sorry -- the
club's money; right?

    A    It was the club's money.

    Q    Okay.  Now, where was all that money kept?

    A    I believe just in the cash box until we got a bank
account.

    Q    And where was the cash box?

    A    In the treasurer's possession.

    Q    At his house?

    A    I -- I assume so.

    Q    You didn't know?

    A    I didn't, no.

    Q    As president of the -- because you just weren't
worried about it or --

    A    I was not worried about it.

    Q    Okay.  And then what kind of payments would have
to be made by the organization?

    A    Well, we had -- let me see.  Whenever we had to

MARTIN GUEVARA APRIL 7, 2011

meeting spots, we had to rent out the hall or cater food.

    Q    Uh-huh.

    A    And pretty much just pay all vendors if we used -- their services.  And then in the meantime also for legal fees.  We had to save up.

    Q    This was during the summer before the takedown that I'm talking about; right?

    A    Oh, the summer -- no.  I'm sorry.  I lost -- I thought you were asking when I was pres.

    Q    Yeah.

    A    So --

    Q    Oh, that's right.  You weren't the --

    A    I was not the pres.

    Q    Okay.  All right.  So before you were president, when you were in the So Cal Chapter, but you weren't the president yet, you were the vice president; is that right?

    A    Yes.

    Q    At that time during the summer before the takedown happened, was the treasurer just holding onto all the cash that was collected every month?

    A    I believe so.

    Q    How were payments being made by the club when they had to be made to vendors during that time period?

    A    I believe it should have been cash.

MARTIN GUEVARA APRIL 7, 2011

Q    Because the organization didn't have a bank account?

A    Yes.

Q    Now, when you took over as president, did you -- of the organization before there was an incorporation -- did you do anything to try and open a bank account for the organization?

A    I didn't do anything until I talked to counsel.

Q    Okay.  So you didn't go to a bank and ask if you could open up a bank account?

A    No.

Q    And you continued on with that previous practice of just the treasurer would keep the money, and then the payments would be made in cash?

A    Yes.

Q    You kept track of that because you were the president at that point; right?

A    I kept track of what now?

Q    Money coming in and money going out.

A    I knew that we had money coming in.  I didn't -- I didn't check the receipts or I didn't check balances or anything like that, no.

Q    Did you have a general awareness, though, that money was being collected, coming in from the chapter, and that money was also going out to pay vendors?

A    Yes.

Q    And you were okay with that being done in cash?

A    Yes.

Q    Okay.  Now, the corporation came into existence in December of 2008; right?

A    Yes.

Q    Did you open a bank account at some point for the corporation?

A    At some point, I did.

Q    When was that?

A    I don't remember.  Early 2009, I guess.

Q    And where was that bank account opened?

A    Bank of America.

Q    What was the name on the bank account?

A    Mongols Motorcycle Club, Inc.  Whatever.

Q    It's the name of the corporation?

A    Yes.  I'm sorry.

Q    Where was the branch where it was opened?

A    I believe we were in San Fernando Valley.

Q    Was there just one account opened?

A    Yes.

Q    During your time as president, was there ever any other bank accounts opened for the corporation?

A    Not that I'm aware of.

Q    After the account was opened, were all of the dues

that were collected deposited into that account?

A    I believe so.

Q    Who made those deposits?

A    It would have been the treasurer.

Q    Which was who?

A    Jason McDonugh.

Q    And was that a checking account?

A    I believe it was, yes.

Q    Was it just a checking account, or was there a savings account attached to it?

A    I do not remember.

Q    And you don't know the current state of that bank account?

A    No, I did not.

Q    Were there checks issued or checks printed with respect to that account?

A    Yes.

Q    Who had signature authority for those checks?

A    Myself and Jason McDonugh.

Q    Did you ever sign any checks on that account?

A    I don't remember.

Q    Did you obtain a federal tax ID number?

A    I believe we did.

Q    Do you think there's any question about that?  You say you "believe" you did.

MARTIN GUEVARA APRIL 7, 2011

A   Yes, I -- I believe Sam Israel got it -- or _____ it for us.

Q   Sam Israel -- was he ever a member of the Mongols?

A   No.

Q   When was the first board meeting of the corporation?

A   I don't -- I wouldn't call it a "board meeting." _____ would call it a members' meeting, but I -- I couldn't tell you exactly when, what the date was.

Q   Because you don't know if there were any board of directors; right?

A   Correct.

Q   Did you ever attend any shareholder meetings?

A   No.

Q   To your knowledge, are there any shareholders of the corporation?

A   Not that I'm aware of.

Q   Did you ever pay any corporate expenses out of your personal bank account?

A   I don't recall.

Q   Is it possible that you did, and you just don't remember?

A   It's -- it -- would you consider gas corporate expenses?

Q   It's not up to me.

Huntington Court Reporters & Transcription, Inc. (626) 792-6777

29

1    A    See, I don't -- I couldn't --

2    Q    It's whether you consider it to be a corporate

3 expense.

4         Does the corporation have a retainer agreement

5 with Mr. Steele?

6    A    I don't know.

7    Q    Does the corporation have an accountant?

8    A    Currently, I don't know.

9    Q    Do you know whether the corporation ever had an

10 accountant?

11   A    We started to have one, I believe, and I don't

12 know -- I don't know what ever happened to them.

13   Q    What does that mean?  You "started to have one"?

14   A    I believe I recommended one at the end of my term.

15 I was -- I was still pres at the time.  And I sought a

16 business out in San Fernando Valley, as well.  I believe it

17 was San Fernando -- or Burbank.

18   Q    So while you were president, the corporation did

19 not have an accountant?

20   A    We were looking to get one.

21   Q    And you don't know if the corporation currently

22 has an accountant; correct?

23   A    I do not know.

24   Q    Did the corporation file a federal tax return for

25 Tax Year 2009, the year of its incorporation?

1     A   I don't know.

2     Q   Strike that question.

3         Did the corporation file a federal tax return for

4  Tax Year 2008, the year of its incorporation?

5     A   I don't think so.

6     Q   Did you ever sign a tax return for the

7  corporation?

8     A   No.

9     Q   Did the corporation file a federal tax return for

10  Tax Year 2009?

11     MR. STEELE:  If you know.

12     THE WITNESS:  I don't know.

13  BY MR. WELK:

14     Q   Did the corporation file a state tax return in

15  2008?

16     A   For 2008?

17     Q   Yes.

18     A   I don't know.

19     Q   Do you know if the corporation filed a state tax

20  return in 2009?

21     A   I don't know.

22     Q   Did you sign any state tax returns while you were

23  president of the corporation?

24     A   No.

25     Q   How many classes of stock does the corporation

have?

A    I don't know.

Q    Do you know whether the corporation has ever issued any stock?

A    I don't know.

Q    Who are the current shareholders of the corporation stock?

A    I don't know.

Q    How many shares of corporation stock have been issued?

A    I don't know.

Q    Do you know that any stock has been issued?

A    No, I don't know.

Q    Who are the original shareholders of the corporation?

A    I don't know.

Q    While you were president of the corporation, did the corporation maintain a corporate minutes book?

A    I believe we had a notebook that the treasurer wrote the minutes -- well, what we consider minutes.  I -- I don't know how official it is.

Q    What did this book contain?

A    It should have contained the chapters that were in attendance, what was discussed.

Q    Is that notebook still being maintained?

MARTIN GUEVARA APRIL 7, 2011

A    I don't know.

Q    Did the corporation issue corporate bylaws?

A    I don't know.

Q    Are there currently bylaws that apply to the activities of the corporation?

A    I don't know.

MR. STEELE:  I'm going to object to that as being vague.  Take a moment here.

(A discussion was held off the record.)

MR. STEELE:  Continue.

BY MR. WELK:

Q    I'm asking you this question as a representative -- well, all of these questions are as a representative of the corporation.

But in your capacity as the spokesperson for the corporation, what consideration was paid by the corporation for the assignment of the registered marks?

A    I don't understand the question.

Q    What did the corporation pay, if anything, for its acquisition for the assignment of the marks?

A    I don't know.

Q    Do you recall the corporation paying anything to anyone in connection with the assignment of the marks?

A    I don't know.  I don't remember.

Q    You don't remember that happening, do you?

MARTIN GUEVARA APRIL 7, 2011

A    No.

Q    Do you have any idea what the corporation's taxpayer ID number is?

A    No.

Q    Do you have a way of determining it?

A    No, not anymore.

Q    Is the corporation registered with the IRS as a Section 501C7 Nonprofit Organization?

A    I don't know.

Q    Do you know of anyone who might know the answer to that question?

A    No.

Q    Did the corporation file a California State tax exemption application?

A    I don't know.

Q    Did the corporation file any papers with the IRS for tax exempt status?

A    I don't know.

Q    Has the corporation ever filed those papers?

A    Not that I'm aware of.  I don't know.

Q    I'll refer you back to the articles of incorporation that we marked as Exhibit 7 in the previous deposition.  And I'll refer you specifically to Article 4.

You reviewed these articles before they were filed; correct?

A      Yes.

Q      And you authorized Mr. Israel to file them with the Secretary of State's office in your position as president of the organization?

A      Yes.

Q      It says, "The corporation shall have members."

What does that mean, that the "corporation shall have members"?

A      To me, it means the members of my club.

Q      All right.  Did you intend that those members would have any sort of voting rights with respect to the corporation?

A      They have rights within the club, and that's -- they could vote on -- if I was going to purchase a clubhouse, they would have the right to say yea or nay.

Q      And what gives them that right?

A      Probably because it's a lot of money.

Q      But --

A      It would -- it would be something -- they're members.  And our constitution states that the members have rights.

Q      And the constitution continued to apply after the corporation came into existence?

A      Yes.

Q      Are the corporations -- I'm sorry.  Is the

constitution incorporated into the bylaws?

A    I don't know.

Q    On the next page of that Article 5, is that your home address that's given there?

A    Yes.

Q    Were you ever told by anyone at the time when you were working, to have this corporation created -- were you ever told that the corporation would be a successor or a successor in interest to the previously existing Mongols organization?

A    I'm not exactly sure what "successor" means.

Q    So do you recall anyone ever using that term with you?

A    I don't remember.

Q    Do you recall anybody ever telling you that the new organization was going to be the same as the old organization in some way?

MR. STEELE:  Objection.  That's vague as what you mean by the "same."  Membership?  Activities?  What?

BY MR. WELK:

Q    Do you understand the question?

A    Yes.  The way I went into this was I would give counsel how we function, what we do.  And they advised me on what the -- to take this action.

Q    Okay.  So did they tell you, "If we incorporate,

here's the things that you're going to have to do that you're not doing right now"?

A    I don't remember.

Q    Did somebody tell you that if you incorporated, you were going to have to open up a bank account?

MR. STEELE:   Objection.   Calls for privileged information.

Don't answer.

BY MR. WELK:

Q    Did you ever talk to any other members of the Mongols about what requirements would result from the incorporation of the organization?

A    I told them we would be able to open up a bank account.

Q    Did you tell them that you could open a bank account or that you were required to open a bank account?

A    I don't remember the exact words.   I think I -- we would be able to.

Q    And was that based on something that someone had told you?

A    Yes.

MR. WELK:   You know, to the extent that -- let's go off the record for a second.

(A recess was taken from 4:02 p.m. to 4:06 p.m.)

BY MR. WELK:

MARTIN GUEVARA APRIL 7, 2011

Q   So do you remember anybody ever using the words "successor" or the term "successor in interest" in discussions about the incorporation of MNMC?

A   I do not remember.

Q   Okay.  Were you ever told by anyone that what was happening through the incorporation was merely a change in form of the organization that already existed?

A   I don't remember.

Q   Do you think somebody might have told you that?

A   They could have possibly worded it a different way, then I don't remember.

Q   Okay.  I'd like you to read the articles of incorporation with this thought in mind:  Can you tell me, reading that through, if you find the words "unincorporated association" anywhere in that two-page document?

A   Okay.  Now, what's your question?

Q   Do you see the words "unincorporated association" anywhere in that document?

A   No.

Q   Do you see in these papers that are before you a statement signed by you or anyone else saying that an unincorporated association has approved the incorporation described here?

A   I believe I don't see that either.

Q   Were you ever asked to sign a statement as the

president of the corporation or as the president of the organization saying that you approved of the incorporation?

A    I don't know.

Q    You don't know, or you don't remember whether you did or not?

A    I don't know what paper -- okay.  I guess I don't remember.

Q    You don't have any recollection of signing something like that, do you?

A    No.

Q    Did the organization or any members of the organization pass a formal resolution authorizing it to participate in this lawsuit?

A    I don't know.

Q    You don't remember anything like that ever happened, do you?

A    No, I don't remember.

Q    Has it happened since you stopped being president?

A    Have -- has what stopped?  I'm sorry.

Q    Did the board pass a resolution authorizing the corporation to participate in this lawsuit?

A    I don't know.

Q    You don't know?

A    Uh-uh.  No.  Sorry.

Q    Did you sign any papers to obtain the taxpayer

MARTIN GUEVARA APRIL 7, 2011

identification number?

A    I don't recall.

Q    Has the corporation ever engaged in the sale of goods or services to produce income?

A    Membership T-shirts.   T-shirts we sold to members.

Q    Where do those sales take place?

A    Club events.

Q    Do those club events occur in the County of Los Angeles?

A    Yes.   Some.

Q    Does the corporation have a headquarters or a central location from which it operates?

A    Not at this -- I don't know.

Q    Did it have a head quarters or a central location when you were the president?

A    No.

Q    Did you ever receive a determination letter from the California Franchise Tax Board designating the corporation as a nonprofit organization under California law?

A    I don't think so.

Q    Did you ever receive any kind of written acknowledgment from the IRS that you are qualified as a nonprofit corporation?

A    I don't think so.

MARTIN GUEVARA APRIL 7, 2011

Q    Has the corporation ever filed for a tax exemption for conducting sales of product in the city of Los Angeles?

A    I don't know.

Q    Did you ever sign anything like that?

A    I don't remember.  I don't think so.

Q    What is the first day of the corporation's taxable year?

A    That, I don't know.

Q    What is the corporation's fiscal year?

A    I don't know.

Q    Did you ever apply for any sort of business license from the County of Los Angeles?

A    Not that I remember.

Q    Does the corporation have any insurance?

A    Not that I'm aware of.

Q    So you're saying the corporation doesn't have a principal office?

A    I don't know.

MR. STEELE:  Objection.  That misstates testimony.

BY MR. WELK:

Q    Did the corporation have a principal office when you were the president?

A    My home address.

Q    That was the principal office?

A    It was the mailing address.

MARTIN GUEVARA APRIL 7, 2011

Q    Is that located in the -- well, was that located in the County of Los Angeles?

A    Yes, it is.

Q    Where was the principal address of the corporation after you stopped being the president?

A    I don't know.

Q    Did you maintain copies of the corporate bylaws at your residence while you were president?

A    I don't believe so.

Q    Sorry?

A    I don't believe so.

Q    Did you keep a copy of the articles of incorporation at your home while you were president?

A    A copy of what now?

Q    The articles of incorporation.

A    This paper here?  Yes, I had a copy of this.

Q    Did you keep the corporate minutes at your principal -- at your home residence?

A    No.

Q    Where were those maintained?

A    I believe the treasurer.

Q    At the treasurer's residence?

A    The treasurer kept the residence -- the minutes. Sorry.

Q    And that was the same procedure that had been

1    followed before the incorporation; right?

2        A    Yes.

3        Q    Did you ever send or receive an annual report with

4    respect to the corporation while you were involved with the

5    corporation?

6        A    An annual report?  No.

7        Q    Are you, as the corporation, willing to produce

8    voluntarily a copy of the original bylaws enacted by the

9    corporation?

10       A    I don't have any.

11       Q    I'm asking you this on behalf of the corporation.

12            Do you understand that?

13       A    I'm asking -- yes.

14       Q    Okay.

15   MR. STEELE:  I'm going to object.  He's not prepared to

16   answer that question without consulting with counsel or

17   actually having the request.

18       MR. WELK:  Okay.  I just want to make sure we have a

19   clear record.

20   BY MR. WELK:

21       Q    You're here to testify on behalf of the

22   corporation; right?

23       A    Yes.

24       Q    Okay.  In that capacity, as speaking as the

25   corporation, are you willing to produce to the government,

MARTIN GUEVARA APRIL 7, 2011

voluntarily, a copy of the opening bylaws of the

corporation?

    A   No.

    MR. STEELE:  Not at this time.

    THE WITNESS:  Not at this time.

BY MR. WELK:

    Q   When might you be willing to do that?

    A   I don't know.

    Q   Are you willing to produce voluntarily a copy of

the current bylaws of the corporation?

    MR. STEELE:  Objection.  You're asking for things that

are not authorized in the discovery order given by the

court.  That's not authorized discovery.  All that's

authorized in discovery is, is question-and-answer

deposition.  So he's not required to answer those questions

in the affirmative or any other way.  Now, if you want to

keep going with that, we can.

BY MR. WELK:

    Q   Do you understand the question?

    A   I forgot what it was.

    Q   Are you willing to provide voluntarily copies of

the current bylaws of the corporation?

    A   I don't have them.  I don't know what they are.

    Q   I'm asking you this question.

    MR. STEELE:  He doesn't know.

BY MR. WELK:

Q    So your answer on behalf of the corporation is you don't know what they are?

MR. STEELE:  No, because the answer is he doesn't know if he's required to do it.  So he doesn't know if he would do it voluntarily.

BY MR. WELK:

Q    Your answer is no then?  You're not willing to offer them up?

MR. STEELE:  That's not his answer.  He didn't give you the answer yet.

THE WITNESS:  Not at this time.

MR. WELK:  He just told me.  He did give me an answer.

BY MR. WELK:

Q    Not at this time?

A    I believe -- yeah.

Q    Is that your answer?  "Not at this time"?

A    Yes.

Q    Do you know when you might be willing to provide those copies?

A    No.

Q    Are you willing to provide -- if I leave blanks in the transcript of this deposition for the identity of the current directors of the corporation, will you provide them?

MR. STEELE:  We need to step outside.  We'll take a

break here.

(A discussion was held off the record from 4:18

p.m. to 4:19 p.m.)

MR. STEELE:  All right.  Let's continue.  I think we're

clear.

BY MR. WELK:

Q    Do you have the question in mind?

A    I'm sorry.  Could you repeat it?

Q    If I leave blanks in the transcript for the

identities, the names of the current directors of the

corporation, will you provide them?

A    I don't know.

Q    The corporation doesn't know?

MR. STEELE:  You're making a discovery request of your

witness.  That's not appropriate in a deposition.  You want

to make the request, make the request pursuant to the

appropriate law in this forfeiture case.

BY MR. WELK:

Q    Why don't you know the answer?  I don't understand

what that means, you don't know.  Does that mean that you

might, that if I leave the blanks in the transcript, you

might answer them?

MR. STEELE:  This is argumentative.  He doesn't know

whether or not he's required to.

BY MR. WELK:

Q    Is that your answer, what your attorney just said?

A    Yes.

Q    If I provide blanks in the transcript for the identity of the original directors at the time of incorporation, will you provide that information?

A    I'm sorry.  One more time.

Q    If I leave blanks in the transcript for the identities of the original directors of this corporation at the time of incorporation, will you, as the corporation, provides that information?

A    I don't know if I have that information.

Q    You mean you individually or you as the corporation?

A    Well, at that time I -- I know I don't have it.

Q    You don't think --

A    From the originals I would -- might -- I -- you already have that paper -- is -- well, you have the same paper I do.

Q    So as far as you know, there is no information about directors at the time the corporation was created?

A    Not as far as I know.

Q    As far as you know, there were no directors at that time?

A    I'm don't -- I'm not exactly sure what a director does or is.

MARTIN GUEVARA APRIL 7, 2011

Q    As far as you know, there were no directors?

A    Yeah.

Q    As far as you know, there's no directors now?

A    I don't know.

Q    So as far as you know, there aren't any.  You're not aware of there being any directors, are you?

A    Right.  I'm not aware of that.

Q    You're not aware of there being any shareholders?

A    No, I'm not.

MR. WELK:  All right.  We're done.

MR. STEELE:  Okay.

MR. WELK:  I'll propose the same stipulation.

         Can you just cut and paste that from the other one?

         (A discussion was held off the record.)

MR. WELK:  I'll propose the following stipulation:
That the court reporter be relieved of her duties with the exception of providing an accurate transcript and preparing it in the normal time period.  The original transcript will be forwarded to Mr. Steele's office.  He will be responsible for getting it to Mr. Guevara so that he can review it, make any changes or corrections within 14 days of Mr. Steele's receipt of the transcript.  At which point the original transcript, signed under penalty of perjury, will be forwarded to my office, to my attention.

MARTIN GUEVARA APRIL 7, 2011

1    If, for some reason, the transcript is not signed

2  or if it is not available for further proceedings, a

3  certified copy may be used in its place.

4    MR. STEELE:  So stipulated.

5    (The deposition concluded at 4:23 p.m.)

MARTIN GUEVARA APRIL 7, 2011

1   STATE OF CALIFORNIA         )

2                              )

3   COUNTY OF Los Angeles       )

4

5        I am the WITNESS in the foregoing deposition.  I have

6   read the foregoing deposition and having made such changes

7   and corrections as I desire, I certify that the same is true

8   of my own knowledge, except as to those matters which are

9   therein stated upon my information or belief, and as to

10  those matters, I believe it to be true.

11       I declare under penalty of perjury that the foregoing

12  is true and correct.

13       Executed on ____5/19/11_____

14  at__Pasadena_____, California.

15

16

17

18

19

20                        _____

21                        MARTIN GUEVARA

22

23

24

25

STATE OF CALIFORNIA        )        SS.

COUNTY OF LOS ANGELES      )

     I, *Barbara Niles*, a Certified Shorthand Reporter for the State of California, do hereby certify:

     That said proceedings were taken before me at the time and place therein set forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision; and I hereby certify that the forgoing transcript of the proceedings is a full, true, and correct transcript of my Shorthand notes so taken.

     I further certify that I am neither counsel for nor related to any party to said action, not in anywise interested in the outcome thereof.

     In witness whereof, I have hereunto subscribed my name this _____15th_____ day of _____April_____, 2011.

 

                  A Certified Shorthand
                  Reporter in and for the
                  State of California
                    CSR No. 13542

CORRECTION SHEET

| PAGE/LINE | FROM | TO |
|-----------|------|-----|
| | | |

# WORD

# INDEX

MARTIN GUEVARA APRIL 7, 2011

INDEX

**< 7 >**
7  1:17  4:1
34:22

**< 8 >**
8  12:14
894  2:6

**< 9 >**
90012  2:5
91101  2:10

**< A >**
ability  6:2
able  37:13, 18
account  24:13
26:2, 6, 10  27:7,
12, 14, 20, 25
28:1, 7, 9, 10, 13,
16, 20  29:19
37:5, 14, 16, 16
accountant  30:7,
10, 19, 22
accounts  27:23
accurate  20:3
48:18
achieve  17:7, 9
acknowledgment
40:23
acquisition
33:20
action  36:24
activities  5:19
19:11  33:5
36:19
actual  23:25
address  5:17
10:25  36:4
41:23, 25  42:4
addressed  5:16,
25  10:7
administered  4:6
advised  36:23
affect  6:2
affirmative  44:16
afternoon  4:11,
12  5:5  6:3
Agent  2:11
ago  13:12, 12
agreement  30:4
aka  1:8
al  1:8
alcohol  18:1
Amendment
7:10, 16
AMERICA  1:5
27:13
amount  21:16
Angeles  1:16
2:5  4:1  40:9

41:2, 12  42:2
50:3
annual  43:3, 6
answer  5:15
34:10  37:8
43:16  44:14, 15
45:2, 4, 8, 10, 11,
13, 17  46:19, 22
47:1
anybody  13:23
36:15  38:1
anymore  34:6
APPEARANCES
2:1
applicable  8:15
application
34:14
applications
9:16
apply  4:23  33:4
35:22  41:11
appropriate
46:15, 17
approved  38:22
39:2
approximately
11:13  13:7
April  1:17  4:1
argumentative
20:17  46:23
arrests  21:1
Article  34:23
36:3
articles  34:21,
24  38:12  42:12,
15
asked  19:21
38:25
asking  10:8
15:22  16:19
25:10  33:12
43:11, 13  44:11,
24
Asset  2:4
assignment
33:17, 20, 23
Assistant  2:3
4:13
association
38:15, 17, 22
assume  9:4, 19
24:17
ATF  2:11
attached  11:24
28:10
attend  29:13
attendance
32:24
attention  48:25

Attorney  2:3
4:13  13:15, 16
47:1
Attorneys  2:9
17:14
ATTORNEY'S
2:3
August  11:16,
17, 19  12:15, 25
authority  13:11,
14, 20  28:18
authorization
12:22
authorized
11:15, 18  12:6,
8, 9, 17  13:8
35:2  44:12, 13,
14
authorizing
39:12, 20
available  49:2
Ave  2:10
aware  27:24
29:17  34:20
41:15  48:6, 7, 8
awareness  26:23

**< B >**
back  11:23
34:21
balances  26:21
bank  24:12
26:1, 6, 9, 10
27:7, 12, 13, 14,
23  28:12  29:19
37:5, 13, 15, 16
banks  21:10
BARBARA  1:17
based  37:19
basis  19:1
23:17
beginning  4:22
behalf  1:14  4:5,
16  7:9, 9  11:16,
18  12:7, 10, 17,
22  13:8  15:20
16:19  43:11, 21
45:2
belief  50:9
believe  9:1, 12,
13, 14, 23  12:23
13:3  15:3, 8, 13
16:6  17:5, 10
19:6  20:21
21:10, 21  22:22
23:24  24:12
25:22, 25  27:19
28:2, 8, 23, 25
29:1  30:11, 14,
16  32:19  38:24

42:9, 11, 21
45:16  50:10
benefit  17:4
bill  21:22
bills  24:1
blanks  45:22
46:9, 21  47:3, 7
board  29:5, 7,
10  39:20  40:18
book  32:18, 22
box  24:12, 14
branch  27:18
break  46:1
bunch  20:10
Burbank  30:17
business  17:11
30:16  41:11
bylaws  33:2, 4
36:1  42:7  43:8
44:1, 10, 22

**< C >**
C.C.P  4:6
Cal  22:16, 19
23:10, 14, 20
24:5  25:16
CALIFORNIA
1:2, 16, 18  2:5,
10  4:1  34:13
40:18, 19  50:1,
14
call  13:15  29:7,
8
called  4:5  13:18
Calls  37:6
capacity  33:15
43:24
care  9:14
Case  1:7  4:17
46:17
cash  23:23, 25
24:12, 14  25:20,
25  26:14  27:2
cater  25:1
CAVAZOS  1:8
ceased  12:18
15:7
CENTRAL  1:2
40:12, 14
certain  20:25
21:2
Certified  1:18
49:3
certify  50:7
change  23:1
38:6
changed  20:14
21:18
changes  21:13
48:22  50:6

MARTIN GUEVARA APRIL 7, 2011

constitution 35:20, 22 36:1
consulting 43:16
consumed 6:1
contain 32:22
contained 32:23
Continue 19:25 33:10 46:4
continued 20:6 21:4 26:12 35:22
copies 42:7 44:21 45:20
copy 42:12, 14, 16 43:8 44:1, 9 49:3
corporate 8:19 10:4 29:18, 23 30:2 32:18 33:2 42:7, 17
corporation 5:11, 12, 13, 14, 25 6:13, 15, 18, 20, 25 7:3, 6, 9, 10, 22 8:9, 12, 23 9:3, 9, 18, 22 10:1, 5 11:9, 12, 16, 19 12:18, 19, 22 13:1, 9, 9, 20, 24 14:7, 19 15:20, 23, 24 16:2, 17, 20, 23, 23, 25 17:4, 11 18:19 19:12 27:4, 8, 16, 23 29:6, 16 30:4, 7, 9, 18, 21, 24 31:3, 7, 9, 14, 19, 23, 25 32:3, 7, 9, 15, 17, 18 33:2, 5, 14, 16, 16, 19, 22 34:7, 13, 16, 19 35:6, 7, 12, 23 36:7, 8 39:1, 21 40:3, 11, 19, 24 41:1, 14, 22, 21 42:4 43:4, 5, 7, 9, 11, 22, 25 44:2, 10, 22 45:2, 24 46:11, 13 47:8, 9, 13, 20
corporations 35:25
corporation's 34:2 41:6, 9
correct 11:10, 21, 22 13:22, 25 20:12 29:12 30:22 34:25 50:12

corrections 48:22 50:7
counsel 26:8 36:23 43:16
County 40:8 41:12 42:2 50:3
COURT 1:1 44:13 48:17
Courthouse 2:4
CR08 1:7
created 36:7 47:20
CRIMINAL 2:3
CSO 16:10
CSR 1:17
currency 23:25
current 7:5 8:9 18:3 28:12 32:6 44:10, 22 45:24 46:10
currently 6:8, 11, 13 9:9, 18, 22 15:23 30:8, 21 33:4
cut 48:13

< D >
date 12:12 29:9
Dave 8:1
day 41:6
days 48:22
December 14:18, 22 16:5 18:17 19:5 21:3 27:5
declaration 12:7, 13 13:2
declare 50:11
Defendants 1:9 2:6
defense 10:9, 10
dependency 17:22
deposited 21:10 28:1
DEPOSITION 1:14 4:14, 22, 24 5:5, 5, 6, 10, 11, 20 6:6 10:4, 25 11:24 34:23 44:15 45:23 46:15 49:5 50:5, 6
deposits 28:3
described 38:23
designated 5:14
designating 40:18
desire 50:7
determination 40:17

determining 34:5
difference 5:4
different 20:22 21:7 23:3 38:10
director 6:13 14:2, 4, 6 47:24
directors 8:9, 12, 17, 23 9:3 15:23 16:1 29:11 45:24 46:10 47:4, 8, 20, 22 48:1, 3, 6
discovery 44:12, 13, 14 46:14
discussed 32:24
discussion 33:9 46:2 48:15
discussions 38:3
DISTRICT 1:1, 2
DIVISION 1:3 2:3
Doc 1:8
document 11:23 12:11 38:15, 18
documents 16:11
doing 19:18 21:21 22:8 37:2
downhill 17:25
drugs 17:25
dues 7:1, 2 9:15 17:13 21:15, 16, 24 22:2, 13 23:13 27:25
duties 48:17

< E >
earlier 5:6, 22, 24
Early 27:11
effort 5:21
either 19:22 38:24
elected 14:12, 14
election 14:9
employee 6:18, 20
employees 10:1
enacted 43:8
engaged 40:3
et 1:8
events 40:7, 8
evidence 19:10, 16
ex 10:23
exact 37:17
exactly 11:1 29:9 36:11 47:24
EXAMINATION

3:2 4:9
examined 4:7
exception 48:18
exchanged 21:20
Executed 50:13
exempt 34:17
exemption 34:14 41:1
exhibit 11:24, 25 34:22
exist 19:4
existed 18:17 38:7
existence 19:22 27:4 35:23
existing 36:9
expense 30:3
expenses 29:18, 24
experienced 5:9
experiences 5:7
extent 37:22

< F >
facing 7:15
fact 19:11 20:6, 13
fair 20:13
far 10:8, 8 21:3 47:19, 21, 22 48:1, 3, 5
federal 28:22 30:24 31:3, 9
fees 25:6
Fernando 27:19 30:16, 17
field 10:8
Fifth 7:7, 10, 16 14:21 15:19, 20
file 30:24 31:3, 9, 14 34:13, 16 35:2
filed 31:19 34:19, 25 41:1
filing 7:23
financial 16:5, 17, 21
find 38:14
fine 6:17 8:7
first 11:25 14:1, 19 29:5 41:6
fiscal 41:9
followed 43:1
following 48:16
follows 4:7
food 25:2
foregoing 50:5, 6, 11
Forfeiture 2:4 46:17

**[left column — partially cut off]**
...ot 44:20
...orm 19:12 38:7
...mal 39:12
...orward 6:5
...orwarded 48:20,

...franchise 40:18
...ly 6:2
...nction 36:23
...rther 49:2

< G >
...ang 24:8
...as 29:23
...eneral 26:23
GEORGE 2:6, 9
...:19
...etting 17:14
48:21
...ive 10:4 36:22
46:10, 13
...given 24:4 36:4
...:4:12
...gives 35:16
...glass 11:1
...go 5:2 6:5
...1:5, 6 12:25
...18:3 21:22
...26:9 37:22
...going 4:15 5:16,
...7:22 6:15
...7:12, 15, 17, 18,
...25 8:18 10:13,
...19 11:23, 25
...17:25 26:19, 25
...33:7 35:14
...36:16 37:1, 5
...43:15 44:17
Good 4:11, 12
...goods 40:4
government
...43:25
...granted 10:25
...3:11, 14, 21
...guess 12:20, 24
...27:11 39:6
GUEVARA 1:14
...3:3 4:4, 11
...12:5 48:21
...50:21
...guys 20:10

< H >
...hall 25:1
...handed 21:7, 19
...handled 23:10
...handling 9:16
...hands 21:20
...hang 7:2
...happen 18:11

**[column 2]**
happened 19:23
23:19 25:20
30:12 39:16, 18
happening
33:25 38:6
head 40:14
headquarters
40:11
heard 15:15
held 23:21 33:9
46:2 48:15
helps 17:21
holding 25:20
home 36:4
41:23 42:13, 18
house 24:16
huh 18:17 25:3

< I >
ID 28:22 34:3
idea 34:2
identification
40:1
identities 46:10
47:8
identity 45:23
47:4
include 22:17
income 40:4
incorporate
36:25
incorporated
5:19 11:9 14:1,
19, 22 16:4
20:11, 15 21:3
36:1 37:4
incorporation
5:18 16:11
18:15, 16 19:8,
23 20:4, 8 21:5
23:2, 2 26:5
30:25 31:4
34:22 37:12
38:3, 6, 13, 22
39:2 42:13, 15
43:1 47:5, 9
incriminates
7:15
individual 5:8
11:24 12:6
20:24
individually
47:12
INFORMATION
3:16 5:7 37:7
47:5, 10, 11, 19
50:9
initiated 18:13,
15 19:7 20:3
innocent 10:13

**[column 3]**
inquiring 18:25
instruct 7:12
insurance 41:14
intend 35:10
interest 36:9
38:2
involved 9:2
13:23 43:4
IRS 34:7, 16
40:23
Israel 29:1, 3
35:2
issue 33:2
issued 28:15
32:4, 10, 12
issues 10:6
its 9:4 12:7
17:13 18:20
30:25 31:4
33:19 49:3

< J >
Jason 14:24
16:14, 20 28:6,
19
John 2:11
July 11:13
12:23 13:6
14:17, 18
June 14:16

< K >
keep 22:3, 10,
12 26:13 42:12,
17 44:17
keeping 22:17,
20
kept 22:7, 25
24:11 26:16, 18
42:23
kind 24:23
40:22
knew 5:8 23:14
26:20
know 7:15 8:10,
13, 13, 19, 20
9:7, 8, 11, 20, 21,
24, 25 10:1, 2, 5,
17 14:5, 8 15:9,
25 16:6, 16, 20,
24 17:3 18:8,
10 21:23 22:9,
19 24:18 28:12
29:10 30:6, 8, 9,
12, 12, 21, 23
31:1, 11, 12, 18,
19, 21 32:2, 3, 5,
8, 11, 12, 13, 16,
21 33:1, 3, 6, 21,
24 34:9, 10, 10,
15, 18, 20 36:2

**[column 4]**
37:22 39:3, 4, 6,
14, 22, 23 40:13
41:3, 8, 10, 18
42:6 44:8, 23,
25 45:3, 4, 5, 19
46:12, 13, 19, 20,
23 47:11, 14, 19,
21, 22 48:1, 3, 4,
5
knowledgable
10:4
knowledge 5:15
8:18 14:6
29:15 50:8
known 5:7, 11
knows 7:21
8:23 9:3

< L >
late 11:16
LAW 2:6, 9
8:19 22:14
40:20 46:17
lawsuit 39:13, 21
leave 18:3
45:22 46:9, 21
47:7
left 14:10
legal 25:6
letter 40:17
license 41:12
line 8:19
list 4:23
LLC 17:2
located 42:1, 1
location 40:12,
14
logged 21:19
long 4:23 12:25
16:16, 20
longer 15:13
Look 11:3, 25
16:7, 8
looking 11:1
30:20
Los 1:15 2:5
4:1 40:8 41:2,
12 42:2 50:3
lose 12:21
lost 25:9
lot 8:14 35:17

< M >
Madison 2:10
mailing 41:25
maintain 32:18
42:7
maintained
32:25 42:20
making 46:14

**[column 5]**
man 11:1
marked 34:22
marks 33:17, 20,
23
MARTIN 1:14
3:3 4:4 12:5
50:21
matter 5:20
10:10
matters 50:8, 10
McDonugh
14:24 15:2, 6
16:14, 20 28:6,
19
mean 10:16, 22,
25 12:9 17:20
20:22 21:6, 22
23:21, 25 30:13
35:7 36:18
46:20 47:12
Meaning 6:21
means 14:5, 8
16:24 17:1, 3,
15 35:9 36:11
46:20
medication 6:1
meeting 25:1
29:5, 7, 8
meetings 29:13
member 6:10,
15:13 17:24, 25
29:3
Members 15:17
17:13, 21 18:6
21:25 29:8
35:6, 8, 9, 10, 20,
20 37:10 39:11
40:5
Membership
36:19 40:5
merely 38:6
mind 38:13 46:7
minutes 32:18,
20, 20 42:17, 23
misstates 19:9
20:18 41:19
misstating 19:16
MNMC 5:18 6:9,
11 38:3
MNMC's 10:9
moment 33:8
money 6:24
21:6, 7, 10, 18,
20 22:17, 20
23:1, 6, 7, 19
24:9, 10, 11
26:13, 19, 19, 20,
24, 25 35:17
moneys 23:15
Mongols 4:17
5:11 8:11 19:5

MARTIN GUEVARA APRIL 7, 2011

27:15  29:3
36:9  37:11
month  23:20
25:21
monthly  23:17
morning  4:15
5:5  14:9
motion  19:1
Motorcycle  4:17
5:12  27:15
mouth  7:14
move  18:24, 25
mutual  17:4

< N >
name  27:14, 16
names  46:10
Nation  4:17
5:11
nay  35:15
need  16:8  45:25
needed  23:22
networking
17:17
never  21:11, 21,
22
new  36:16
NILES  1:17
nonprofit  8:14,
16  17:4, 5, 8, 10
34:8  40:19, 24
normal  48:19
North  1:15  2:5,
10
notebook  22:7
32:19, 25
Notice  1:19
November  21:2
number  28:22
34:3  40:1

< O >
oath  4:6
object  18:23
33:7  43:15
objecting  19:19
Objection  18:23
19:9  20:17
36:18  37:6
41:19  44:11
obtain  28:22
39:25
occur  40:8
ODW  1:7
offer  45:9
OFFICE  2:3
9:15  14:10
35:3  41:17, 21,
24  48:20, 25

officer  6:11
16:5, 17, 21
22:16
officers  9:4, 5, 8
10:5
OFFICES  2:6
official  32:21
Oh  17:17  25:9,
13
Okay  4:19  5:4
6:16, 24  7:8
8:3  9:5  12:3
19:7, 14  20:1, 6
21:9, 12, 24
22:8, 25  23:5
24:11, 23  25:15
26:9  27:2, 4
36:25  38:5, 12,
16  39:6  43:14,
18, 24  48:11
old  36:16
open  26:6, 10
27:7  37:5, 13,
15, 16
opened  27:12,
18, 20, 23, 25
opening  44:1
operated  21:13
operates  40:12
operation  20:14
21:4
order  44:12
organization
17:16  19:5, 13
20:14, 25  21:2,
4, 13  23:7, 11
24:24  26:1, 5, 7
34:8  35:4
36:10, 16, 17
37:12  38:7
39:2, 11, 12
40:19
original  32:14
43:8  47:4, 8
48:19, 23
originals  47:16
outside  45:25
owner  10:13

< P >
p.m  1:16  4:2
11:7, 7  37:24,
24  46:3, 3  49:5
PAGE  3:2  12:1,
12  36:3  38:15
paid  22:13
33:16
paper  16:7, 8, 9
39:6  42:16
47:17, 18

papers  34:16, 19
38:20  39:25
paperwork  9:15
Paragraph  11:25
12:1
part  10:24  19:4,
7  22:2
parte  10:23
participate
39:13, 21
particular  15:18
Pasadena  2:10
pass  39:12, 20
paste  48:13
pay  21:16, 21,
22  23:7  25:4
26:25  29:18
33:19
paying  23:5
33:22
payments  23:10
24:23  25:23
26:14
penalty  48:24
50:11
people  21:16
23:7
period  25:24
48:19
perjury  48:24
50:11
person  5:14
8:25  10:3
personal  29:19
petition  10:23
petitioner  4:17
Pico  22:5
place  20:8, 11
21:1  40:6  49:3
Plaintiff  1:6, 15
2:2  4:5
point  10:22
12:21  17:15
19:21  26:17
27:7, 9  48:23
position  6:9
9:16, 17  33:5
possession
24:15
possible  29:21
Possibly  16:12
38:10
practice  22:9
26:12
prepared  43:15
preparing  48:18
pres  25:10, 14
30:15
present  2:11
president  7:5,
21  8:1  11:10,

12  12:18  13:1,
5  14:3, 10, 11,
14, 20  15:7
18:11, 13  21:23
23:11, 14  24:20
25:15, 17, 17
26:4, 17  27:22
30:18  31:23
32:17  35:4
39:1, 1, 18
40:15  41:22
42:5, 8, 13
Pretty  21:17
25:4
previous  19:12
26:12  34:22
previously  36:9
primary  5:4
principal  41:17,
21, 24  42:4, 18
printed  28:15
prior  19:5
20:18  21:23
privilege  7:10
privileged  37:6
Probably  35:17
procedure  42:25
proceedings
49:2
produce  40:4
43:7, 25  44:9
product  41:2
properly  5:17
propose  48:12,
16
protocols  4:23
provide  12:6
44:21  45:19, 22,
24  46:11  47:3, 5
provides  47:10
providing  48:18
public  7:23, 23,
25  9:1
purchase  35:14
purpose  5:10
7:18
pursuant  1:19
46:16
put  8:18  23:21

< Q >
qualified  40:23
quarters  40:14
question  15:22
16:19  19:2, 14,
15, 21, 24  23:12
28:24  31:2
33:12, 18  34:11
36:21  38:16
43:16  44:14, 19,
24  46:7

questions  5:14,
15, 17, 23  33:13
44:15

< R >
Rachel  2:13
read  12:1  38:12
50:6
reading  10:23
38:14
Really  11:2
19:20  20:13, 14
reason  6:5, 25
49:1
recall  29:20
33:22  36:12, 15
40:2
receipt  48:23
receipts  21:7, 19
26:21
receive  6:21, 24
7:2  40:17, 22
43:3
received  22:20
recess  11:7
37:24
recollection  39:8
recommended
30:14
record  7:24, 25
9:1  11:5, 6
22:3  33:9
37:23  43:19
46:2  48:15
records  22:10,
25
refer  6:15
11:23  34:21, 23
registered  33:17
34:7
relating  10:7
relieved  48:17
remained  11:12
16:16, 20
remember  4:25
27:11  28:11, 21
29:22  33:24, 25
36:14  37:3, 17
38:1, 4, 8, 11
39:4, 7, 15, 17
41:5, 13
rent  25:1
repeat  5:21
23:12  46:8
repetition  5:23
report  43:3, 6
reported  1:17
Reporter  1:18
48:17
representative
15:22  33:13, 14

MARTIN GUEVARA APRIL 7, 2011

request 43:17
46:14, 16, 16
REQUESTED
3:16
require 9:15
required 37:16
44:15 45:5
46:24
requirements
37:11
residence 42:8,
18, 22, 23
resolution 39:12,
20
respect 7:16
28:16 35:11
43:4
responsibilities
22:3, 16
responsible
48:20
responsive 19:2
result 20:7, 7
37:11
retained 29:2
retainer 30:4
retired 6:10
return 30:24
31:3, 6, 9, 14, 20
returns 31:22
review 48:21
reviewed 34:24
ridiculous 11:2
right 6:8 7:5
10:19, 24 11:20
13:9 16:13
18:7 19:8 20:8
21:5, 25 22:13
23:14, 15, 16
24:2, 2, 6, 9
25:8, 13, 15, 17
26:17 27:5
29:11 35:10, 15,
16 37:2 43:1,
22 46:4 48:7, 10
rights 35:11, 13,
21
Room 1:15
Rossi 2:13
RUBEN 1:8
rule 10:20
rules 4:23
running 8:14
20:25 21:2

**< S >**
salary 6:21
sale 40:3
sales 40:6 41:2
Sam 29:1, 3

San 27:19
30:16, 17
Santillion 8:2
9:6
save 25:6
savings 28:10
saying 20:24
23:6 38:21
39:2 41:16
says 10:20 35:6
schedules 21:15
second 12:1
37:23
secretary 9:18
14:23 15:6, 9
35:3
Section 2:4 4:6
34:8
see 7:17 24:3,
25 30:1 38:17,
20, 24
seen 17:24
send 43:3
separate 4:14
19:10
serious 10:18
services 25:5
40:4
shareholder
29:13
shareholders
29:15 32:6, 14
48:8
shares 32:9
shirts 40:5, 5
Shorthand 1:18
sign 28:20 31:6,
22 38:25 39:25
41:4
signature 12:12
28:18
signed 13:2
38:21 48:24
49:1
signing 39:8
simple 19:21
sit 5:13
Sober 17:18, 20,
21 18:2, 4, 6, 9
19:4, 22
social 17:17
sold 40:5
somebody 9:14
15:4 24:5 37:4
38:9
sorry 10:3 12:4,
24 23:12 24:8
25:9 27:17
35:25 39:19, 24
42:10, 24 46:8

47:6
sort 35:11 41:11
sought 30:15
speak 10:24
11:15, 18 12:9,
17, 22 13:8, 9
speaking 43:24
Special 2:11
specifically
34:23
spokesperson
33:15
spots 25:1
Spring 1:15 2:5
started 20:7
30:11, 13
State 1:18
16:10 28:12
31:14, 19, 22
34:13 50:1
stated 50:9
statement 38:21,
25
STATES 1:1, 5
2:3, 4 35:20
State's 35:3
status 17:8
34:17
stay 21:15
stayed 20:11
STEELE 2:6, 9
7:13, 25 8:4, 6,
13, 18 10:6, 11,
14, 16, 19 11:3,
5 13:19, 21
16:13 17:15
18:23 19:2, 9,
16, 18, 25 20:17
30:5 31:11
33:7, 10 36:18
37:6 41:19
43:15 44:4, 11,
25 45:4, 12, 25
46:4, 14, 23
48:11 49:4
Steele's 48:20,
22
step 45:25
steps 18:1
Steve 4:13
STEVEN 2:3
stipulate 7:17
8:1, 4, 11
stipulated 49:4
stipulation
48:12, 16
stock 31:25
32:4, 7, 9, 12
stop 12:21 13:5
stopped 39:18,

19 42:5
Street 1:15 2:5
strenuous 5:21
strike 18:24, 25
31:2
stuff 13:4
subject 5:20
succeeded 19:12
successor 19:11
36:8, 9, 11 38:2,
2
Suite 2:10
summer 22:15
25:7, 9, 19
suppose 7:11
supposed 10:6
22:12, 20
sure 8:24 9:25
11:6 17:1
36:11 43:18
47:24

**< T >**
take 5:10 7:7
8:5 9:14 14:21
15:19 33:8
36:24 40:6
45:25
takedown 25:7,
19
taken 1:14 11:7
37:24
talk 10:17
13:23 37:10
talked 26:8
talking 23:5
25:8
tax 28:22 30:24,
25 31:3, 4, 6, 9,
10, 14, 19, 22
34:13, 17 40:18
41:1
taxable 41:6
taxpayer 34:3
39:25
tell 10:19 29:8
36:25 37:4, 15
38:13
telling 10:11, 14,
16 36:15
term 30:14
36:12 38:2
terms 20:13
23:2
testified 4:7
14:9 20:23, 23
testify 4:16 6:2
13:20 43:21
testifying 4:16
5:6 7:8

testimony 20:18
41:19
thing 10:22
things 5:8 10:8
19:10 37:1
44:11
think 7:19 8:15,
16, 22, 25 9:2
15:4, 5, 11, 12,
14 16:9 17:6,
15 21:14 22:24
28:24 31:5
37:17 38:9
40:21, 25 41:5
46:4 47:15
thought 10:12
12:23 25:10
38:13
Thursday 1:16
4:1
time 11:9 14:11,
20 25:19, 24
27:22 30:15
36:6 44:4, 5
45:12, 15, 17
47:4, 6, 9, 14, 20,
23 48:19
timeline 19:21
today 5:16, 18
6:8 13:9
told 22:11 36:6,
8 37:13, 20
38:5, 9 45:13
track 22:12, 17,
20 26:16, 18
trademark 10:7
transcript 45:23
46:9, 21 47:3, 7
48:18, 19, 23, 24
49:1
transfer 13:4
transferring 13:3
treasurer 9:22
14:25 15:6, 10
22:5 25:20
26:13 28:4
32:19 42:21, 23
treasurer's
24:15 42:22
true 11:15
20:16, 20 50:7,
10, 12
truthfully 6:3
try 18:1, 1 26:6
trying 17:7, 9
19:10
two 12:24 13:4,
6, 7, 12 19:10
38:15
type 17:11

30:16  32:20
33:13  42:1
47:14, 17
**went**  4:23, 25
21:22  36:22
**we're**  46:4
48:10
**WESTERN**  1:3
**we've**  17:24
**willing**  8:11
43:7, 25  44:7, 9,
21  45:8, 19, 22
**WITNESS**  3:2
4:5  16:14
17:17  31:12
44:5  45:12
46:15  50:5
**worded**  38:10
**words**  37:17
38:1, 14, 17
**work**  17:23
**working**  36:7
**world**  8:22
**worried**  24:21,
22
**worry**  8:7
**written**  40:22
**wrote**  32:20

**< Y >**
**yea**  35:15
**Yeah**  7:13, 13
8:4, 6  10:19
16:9  22:6
25:11  45:16
48:2
**year**  30:25, 25
31:4, 4, 10  41:7,
9

— — —

...S 2:3  4:13
...h 18:17  25:3
...9, 24, 24
...nderstand  4:20
...8  33:18
...21  43:12
...19  46:19
**unincorporated**
...14, 17, 22
UNITED  1:5  2:3,

...se  7:18

**< V >**
...gue  18:23
...8  36:18
Valley  27:19
...16
vendors  23:7
...4, 24  26:25
...ice  14:11, 19
...17
voluntarily  43:8
...4, 9, 21  45:6
vote  35:14
voting  35:11
vs  1:7

**< W >**
want  10:17, 17
...18  44:16
...15
...ay  20:25  21:3,
...13, 18  34:5
...17, 22  38:11
...16
week  13:12
weekend  13:6
weeks  12:24
...4, 7, 7, 12
WELK  2:3  3:3
...10, 13  7:12,
...23  8:3, 5, 8,
...16, 21  10:3,
...12, 15, 18
...1, 4, 6, 8
...15  17:19
...25  19:3, 14,
...20  20:1, 2,
...31:13  33:11
...37:9, 22,
...41:20  43:18,
...44:6, 18
...1, 7, 13, 14
...6, 18, 25
...10, 12, 16
Well  7:2  10:12
...16  21:6
...13  24:25