ORIGINAL

STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,                    )
                                             )
              Plaintiff,                     )
                                             )
       vs.                                   ) Case No. CR08-1201-ODW
                                             )
RUBEN CAVAZOS, aka "Doc," et                 )
al.,                                         )
                                             )
              Defendants.                    )
_____)

DEPOSITION OF MARTIN GUEVARA-PMK CORPORATION

Los Angeles, California

Thursday, April 7, 2011

**HCR**

THE HUNTINGTON BUILDING, SUITE 100
1450 WEST COLORADO BLVD.
PASADENA, CA 91105
GSA APPROVED VENDOR-GS-07F-0169V
626/792-6777
FAX 626/792-8760
E-Mail : reports@huntingtoncr.com
Website: http://www.huntingtoncr.com

REPORTED BY:
BARBARA NILES
CSR NO.: 13542

STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )     Case No. CR08-1201-ODW
                                    )
RUBEN CAVAZOS, aka "Doc," et        )
al.,                                )
                                    )
          Defendants.               )
_____       )

DEPOSITION OF MARTIN GUEVARA, taken on behalf of
the Plaintiff, at 312 North Spring Street, Room 1302, Los
Angeles, California, commencing at 10:11 a.m., on Thursday,
April 7, 2011, reported by BARBARA NILES, CSR No. 13542, a
Certified Shorthand Reporter for the State of California,
pursuant to Notice.

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

 1    APPEARANCES:

 2   For Plaintiff:

 3    UNITED STATES ATTORNEY'S OFFICE - CRIMINAL DIVISION
      BY:   STEVEN WELK, Assistant U.S. Attorney
 4    Chief Asset Forfeiture Section
      1400 United States Courthouse
 5    312 North Spring Street
      14th Floor
 6    Los Angeles, California  90012
      (213) 894-6166/5710
 7

 8   For Defendants:

 9    LAW OFFICES OF GEORGE L. STEELE
      BY:   GEORGE L. STEELE
10    Attorneys at Law
      127 North Madison Ave., Suite 24
11    Pasadena, California  91101
      (626) 405-4910
12    (626) 405-4860

13   Also present:   ATF Special Agent John Ciccone
                     Rachel Rossi

14

15

16

17

18

19

20

21

22

23

24

25

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1                                I N D E X

2   WITNESS               EXAMINATION                    PAGE

3   MARTIN GUEVARA        By Mr. Welk                  5, 179

4                         By Mr. Steele                   175

5

6

7

8

9

10                         E X H I B I T S

11  Plaintiff's                                         Page

12    1 - Motorcycle club name                           24

13    2 - Center logo of motorcycle club                 26

14    3 - Mongols Outlaw Motorcycle Gang Vest Insignia   39

15    4 - Martin Guevara's Declaration                  125

16    4A - Declaration of Martin Guevara in support of  160
           non-party Mongols Nation Motorcycle Club
17         supplemental brief

18    5 - Articles of incorporation                      98

19    6 - Restraining order on the Mongols trademark     67

20    7 - Trademark assignment                          105

21    8 - Respect Few Fear None T-shirt                 163

22    11 - Response to action                           164

23    12 - Trademark assignment Abstract of Title       166

24

25

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

INFORMATION REQUESTED

(None)

1          Los Angeles, California, Thursday, April 7, 2011

2                              10:11 a.m.

3

4                          MARTIN GUEVARA,

5     called as a witness on behalf of the Plaintiff, having been

6     administered an oath in accordance with C.C.P. Section 2094,

7     was examined and testified as follows:

8

9                            EXAMINATION

10    BY MR. WELK:

11        Q     Good morning, Mr. Guevara.   My name is Steve Welk.

12    I'm the assistant U.S. attorney responsible for this case.

13    Sitting here with me is ATF Special Agent John Ciccone.   And

14    then you know the people you brought with you.

15             Have you ever been deposed before?

16        A     No.

17        Q     All right.   Have you had an opportunity before

18    now -- without telling me any of the contents of any

19    discussions you might have had, have you had an opportunity

20    to talk to your lawyer about why you're here today?

21        A     Yes.

22        Q     Okay.   What I'm going to do -- some of these

23    things may be repeats of what your attorney has already

24    talked to you about, but I want to make sure that you

25    understand what the parameters are that are applicable to

MARTIN GUEVARA-PMK CORPORATION    APRIL 7, 2011

1    what we're doing here today.  So I'm going to go through

2    some preliminary instructions and as you -- as we go along,

3    if you understand them.

4            The first thing -- one of the things I'm going to

5    tell you is that you should make an effort to talk slowly so

6    that the court reporter can take down everything that's

7    said.

8            Are you currently on any medications or under the

9    influence of any substance?

10        A    No.

11        Q    All right.  Is there any condition that you're

12   aware of that you think might affect your ability to testify

13   accurately today?

14        A    No.

15        Q    All right.  So is there any reason why we cannot

16   go forward with this deposition?

17        A    No.

18        Q    Okay.  You've taken an oath that the court

19   reporter has just administered to you that requires you to

20   testify truthfully.  Despite the fact that we're in a

21   informal setting here without a judge or a jury present, the

22   oath that you've taken requires you to testify as if you

23   were in court before a judge and jury.

24            Do you understand that?

25        A    Yes.

Huntington

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    Q    Do you know what "perjury" means?

2    A    I have an idea of what it means.

3    Q    What do you understand it to mean?

4    A    I guess if I don't tell the truth, I could be

5  charged with perjury.

6    Q    Okay.  And that that's a crime?

7    A    Correct.

8    Q    And did you know what perjury meant in December of

9  2008?

10    MR. STEELE:  Objection.  What's the point of this?

11    MR. WELK:  Are you going to instruct him not to answer?

12    MR. STEELE:  I instruct him to take the Fifth, but we

13  can work it out before or we can just move on.

14    MR. WELK:  You can take the Fifth if you want.  He

15  signed a declaration in December of 2008 under penalty of

16  perjury.  I want to make sure he understood what he was

17  doing.

18    MR. STEELE:  That's all I wanted to know.

19        Go ahead and answer.

20    THE WITNESS:  Yes.

21  BY MR. WELK:

22    Q    Okay.  Everything that is said by anyone in this

23  room while we're on the record is going to be taken down by

24  the court reporter right here in real time.  "On the record"

25  means that we're actively engaged in the deposition as we

MARTIN GUEVARA-PMK CORPORATION APRIL 7, 2011

1    are right now.  If we go off the record, there will be an

2    agreement.  There has to be an agreement by both sides that

3    we're going to go off the record.

4          So if one person says, "I want to go off the

5    record," we will -- the court reporter will continue to take

6    everything down unless the other side -- talking mainly

7    about the attorneys here -- agrees to go off the record.

8          Do you understand that?

9    A    Yes, I do.

10   Q    Everything that is said by everyone in the room

11   will be taken down.  After this deposition is over, the

12   court reporter will prepare a transcript of what was said

13   here on the record.  You'll be given an opportunity to read

14   that over.  And at that time you'll be allowed to make any

15   changes or adjustments to your testimony that you feel are

16   necessary.

17         I will caution you that you need to be careful

18   when you're here today, to listen carefully to my questions,

19   and try and answer them as completely and truthfully as you

20   can because if you make important changes later, after the

21   deposition has been completed, I'm able to comment on those

22   later on.

23         And that may affect your credibility at any later

24   proceeding because, for example, if you change a "yes" to a

25   "no," or you change "I don't know" to include some

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1   substantive information, I may argue that you intentionally

2   didn't answer the question when you were at the deposition

3   so you could think about it and decide what you were going

4   to answer later.

5          Do you understand that?

6      A    Yes.

7      Q    Now, you do have to testify truthfully.  But if

8   you don't remember something or you don't know the answer to

9   a question, "I don't know" or "I don't remember" is a

10  perfectly acceptable answer as long as it's true.

11         If you don't know the answer to a question, then

12  you should tell me you don't know.  If you don't remember

13  something I have asked you, tell me you don't remember.

14         However, I am entitled to your best estimate if

15  you have some basis for answering the question.  I don't

16  want you to guess at anything, but I am entitled to an

17  estimate if you can give me a reasonable estimate.

18         An example of that is if I would have asked you

19  yesterday how many chairs are there in the room in which

20  you're going to be deposed, you, having never been in this

21  room before, would have no idea how many chairs were in this

22  room.  You couldn't answer that question.  You'd have to

23  say, "I don't know."

24         If I ask you tomorrow how many chairs were in the

25  room in which you were deposed -- presumably, even if you

1   don't know the exact number of chairs that were in here, you

2   would be able to give me some estimate based on your

3   experience in being here as to how many chairs were in the

4   room.  Even if that answer was there were more than two or

5   there were less than a hundred -- if you can make an

6   estimate, I'm entitled to that estimate.

7           Do you understand that?

8       A   Yes.

9       Q   Okay.  In terms of our discussion back and forth

10  here, while we're having something that's sort of seems like

11  a conversation, it's not really a conversation, the kind

12  that people would normally have with each other.  And the

13  fact that it's being taken down by the court reporter is so

14  that we have a record of what is said here during the entire

15  course of this proceeding.

16          Because we want the record to be clear, it's

17  important that we only talk one person at a time.  There's a

18  couple of things that people do regularly in conversation

19  that sometimes cause a problem in depositions.  One of them

20  is sometimes we have a tendency to answer with gestures or

21  with nonverbal responses like uh-huh or uh-uh.  Those are

22  impossible to interpret in a transcript.

23          So I'm going to ask you to try and keep in mind as

24  we go along, to try and remember to give verbal answers like

25  yes or no.  Try not to answer with any gestures or anything

1  like that.  Now, sometimes that's going to happen.  It

2  always happens.  Everybody does it.  It's not anything to be

3  worried about, but there will be times -- there may be times

4  -- in every deposition I've ever done, there are times where

5  either Mr. Steele or I will -- after you've answered a

6  question -- will say yes or no.  We'll suggest to you what

7  we think your answer is because you've given a nonverbal

8  response.

9        We're not trying to criticize you or make you

10  nervous or anything.  We're just trying to keep a clear

11  record.  Okay?

12      A    I understand.

13      Q    All right.  The other thing is sometimes when I'm

14  asking you a question, it's going to be really obvious to

15  you early on in my question what I'm about to ask you.  And

16  sometimes we have a tendency in normal conversation to jump

17  ahead and answer a question to save time.  That messes up

18  the transcript.  I'll ask you to try and wait until I've

19  completely finished my question before you begin your

20  answer, and I'll try to do the same for you.  I'll try to

21  wait until you've completed your answer before I start my

22  next question.  Okay?

23      A    Okay.

24      Q    If you answer a question during this deposition,

25  I'm going to assume that you understood what I asked you.

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1    If I ask you a question and you do not understand what I

2    asked you either because you don't understand the words I

3    used or you just don't understand what I'm trying to get at,

4    feel free to tell me that you don't understand the question.

5    I'll try and rephrase it so that it makes more sense to you.

6    Okay?

7         A    Okay.

8         Q    The purpose of this proceeding today is for me to

9    ask you questions about your personal knowledge.  And when I

10   say the "proceeding today," I mean the proceeding this

11   morning because as I understand it, you're also going to be

12   testifying this afternoon on behalf of the corporation; is

13   that right?

14        MR. STEELE:  He's having a deposition as the PMK

15   pursuant to subpoena.

16        MR. WELK:  Okay.  All right.

17   BY MR. WELK:

18        Q    So what you're talking about here this morning --

19   what I'm going to be asking you about this morning is your

20   personal knowledge of and involvement in the facts

21   surrounding the transfers of the registered collective

22   membership marks of the Mongols and the incorporation of the

23   entity known as Mongols Nation Motorcycle Club, Inc., which

24   I will refer to as MNMC.  Okay?

25        A    Okay.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1     Q    All right.  Now, later on today, you're going to

2   testify as a person most knowledgeable on behalf of the

3   corporation.  So I'm going to be asking you things in the

4   afternoon that you may not necessarily have personal

5   knowledge of but that the corporation should know.  That's

6   not what I'm doing this morning.  I'm only asking you things

7   about -- things that you did and things that you know.

8   Okay?

9     A    I understand.

10    Q    Are you a current member of the Mongols?

11    A    Yes.

12    Q    What does that mean?  What does membership in the

13  Mongols mean?

14    MR. STEELE:  Objection.  Vague.

15  BY MR. WELK:

16    Q    Do you understand the question?

17    A    I understand what you're asking.

18    Q    Okay.  Then you can go ahead and answer.

19    MR. STEELE:  I object.  That's vague.  Speculation.  I

20  mean, what are you -- is this existential in nature, or

21  what?  I mean, you're asking -- is there a membership

22  procedure?  You've got to be more specific.  I'm going to

23  instruct him not to answer until he understands the question

24  to my satisfaction.

25    MR. WELK:  He said he understood the question.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1       MR. STEELE:  Do you understand the question?

2       THE WITNESS:  Can you rephrase it or reword it or ask

3   it again?  I'm sorry.

4   BY MR. WELK:

5       Q    Are you a member of the Mongols?

6       A    Yes.

7       Q    What does that mean to you, that you're a member

8   of the Mongols?

9       A    That I signed up to be a member.

10       Q    And how did you sign up?

11       A    I filled out an application.

12       Q    When did you fill out an application?

13       A    In approximately October of 1997.

14       Q    And is that all you had to do, was fill out an

15   application, and you became a member?

16       A    Yes.  For me?  Yes.

17       Q    Did you have to be sponsored or anything?

18       MR. STEELE:  If you know.

19       THE WITNESS:  I did not have to be sponsored, no.

20   BY MR. WELK:

21       Q    Did you have to prospect?

22       A    No.

23       Q    Do you know why you didn't have to prospect?

24       A    We were a new chapter.

25       Q    What chapter was that?

MARTIN GUEVARA-PMK CORPORATION APRIL 7, 2011

1    A    Pico.

2    Q    Were you ever a member of another chapter?

3    A    No -- oh, scratch that.  Yes.  Years later, I was

4 a member of So Cal.

5    Q    What's the difference between those chapters?

6    A    The name.  One's been in existence longer than the

7 other.

8    Q    Does the Pico still exist?

9    A    Does it still -- yes, it does.

10   Q    Why did you change from one to another?

11   A    I'm sorry.  I also was from a nomad chapter.  Pico

12 Nomad.

13        (Discussion off the record)

14   THE WITNESS:  So from Pico Chapter I went to Pico

15 Nomad.  From Pico Nomad I went to So Cal.

16 BY MR. WELK:

17   Q    Okay.  Why did you change from Pico to Pico Nomad?

18   A    I was asked to be in that chapter.

19   Q    In the Pico Nomad Chapter?

20   A    Oh, in Pico Nomad I'm semiretired.  Like, it's

21 a -- where a member is semiretired.  You're not -- you're

22 not really active.

23   Q    Well, what's the difference between being active

24 and being semiretired?

25   A    Active is I donate dues to the club as being

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    active.

2         Q    And semiretired you don't?

3         A    Correct.

4         Q    Any other differences?

5         MR. STEELE:  Objection.  Vague.

6         MR. WELK:  I should say a word.  I'll interrupt you for

7    a moment.  I'll say a word about objections.  At times

8    during the course of this deposition, your attorney may

9    state objections to questions that I've asked.  Under the

10   rules he's certainly entitled to do that.  It has to do with

11   whether or not the material that's in the deposition is

12   going to be allowed to be used later on -- usually,

13   evidentiary objections.

14         There are limitations in the rules on when an

15   attorney can instruct the client not to answer a question.

16   I'm not going to get into what those are because I'm sure

17   Mr. Steele and I probably disagree about what those are.

18         THE WITNESS:  Okay.

19         MR. WELK:  But I'll let you know that the mere fact

20   that an objection is made does not mean that you should not

21   answer the question or that you cannot answer the question.

22   So when Mr. Steele makes an objection, you should -- unless

23   he tells you otherwise, you should go ahead and answer the

24   question unless you don't understand it.

25         Generally, when he makes an objection, I'm going

1    to ask you, "Did you understand the question?"  If you tell

2    me you did, then I'm going to expect you to answer it unless

3    Mr. Steele tells you not to answer it.

4          If he tells you not to answer it, then he and I

5    will undoubtedly engage in an exchange on the record as to

6    why I think his instruction is invalid, and he'll tell me

7    why he thinks it is valid.  And then we'll go from there.

8          But just as a general point, the mere fact that an

9    objection is made doesn't mean you shouldn't answer the

10   question.  But it's probably always a good idea to check

11   with your lawyer before you do to make sure he wants you to

12   answer it.  Okay?

13        THE WITNESS:  Okay.

14   BY MR. WELK:

15       Q    All right.  So you said that the difference

16   between Pico and Pico Nomad was that in Pico you were active

17   and in Pico Nomad you were semiretired.  And you said that

18   the difference between those two statuses was that active

19   you paid dues and semiretired you didn't.

20        Were there any other differences between those two

21   types of membership?

22       A    When, for example, going to a party or an event, a

23   club event, usually a chapter will be -- have to be there at

24   a certain time or they're, you know -- they're asked to be

25   there at a certain time.  Me, being from the chapter, I -- I

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1   could come and go as I please without, you know.  I didn't

2   have to sit for a meeting if I didn't want to.  I could

3   leave.

4       Q    As semiretired, were you still required to attend

5   the national runs?

6       A    No.

7       Q    Now, why did you join the So Cal Chapter?

8       A    I was asked to.

9       Q    Were you an active member when you were in the So

10  Cal Chapter?

11      A    Yes, I could -- I guess I could be considered

12  active.

13           (Discussion off the record)

14      THE WITNESS:  Yes.

15  BY MR. WELK:

16      Q    When was it that you joined the So Cal Chapter?

17      A    Approximately July of 2008.

18      Q    And what was your motivation for joining that

19  chapter?

20      A    I was asked by a good friend.

21      Q    Who is that?

22      A    Hector Gonzalez.

23      Q    Was Hector Gonzalez the national president of the

24  Mongols at that time?

25      A    Yes.  Well, I'm sorry.  He became national

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1   president around that time.

2       Q     Okay.  Who was the national president before that?

3       A     Cavazos.

4       Q     Ruben Cavazos?

5       A     Ruben Cavazos.

6       Q     Also known as "Doc"; right?

7       A     Correct.

8       Q     How do you characterize the Mongols organization

9   now?

10      MR. STEELE:  Objection.  That's vague.

11  BY MR. WELK:

12      Q     Do you understand the question?

13      A     Yes.

14      Q     Go on.

15      A     As motorcycle enthusiasts.

16      Q     You've been a member since 1997; right?

17      A     '98.

18      Q     '98.  Do you --

19      A     I'm sorry.  You're right.  Scratch that.  '97.

20      Q     In your opinion, is there any difference in the

21  nature of the organization now than there was when you

22  joined it?

23      A     Yes.

24      Q     What are the differences?

25      A     I believe we're more businesslike, more organized.

1   Q   What do you mean by more "businesslike"?

2   A   We have a -- the club has a federal tax ID now.

3 We were opened as a corporation, and it's very transparent

4 for the membership too.  We're able to look at bank accounts

5 and file taxes and stuff like that.

6   Q   And when did all those changes occur?

7   A   I believe in -- probably about December of 2008.

8   Q   Were there any differences in the nature of the

9 organization between 1997 when you joined and early 2008?

10   MR. STEELE:  Vague.

11   THE WITNESS:  That question, I don't understand.

12   MR. WELK:  Okay.  You don't understand.

13 BY MR. WELK:

14   Q   Okay.  Well, you said that you identified some

15 differences between what the organization was like between

16 1997 and now.  You said that it's more businesslike, it's

17 more organized, and that you now have a federal taxpayer ID

18 number, it's more transparent, and that those changes

19 occurred in late 2008; right?

20   A   Correct.

21   Q   So I'm asking about early 2008 before all those

22 changes occurred.  How did the nature of the organization --

23 how did it compare in early 2008 to the way it was when you

24 first joined in October of 1997?

25   MR. STEELE:  It's asked and answered and vague as to

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    nature.  What do you mean by "nature"?

2    BY MR. WELK:

3         Q    Do you understand the question?

4         A    Yes.

5         Q    Okay.

6         A    I believe -- we -- I didn't have any knowledge of

7    what -- what the club was doing, about the business side of

8    the -- about the club.  I didn't see the books.  I wasn't --

9    we weren't privy to that.  Doc did not have books.  And when

10   it was handed over to Gonzalez, we hadn't -- we had nothing.

11   No paperwork, no nothing.

12        Q    Did you know in early 2008 -- did you know that

13   the Mongols organization had registered trademarks?

14        A    Did I know?

15        Q    Yes.

16        A    Yes.

17        Q    How did you know that?

18        A    I believe in 2005 we had a different cabinet, and

19   we were advised that a member had registered them, had

20   trademarked our logo and our name.

21        Q    Now, was there any -- prior to that registration

22   of those marks, was there a vote taken amongst the

23   membership of whether that should happen?

24        MR. STEELE:  Objection.  Foundation.

25        Do you have a reason for knowing that?

Huntington

MARTIN GUEVARA EMK Corp

```
 1   BY MR. WELK
 2        Q    Do you understand
 3        A    Yeah. Can
 4        Q    Sure.
 5        A    I mean --
 6        MR. STEELE:  We can st
 7        MR. WELK:  Wait a second.
 8   caution you that conferring with your
 9   a question pending, I will undoubtedly cou
10   that's what you want to do --
11        MR. STEELE:  Yeah, that's fine.
12        MR. WELK:  -- you can do that.  Okay.
13        MR. STEELE:  That's fine.
14        MR. WELK:  That's great.
15        THE WITNESS:  I actually forgot the question now.
16        MR. WELK:  Yeah.  Well, I can ask it again if you'd
17   like.
18        MR. STEELE:  Yeah.  Well, let's get --
19             (Pause in the proceedings, 10:32 to 10:32)
20        MR. STEELE:  Okay.  There's no problems.  Just reask
21   the question, and we'll get going from there.
22        THE WITNESS:  Sorry about that.
23   BY MR. WELK:
24        Q    This isn't an endurance contest here today.  If
25   you need to take a break or need to go to the bathroom or
```

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1  something like that, we can take a break.  I would

2  appreciate it if a break didn't happen when a question has

3  been asked because the implication can be made that when you

4  go talk to your attorney while there's a question pending

5  and then you come back and answer it, that your attorney

6  told you what the answer should be.  I don't know that

7  that's what he did, but --

8      MR. STEELE:  You know, I'd like to say for the record,

9  though, it's customary in depositions that whenever a client

10  needs to speak to his attorney, he's allowed to take a break

11  and do so for whatever reason he likes.  Now, if you want to

12  put on the record your spin on what that is, go ahead.  But

13  I'm going to put mine on it, which is it's customary in

14  depositions for a client to be able to speak to his attorney

15  at any time he wants to.

16      MR. WELK:  And I want to make it clear, if I didn't,

17  that you can do that any time you want to.  If you want to

18  go talk to your attorney every time I ask you a question,

19  you can do that; but it's going to impair your credibility.

20      MR. STEELE:  And I would object to that as being

21  harassing.

22      MR. WELK:  Okay.

23          Can you --

24      MR. STEELE:  At any time you need to take a break; you

25  just take one; and we'll go out and talk.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    MR. WELK:  Can you read back the last question, please.

2         (Record read)

3    THE WITNESS:  No.

4    BY MR. WELK:

5    Q    As a member, you didn't know anything about the

6    registration of the marks until after it had occurred;

7    right?

8    A    Yes.

9    Q    Did you --

10   A    Actually, I believe there was talk about it when

11   it was getting done.  But as far as being asked or voted my

12   opinion on it, no, I wasn't asked.

13   Q    Okay.  I'm going to put a document in front of

14   you.  The first two are just to make sure that we all

15   understand what we're all talking about.  The first one I've

16   marked is Exhibit 1, and I'll ask you if you recognize that.

17        (Plaintiff's Exhibit 1 was marked for

18        identification, the original of which is attached

19        hereto.)

20   MR. STEELE:  Okay.

21   THE WITNESS:  Yes, I do.

22   BY MR. WELK:

23   Q    What is that?

24   A    That is our -- the club name.

25   Q    Okay.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1      A      Motorcycle club name.

2      Q      And you understand that this is one of the

3  registered marks that are in dispute in this action that

4  we're involved in?

5      A      Yes.

6      Q      And I'm going to refer to this as the verbal mark

7  as we go forward.  Okay?

8      A      Okay.

9      Q      The organization issues patches to its members

10  that have this word on it; correct?

11      A      Yes.

12      Q      And some of those patches that bear that mark are

13  used as what's called a "top rocker"?

14      A      Yes.

15      Q      Okay.  And those --

16      A      One of them, yes.

17      Q      One of them.  Right.  And those are worn on vests

18  or jackets worn by members?

19      A      Vests and T-shirts.

20      Q      Who's qualified to wear a top-rocker patch?

21      A      A member in good standing.

22      Q      Does that person have to be a full-patched member?

23      A      Yes.

24      Q      And do you have -- well, strike that.  We'll get

25  to that later.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    All right.  This is Exhibit -- I've premarked this

2  as Exhibit 2.  I'll ask you to take a look at that and tell

3  me if you recognize that.

4    (Plaintiff's Exhibit 2 was marked for

5    identification, the original of which is attached

6    hereto.)

7  THE WITNESS:  Yes, I do recognize it.

8  BY MR. WELK:

9    Q    What is it?

10    A    It's our centered logo of our motorcycle club.

11    Q    So your understanding is that that is another

12  registered mark of the organization?

13    A    Correct.  Yes.

14    Q    And this is depicted on a patch as the center

15  patch on a member's vest; right?

16    A    Yes.

17    Q    Who is allowed to wear a patch with that image on

18  it?

19    A    With both images?

20    Q    With just the what I'm going to call the symbolic

21  mark, Exhibit 2.  The picture.

22    A    Members.

23    Q    Anybody else?

24    A    Not that -- not that I'm aware of, no.

25    Q    Okay.  Who is allowed to wear the two logos

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    simultaneously together?

2        A    Members in good standing.

3        Q    And that's all; right?

4        A    Correct.

5        Q    Now, I understand from some of the declarations

6    that you've provided here in this case, that we'll get to a

7    little bit later, that these patches that bear these two

8    images, or this word and this image, that the right to wear

9    those is a limited license that's granted by the

10   organization; right?

11       MR. STEELE:  Objection.  Calls for a legal conclusion.

12   BY MR. WELK:

13       Q    Do you understand the question?

14       A    I'm not exactly sure what "limited license" means.

15       Q    Do you recall using the term in a declaration that

16   you signed?

17       A    Correct.

18       Q    Did you understand it when you signed the

19   declaration?

20       A    I was advised by my counsel at that time about --

21   when we wrote it up.

22       Q    Okay.  Were you comfortable when you read it that

23   you understood what it meant?

24       A    Yes.

25       MR. STEELE:  At that time.

1        THE WITNESS:  At that time.

2   BY MR. WELK:

3        Q    Okay.  But do you have some uncertainty now as to

4   what it means?

5        MR. STEELE:  In the context of the question, yeah.

6   Just rephrase the question.  It would probably be okay.

7   BY MR. WELK:

8        Q    Do you know what -- what is a limited license to

9   you?

10        A    That we control -- the -- the members -- the club

11   controls the marks, and we allow certain members to use it.

12        Q    Okay.  And does that also include the power to

13   prevent other people from using it?

14        A    If they are not members?

15        Q    Yeah.

16        A    Yeah.  If they're not members, then we -- we

17   wouldn't allow them to use it.

18        Q    So if a bunch of guys in the San Fernando Valley

19   decided that they wanted to become a motorcycle club and

20   they started making up patches of those two marks and riding

21   around on motorcycles with those patches on the back of

22   their vests, in your view would your organization have the

23   legal authority to prevent them from doing that?

24        A    I would seek counsel and see if we could get them

25   to stop using it or not even make them.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    Q    Okay.  So is it fair to say that your

2  understanding is that you could, through legal means,

3  prevent them from using those marks?

4    A    I would like to think so, yes.

5    Q    Okay.  Now, what happens when -- has anybody ever

6  been kicked out of the Mongols organization?

7    A    Yes.

8    Q    And that's called "being out bad"; is that right?

9    A    You're out in bad standing.

10         (Discussion off the record)

11    THE WITNESS:  You're out in bad standing.  Sorry about

12  that.

13  BY MR. WELK:

14    Q    Okay.  Now, when a member is out in bad standing,

15  do they get to keep their patches?

16    A    No.

17    Q    Do they understand that when they're given the

18  patches?

19    A    Yes.  On applications I believe it says --

20  there's -- there's a disclaimer on there that all patches

21  and any property given from the club to a member, if they

22  are no longer members, that it is club property and they

23  should -- it should be returned.

24    Q    And in your experience is that a common practice,

25  when members are out in bad standing, that they're required

1    to give their patches back?

2         MR. STEELE:  In your knowledge.

3         THE WITNESS:  As far as I know, yes.  They give them

4    back.  The -- an out member gives back his property.  Some

5    have kept them.

6    BY MR. WELK:

7         Q    Well, are those people asked to give them back?

8         A    Yes.

9         Q    Okay.  But they just refuse?

10        A    Yes.

11        Q    All right.  How many sets of these patches does

12   each member receive?

13        A    One.

14        Q    Is there any way to get another set?

15        A    If it's confiscated by law enforcement.

16        Q    Has that occurred, where you've issued -- where

17   the organization as issued replacement patches to people who

18   have had their patches confiscated?

19        A    If they can afford it.

20        Q    How much does it cost to buy the patches?

21        A    I don't know at this time.

22        Q    Did you ever know?

23        A    I believe for a -- for a set, for everything,

24   front and back, it was approximately 325, I believe.

25        Q    $325?

MARTIN GUEVARA-PMK CORPORATION APRIL 7, 2011

1    A    Yes.

2    Q    And who is that paid to?

3    A    To the motorcycle club.

4    Q    Now, when you say a full set, "front and back,"

5  what would that include?

6    A    The -- the name of the front, Mongol name,

7  California -- or whatever state you're from.  I believe your

8  chapter, your side rocker.

9    Q    What's the side rocker?

10    A    What chapter.  Again, what chapter name you're --

11  you're going to -- signing up to.  And a diamond, 1%

12  diamond, on the -- I mean, that's all I can remember.

13    Q    Okay.  What does the 1% diamond -- what does that

14  mean?

15    MR. STEELE:  If you know.

16    THE WITNESS:  The 1% diamond is -- it represents that

17  we're a club, motorcycle club.

18  BY MR. WELK:

19    Q    Why does it say "1%"?

20    A    Because there's -- there's only a certain percent

21  of motorcycle clubs out there, and the rest are, I guess,

22  that are not belonging to a club.

23    Q    I'm sorry.  I'm not sure I understand your

24  question -- I mean your answer.

25    Does the 1% significant -- first of all, you're a

1  full member; right?

2  A    Right.

3  Q    You've got a full set of patches on

4  you have a vest?

5  A    I do.

6  Q    Okay.  Do you have a full set of patches on your

7  vest?

8  A    Yes.

9  Q    You got the top rocker, the middle logo, and the

10  bottom rocker; right, on the back?

11  A    Correct.

12  Q    What's your -- bottom rocker says "California" on

13  it?

14  A    Yes.

15  Q    You got a side rocker?

16  A    Yes.

17  Q    What does that say on it?

18  A    I believe it says "Pico Nomad."

19  Q    Okay.

20  A    I have two side rockers.

21  Q    What does the other one say?

22  A    One's Nomad, and other one's Pico.

23  Q    I see.  Okay.  You got one --

24  A    Or Pico and Nomad.

25  Q    You have a one-percenter patch on there?

1      A    I believe so.

2      Q    What does that mean to you?  What's the

3  significance of 1%?

4      A    That I belong to a motorcycle club, and I'm not a

5  independent.

6      Q    So it could mean -- do you know if other

7  motorcycle clubs wear one-percenter patches?

8      A    I -- I believe they do.

9      Q    And that the only significance to that is that

10  you're in a motorcycle club?

11      A    To me, yes.

12      Q    Do you have any knowledge of whether that

13  one-percenter has other significance to other members of the

14  club?

15      A    In my -- I couldn't say about that.

16      MR. STEELE:  Objection.  Foundation.  He doesn't know

17  what anybody else is thinking.

18  BY MR. WELK:

19      Q    I didn't ask you to say what other people are

20  thinking.  I want to make it clear because Mr. Steele seems

21  to have misunderstood my question.

22      Do you have an understanding of what anybody else

23  thinks that -- or believes what it means to them?  Have you

24  ever talked to any other member about what one-percenter

25  means to them?

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1      MR. STEELE:  Calls for speculation.

2      MR. WELK:  Not if he's talked to them.  It doesn't call

3  for -- I'm not asking you to speculate.

4  BY MR. WELK:

5      Q    I'm asking you if you've ever had a conversation

6  with any Mongol member.

7      MR. STEELE:  That's a different question you asked

8  before now.

9      MR. WELK:  I'm accommodating you, Mr. Steele.  I'm

10  going to keep asking this question until Mr. Steele's happy

11  with it because I'm an accommodating kind of guy.

12      THE WITNESS:  Good.

13      MR. WELK:  And I want us all to be friends here.

14  BY MR. WELK:

15      Q    So I'm wondering if since 1997 you've ever had a

16  conversation with anybody involved in the Mongols

17  organization about what one-percenter means to them?

18      A    No.

19      Q    Has anybody ever told you that the significance of

20  one-percenter means that people who wear this patch are

21  within the 1% of people who don't follow the general rules

22  of society and go their own way?

23      A    Yes.

24      Q    Who's told you that?

25      A    The news.  I've -- and I've read it again in the

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1   news.

2        Q    You ever heard any --

3        A    And --

4        Q    -- member -- I'm sorry.  I didn't let you finish

5   your answer.

6        A    I've also read it in other motorcycle books -- or

7   outlaw motorcycle club books that people have written.

8        Q    What is an --

9        A    That people have written.

10       Q    What is an "outlaw motorcycle club"?

11       MR. STEELE:  If you know.

12       THE WITNESS:  The way you just explained it, I'm

13  assuming, is they're -- society -- one percent -- 99 percent

14  of society is -- follows the straight and narrow.  It

15  doesn't have its own political views.  I guess that would be

16  my interpretation of it.  And there's the one percent of us

17  that do that -- the motor -- that we -- when we signed up

18  for a motorcycle club, we chose that we were going to have

19  our beliefs.

20  BY MR. WELK:

21       Q    And your beliefs are follow the straight and

22  narrow?

23       A    Yes.  I believe I should be able to go anywhere I

24  choose to go.  And whether law enforcement or society

25  doesn't like the way I dress because I look a certain way, I

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1   should be -- still be able to be allowed and wherever they

2   go.  I'm a tax-paying citizen.

3       Q    Okay.

4       A    And I work.

5       Q    Okay.  Now, you used the term "outlaw motorcycle

6   club."

7       A    Yes.

8       Q    What does that mean?  What do you think that

9   means?

10      A    Some -- some motorcycle clubs I would -- I would

11  assume they consider themselves outlaws such as the days of

12  old.  So they ride.  They ride crazy.  They party crazy.

13  They don't care about what laws they break.

14      Q    In your opinion or in your experience, have the

15  Mongols ever been that type of an organization?

16      MR. STEELE:  Objection.  Vague as to "that type of an

17  organization."

18  BY MR. WELK:

19      Q    In your opinion, has the Mongols ever been an

20  outlaw motorcycle club?

21      A    I believe we fall -- might fall into that category

22  in other people's eyes.

23      Q    But what do you think.  Based on your description

24  of what an outlaw motorcycle club is, do you think that the

25  Mongols, while you've been a member, have ever fallen into

that category?

1

    MR. STEELE:  I'll tell you asked and answered.  That's

2

exactly what he said.  Next question.

3

BY MR. WELK:

4

    Q    Do you understand the question?

5

    A    I understand the question.  I forgot the question

6

now, though.

7

    MR. STEELE:  It was asked and answered.  What he asked

8

him is a question which he responded to with at -- sometimes

9

people have believed they have fallen into it.  Then you

10

followed up with, "Do you think that they've ever" --

11

"people think they have fallen into it?" is exactly -- you

12

just read him back his own answer.

13

    MR. WELK:  I'll ask the court reporter to read back my

14

last question, please.

15

        (Record read)

16

    THE WITNESS:  Like, to party and ride hard?  Yes, I --

17

we like to party and so yes.

18

BY MR. WELK:

19

    Q    Okay.  So you think that Mongols are -- have been

20

an outlaw --

21

    THE WITNESS:  I believe people will --

22

    MR. STEELE:  No.  Mischaracterizes his answer.

23

    MR. WELK:  No, no.  Now, hang on a second, now.

24

25

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    the question?

2        A    Yes.

3        Q    I'd like you to answer it, please.

4        A    I'd like to take the Fifth on this one.

5        Q    Okay.  All right.  I'm going to show you now what

6    I'm going to attach as Exhibit 3 to your deposition, which

7    is a diagram --

8        A    Okay.

9        Q    -- headed "Mongols Outlaw Motorcycle Gang Vest

10   Insignia."

11           (Plaintiff's Exhibit 3 was marked for

12       identification, the original of which is attached

13       hereto.)

14   BY MR. WELK:

15       Q    Now, I will begin by saying that I'm not going to

16   ask you to adopt the characterization of the Mongols as an

17   outlaw motorcycle gang.  So I want to be as clear as

18   possible that in asking you these questions, I'm not

19   assuming or suggesting that that is your characterization of

20   that organization.

21           Do you understand that?

22       A    Yes.

23       Q    Okay.  Now, I want to ask you, though, about some

24   of these patches on here and what they mean.  We already

25   talked about one percent, and I just want to clarify that to

1    you one-percenter means that one percent -- you're one

2    percent of the population that's in a motorcycle club?

3         A    Correct.

4         Q    All right.  All right.  On the right side of that

5    page, if you look at the boxes on the right side, there's a

6    skull and crossbones description.  It's a diamond-shape

7    patch with a skull and crossbones.

8              Are you familiar with that patch?

9         A    I've seen it before.

10        Q    Do you have one of those?

11        A    No.

12        Q    Do you have an understanding of why someone -- and

13   based on your experience as a member of the Mongols -- do

14   you have an understanding as to why someone would be issued

15   one of those patches?

16        MR. STEELE:  Based on your experience, not what the

17   document says.

18        MR. WELK:  In case I didn't make that clear by

19   saying -- yeah, that's what I meant.

20        THE WITNESS:  I'm sorry.  One more time.  Can you

21   repeat the question?

22   BY MR. WELK:

23        Q    I'd love to.  The skull and crossbones -- now,

24   again, I'm using the -- when I refer to the boxes, I'm not

25   asking you to adopt anything on this page because --

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1     A    Okay.

2     Q    -- this is a page that was prepared by the

3     government in connection with the criminal investigation

4     that we undertook with respect to this organization of which

5     you were a member.  So the things that are on here, I'm not

6     necessarily asking you to adopt those things unless, of

7     course, you agree that that's what they're for.

8          So what I'm asking you, specifically -- you say

9     you're familiar with the diamond-shaped skull and crossbones

10    patch.  Setting aside what it says here what that means, I'd

11    like you to tell me based on your experience as a full-patch

12    member of the Mongols since 1997, why would somebody be

13    issued a skull and crossbones patch like that?

14    MR. STEELE:  I would object.  If we're going to go this

15    route, I'm going to advise him take the Fifth on anything

16    regarding any aspect of the patch that's not at issue in

17    this word that you're -- which is the word mark and the

18    symbolic mark.  I mean, I'm not trying to be difficult, but

19    you're going in a different direction.  I've given you a lot

20    of leeway, and I've accommodated you.  But at this point we

21    got to stop.  So I'm going to advise him to take the Fifth.

22    MR. WELK:  Okay.

23    BY MR. WELK:

24    Q    You have testified that the club owns the word

25    "Mongols" and the image that is Exhibit 2; right?

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    A    Correct.

2    Q    Are there any other words or images that the club

3  owns that is theirs alone?

4    MR. STEELE:  Foundation -- objection.  Foundation.

5    THE WITNESS:  No.

6    MR. STEELE:  Do you know?

7    THE WITNESS:  Not -- I don't know.

8  BY MR. WELK:

9    Q    What about "Respect Few.  Fear None"?

10    A    I don't know.  I couldn't answer that.

11    Q    Are you familiar with that phrase?

12    A    Yes, I am.

13    Q    Is that something that the club uses on patches?

14    MR. STEELE:  Objection.  I'm going to advise him to

15  take the Fifth.  That mark is not at issue in this

16  litigation.

17    MR. WELK:  Oh, but it's relevant.

18    MR. STEELE:  I'll advise him to take the Fifth on it.

19    MR. WELK:  Okay.  All right.

20  BY MR. WELK:

21    Q    Is there a patch issued by the gang -- or I'm

22  sorry -- by the club -- has there been a patch issued by the

23  club to commemorate the 2002 Laughlin shooting?

24    MR. STEELE:  No.  Objection.  He's going to assert his

25  Fifth Amendment privilege on that.

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1        MR. WELK:  You're instructing him not to answer?

2        MR. STEELE:  Uh-huh.

3    BY MR. WELK:

4        Q    And you're going to accept your attorney's advice

5    in that regard?

6        A    Correct.

7        Q    Mr. Guevara, can we agree that if your attorney

8    instructs you not to answer, that we should assume that you

9    are going to follow that advise and not answer unless you

10   state otherwise?

11       A    Yes.  I -- yes, I will listen to my attorney.

12       Q    Okay.  Well, I just want to save time.  I don't

13   want to ask you every time if you're going to follow your

14   attorney's advice.  So if it occurs that you are somehow --

15   or one time you're not going to take your attorney's advice,

16   I'll ask you to just go ahead and answer the question.

17   Okay?

18       A    Okay.

19       Q    In your experience as a -- on your vest that you

20   have as a member, do you have any colored wings patches on

21   your vest?

22       MR. STEELE:  Take the Fifth.

23       THE WITNESS:  I'll take the Fifth.

24       MR. WELK:  On whether he even has any?

25       MR. STEELE:  Yeah.

MARTIN GUEVARA-PMK CORPORATION  APRIL 7, 2011

1    MR. WELK:  Okay.

2    MR. STEELE:  We're way, way, way outside of what this

3    deposition is supposed to be about.

4    MR. WELK:  Okay.

5    MR. STEELE:  And I know how you guys do, so we're just

6    not going to go that route here.  If you want to talk about

7    the mark and things relevant to the seizure, then let's do

8    that.

9    MR. WELK:  Okay.  Would you agree, Mr. Steele, that one

10   of the reasons we're here today is to talk about Mongols'

11   marks?

12   MR. STEELE:  I'm not going to engage in a discussion

13   here.  You ask your question and I'll object if it's

14   appropriate.

15   MR. WELK:  Well, the reason I ask is because you're

16   telling me now what we're here to talk about.  I want to

17   clarify what we're here to talk about.  And it seems to me

18   that one of the things we're here to talk about are the

19   Mongols' marks.

20   MR. STEELE:  Okay.

21   MR. WELK:  You disagree?

22   MR. STEELE:  Now, we're here to talk about the specific

23   marks at issue.  Now, what you told the Court when you moved

24   for this was that the issue you wanted to address was the

25   ownership of the marks and the time frame for the ownership

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 20

1  of the marks, the marks in question.  That's what y

2  the Court in your pleading where you moved ex parte fo

3  deposition.

4       MR. WELK:  Uh-huh.

5       MR. STEELE:  And that is what the Court based this on.

6       MR. WELK:  Uh-huh.

7       MR. STEELE:  Now, that's my understanding.  Now, if

8  your question is about the general breadth of depositions, I

9  understand that too.  But I also understand the Fifth

10  Amendment.

11       MR. WELK:  Okay.  Well, that's fine.  I don't have any

12  -- listen, if he wants to take the Fifth Amendment, that's

13  fine with me.

14  BY MR. WELK:

15       Q    Between the time you joined the Mongols as a

16  member and today, have you ever been an officer in a

17  chapter?

18       A    Yes.

19       Q    When were you first an officer in a chapter?

20       A    In '97.

21       Q    And that was when you were in the Pico Chapter?

22       A    Yes.

23       Q    What was your status?

24       A    I believe when I joined, I was treasurer.

25  Secretary, slash, treasurer.

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1       Q     What were your duties as secretary/treasurer of

2   the chapter?

3       A     I collected dues and took roll call, members from

4   Pico, and the minutes.

5       Q     What are the "minutes"?  What does that mean?

6       A     Whatever was discussed in our meeting.

7       Q     Okay.  Did all the members pay the same amount of

8   dues?

9       MR. STEELE:  If you know.

10      THE WITNESS:  In my chapter we -- we had -- every

11  member in my chapter had to pay whatever our chapter said

12  for dues.

13  BY MR. WELK:

14      Q     But did every member pay the same amount?

15      A     I don't know.  I -- I -- it wasn't a rule.

16      Q     Well, you were responsible for collecting the

17  dues; right?

18      A     Right.

19      Q     How did you know how much to collect from your

20  members?

21      A     I -- I believe at the time it was -- $5 went to be

22  a member -- was to be a member at the time, and $2 was set

23  up for, like, a defense fund.  So as long as we -- we

24  covered that at the end of the month to give to So Cal.

25      Q     Was there ever something called the "Mother

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

Chapter"?

1   A   They refer to it as -- members sometimes refer to

2   So Cal Chapter as Mother.

3   Q   I see.  So you collected dues on a monthly basis?

4   A   Weekly.

5   Q   Weekly.  And did every single member pay the same

6   amount every week?

7   A   In my chapter, yes.

8   Q   Based on your knowledge and experience, were there

9   different amounts collected in other chapters?

10  MR. STEELE:  Okay.  We're going far field here.

11  THE WITNESS:  I don't --

12  MR. STEELE:  It's got nothing to do with the marks.

13       Take the Fifth on this.

14  BY MR. WELK:

15  Q   So when you rejoined as an active member, you were

16  a member of the Mother Chapter; is that right?

17  MR. STEELE:  Go ahead answer.

18  THE WITNESS:  From -- from Pico -- from Pico Nomad I

19  went to So Cal.

20  BY MR. WELK:

21  Q   And you went from -- because you went from being

22  semi-retired to being active again; right?

23  A   Correct.

24  Q   Did Pico Nomad have officers?

1    MR. STEELE:  Okay.  At this point I'm going to instruct

2  him to take the Fifth, and I'm going to keep doing so until

3  we get on the subject that you said you were going to cover

4  when you asked the Court for leave to take this deposition.

5  Now, I'm letting everything go to a certain point because I

6  think there are --

7    MR. WELK:  He --

8    MR. STEELE:  Wait.  Let me finish.  I think you're

9  justified on foundational grounds to show that he has reason

10  for knowing certain things.  But you're getting into all

11  sorts of other things here, and that's just not the scope of

12  the deposition here.

13    MR. WELK:  The scope of the deposition includes the

14  reason why we're litigating this, and that is the ownership

15  claim of the Mongols Nation Motorcycle Club.  Mister --

16    MR. STEELE:  And we've talked precious little about

17  that.

18    MR. WELK:  Oh, wait.  It's my turn.  He submitted two

19  sworn statement in this case -- two of them -- declarations

20  sworn under penalty of perjury.  And he covered his

21  responsibilities as a member of this gang both at the time

22  it was an unincorporated association and after it was

23  incorporated.  And it's always been clear that the purpose

24  of the --

25    MR. STEELE:  Then use the exhibits to explain your

Huntington

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

1    question, and we probably won't have a problem.

2        MR. WELK:  Okay.  You can do your objections whatever

3    you want, but I'm going to go ahead and ask my questions.

4    You can make your objections.

5        MR. STEELE:  I know.

6        MR. WELK:  And then we can go talk to Judge Wright

7    about why we're here.

8        MR. STEELE:  No, we surely will, but I'm just telling

9    you that's why we're doing it.  And for the purpose of

10   moving forward, that's the way we're going to move forward.

11       MR. WELK:  Okay.  I'm entitled to inquire about the --

12       MR. STEELE:  He's entitled to assert the Fifth

13   Amendment.

14       MR. WELK:  Mr. Steele, since the court reporter is

15   taking down everything that's said while we're on the

16   record, it's better if we don't talk at the same time.  I

17   will try and extend you the courtesy to wait until you've

18   completed your statement before I begin mine, and I'll ask

19   that you extend me the same courtesy.

20       MR. STEELE:  I shall.

21       MR. WELK:  Okay?

22       MR. STEELE:  I would ask the same of you.

23       MR. WELK:  Okay.

24   BY MR. WELK:

25       Q    Did the structure of the organization change when

MARTIN GUEVARA-PMK CORPORATION   APRIL 7, 2011

Mongols Nation Motorcycle Club, Inc. came into existence?

     MR. STEELE:  Objection.  Vague.

       Don't answer.

BY MR. WELK:

    Q   Do you understand the question?

    A   No.

    Q   Okay.  What is Mongols Nation Motorcycle Club?
What kind of entity is it?  Do you know?

     MR. STEELE:  Objection.  That's vague.

     THE WITNESS:  I don't understand that.  Like, I don't
understand what you're getting it.

BY MR. WELK:

    Q   Is it a corporation?

     MR. STEELE:  Objection.  Vague as to time.

     THE WITNESS:  I don't know.

BY MR. WELK:

    Q   Is Mongols Nation Motorcycle Club a corporation?

     MR. STEELE:  Vague as to time.

     MR. WELK:  I cannot comprehend your objection.

BY MR. WELK:

    Q   Is --

     MR. STEELE:  Just go ahead and answer, if you
understand it.

BY MR. WELK:

    Q   Do you understand the question?