36. On April 9, 2006, **Cavazos** led a Mongols meeting, along with co-defendants H. Gonzalez, Munz and Canales, in which they addressed confrontations with rival Hell's Angels gang members.

37. On July 27, 2006, **Cavazos** directed Mongols at a "Sergeant-at-Arms" meeting, in which he directed members to carry weapons and travel with other members in anticipation of violent confrontations with rival gang members.

38. In September 2006, **Cavazos** conducted negotiations with Mexican Mafia representatives concerning the payment of "taxes" by Mongols to the Mexican Mafia for the distribution of narcotics by Mongols members.

39. On December 4, 2006, **Cavazos** addressed the Mongols "Mother Chapter" during a meeting at his residence in West Covina, California and advised the members that he had identified 20 to 25 "front-line" Mongols to be responsible for the most significant violent confrontations of the organization. **Cavazos** also directed Mongols members to store weapons at his residence in order to prevent them from being identified and seized by law enforcement.

40. On April 8, 2007, Mongols members Maldonado and Savala attacked rival Maravilla gang members at the Nicholas bar by shooting them multiple times, paralyzing one of the victims. Two days later, **Cavazos** led a Mongols "presidents" meeting and a "Sergeant-at-Arms" meeting in which he directed Mongols leaders to prepare for retaliation from Maravilla gang members in response to the shooting.

41. On July 7, 2007, **Cavazos**, along with co-defendant Munz, rewarded Maldonado for having shot the rival Maravilla gang members by elevating his membership rights and authorizing Maldonado to wear a "full patch" Mongols image tattooed on his head.

42. On July 19, 2007, **Cavazos** led a Mongols "Presidents" and "Sergeant-at-Arms" meeting with co-defendants H. Gonzalez, A. Rodriguez, Soto, Munoz, J. Garcia, R. Martinez, R. Lozano, Lozano and others in which **Cavazos** discussed the need to use violence as a means to expand the authority of the Mongols across the United States. To that end, on July 27, 2007, **Cavazos** directed Mongols to attack rival gang members in order to expand the authority of the Mongols into Florida. Further, in July and August 2007, **Cavazos** met with co-defendants Munz and Lawrence Wilson and discussed plans to combat rival "Sons of Silence" gang members in Indiana. **Cavazos** and Wilson then directed Mongols members to travel to Indiana in order to attack and kill rival gang members there. In August 2007, co-defendant Wilson traveled to Indianapolis and led a group of Mongols in planned attacks on rival "Sons of Silence" members. Under Wilson's leadership, Mongols armed themselves with firearms and bullet-proof vests for the planned attacks. Mongols, including R. Lozano, attacked a rival "Sons of Silence" member in Indiana and forcibly seized his "Sons of Silence" patch, after having been persuaded by a confidential information not to kill the rival member.

*This was used in our sentencing*

10

# Contact Information

Ruben Cavazos Sr.
#55348-112
FCI La Tuna
Federal Correctional Institution
P.O. Box 3000
Anthony, TX 88021

## My Family

Ruben Cavazos Sr.
3007 Cordova Ct.
West Covina, CA 91791

Email:
Cavazosr20@yahoo.com
althesuit@gmail.com

Al Cavazos
Cell#(562)201-3300
Fax#(626)430-6318

Charge Evaluation Worksheet
J.S.I.D File #03-0277R
Montebello Police Department #05-03
Page 2 of 5

The Justice System Integrity Division of the Los Angeles County District Attorney's Office has completed its review of allegations that Montebello Police Officer, Detective Chris Cervantes, #1314, committed perjury in his affidavit for a search warrant on January 23, 2003. For the reasons set forth below, this office declines to initiate criminal proceedings against Detective Cervantes.

## FACTUAL ANALYSIS

The following analysis is based on reports prepared by the Montebello Police Department which were submitted to this office on April 4, 2003, by Lieutenant Greg Sells.

On January 22, 2003, Detective Cervantes, a member of the Montebello Police Department's Crime Impact Team, Gang Unit (CIT), submitted a search warrant to a judge at the East Los Angeles Superior Court for service on January 24, 2003. The home to be searched was located at 812 Hughes Avenue in Montebello. Detective Cervantes wrote the affidavit for the search warrant. Lieutenant Don Ramos has alleged that Cervantes' affidavit was false and misleading in three respects:

1) Where it states that the Confidential Reliable Informant (CRI) has never given false or misleading information, and implying that the CRI was still being used by the Montebello Police Department by stating that he (Cervantes) did not want to disclose the CRI's identity as it would destroy the CRI's further usefulness to law enforcement;

2) Where it describes that the controlled buy completed by the CRI occurred within the past six months of submission of the search warrant, when it actually occurred on June 28, 2002;

3) And where it states that within the past two weeks a confidential untested informant provided Detective Vuncanon information regarding marijuana and a semi-automatic rifle being stored at the Hughes address, when that information was actually given to Vuncanon on December 27, 2002.

Lieutenant Ramos was aware that the CRI was subsequently terminated by the department on July 23, 2002, and that a memorandum to that effect was distributed to all CIT investigators. Ramos believed that the reason the CRI was terminated was because he/she was untruthful and bought narcotics (presumably without police oversight). Because of Lieutenant Ramos' concern, the search warrant was never served and he (Ramos) referred his concerns to his supervisors at Montebello Police Department.



RECEIVED
BUT NOT FILED

AUG 20 2012

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

Charge Evaluation Worksheet
J.S.I.D. File #03-0277R
Montebello Police Department #05-03
Page 3 of 5

Lieutenant Greg Sells was asked to investigate Ramos' allegations. Sells interviewed Lieutenant Ramos, Sergeant Weast and several other CIT investigators. In his interview with Lieutenant Ramos, Sells discovered that the basis for Ramos' concern, that the CRI was untruthful and bought narcotics, came from his conversations with Sergeant Weast.

Sergeant Dan Weast, supervisor of the CIT Unit at the time of the controlled buy, told Lieutenant Sells that the CRI was terminated because he was uncontrollable, not because he was untruthful or unreliable. According to Weast, there were times when the CRI would purchase narcotics on his own without notifying investigators, then contact Montebello detectives and hand over the narcotics to them. Weast recalled another occasion when a Montebello officer conducted a traffic stop on the CRI and he/she told the officer that his/her car was supposed to be a getaway car in a gang retaliation shooting, and that his/her car had transported weapons for that shooting. On other occasions, the CRI would show up unannounced at various surveillance locations and at times inform people on the street, as well as other officers, that he/she was a police informant. Due to this unpredictable behavior, Sergeant Weast felt that his investigators could be exposed to "officer safety issues." To Weast's knowledge, the CRI was informed that his/her services were no longer needed, and Weast prepared the memorandum to the CIT investigators stating that the CRI was not to be used by their unit again. The reasons for the termination were not explained in the memorandum. However, some CIT investigators, including Cervantes, were aware that the CRI was terminated because he/she was "uncontrollable".

Sergeant Weast said that he could not recall the CRI ever providing untruthful information to his investigators. The CIT investigators told Lieutenant Sells that the CRI never gave them untruthful information.

Although Detective Cervantes declined an offer by Lieutenant Sells to be interviewed voluntarily, Cervantes wrote a memorandum to Montebello Police Chief Garry Couso-Vasquez. In that memorandum, he explained that he believed Lieutenant Ramos and Sergeant Weast have treated him unfairly since joining the CIT Unit. With respect to the CRI, Cervantes indicated that the CRI has never given false information. He received Weast's memorandum regarding terminating the use of the CRI after the controlled buy in June of 2002. Weast indicated then that the CRI was "too involved" and his/her actions were jeopardizing his/her safety. Sergeant Weast never said that the CRI was untrustworthy and Cervantes never regarded him/her as such. In fact, according to Cervantes, shortly after the CRI's services were terminated by the Montebello Police Department, the FBI began using him/her.

Cervantes acknowledged that the search warrant included the June 28, 2002 incident, the information provided by Detective Vuncanon, as well as information regarding a

January 17, 2003 CIT surveillance of activity at the 812 Hughes Avenue residence, which was consistent with narcotic sales. According to Cervantes, while the judge was reading the search warrant, Cervantes said that he told the judge that the controlled buy was stale, but because there was enough information independent of the controlled buy, he (Cervantes) believed that sufficient probable cause existed for the warrant to be issued.

After being apprised of Lieutenant Ramos' concern about the search warrant and that an investigation had commenced regarding it, Cervantes spoke to a Deputy District Attorney he identified as "Markus" in the "District Attorney's Command Post," and a Sacramento Deputy District Attorney to determine if his (Cervantes') use of the CRI was impermissible. He believed that the information he received from those prosecutors validated his actions.

## CONCLUSION

There is insufficient credible evidence to show that Detective Cervantes committed perjury when he obtained the search warrant. From the evidence submitted, it appears that the CRI was terminated because he/she had a tendency to go above and beyond what was asked of him/her, not because the members of the Montebello Police Department CIT Unit believed the CRI had provided false information. Furthermore, the information provided by the CRI regarding the 812 Hughes Avenue location and the aforementioned follow up investigations to that residence adequately corroborated the CRI information.

The fact that the CRI was never going to be used again by the Montebello Police Department, and the reasons for that decision, should have been disclosed to the judge reviewing the warrant. However, because the CRI was observed obtaining narcotics from the residence, and Montebello officers observed activity consistent with narcotic sales at the same residence on January 17, 2003, the lack of disclosure would not constitute a material misrepresentation that would warrant a perjury allegation.

Furthermore, according to Sergeant Weast, the CRI was a "wealth of information" and investigators from other agencies expressed "a desire to use [him/her] in their future operations." According to Cervantes, the FBI was using him. Thus, it appears that other law enforcement agencies may continue to use the CRI.

Lieutenant Ramos' concern about the controlled buy of June 28, 2002, being listed in the warrant as occurring "within the past six months," and the December 27, 2002, information provided by the untested informant to Detective Vuncanon regarding the marijuana and the semi-automatic rifle as occurring "within the past two weeks," may well be described as careless and something the Montebello Police Department may want to

Charge Evaluation Worksheet
J.S.I.D. File #03-0277R
Montebello Police Department #05-03
Page 5 of 5

address through their own disciplinary procedures. However, under these circumstances, these misstatements fail to rise to a material misrepresentation that would warrant a filing of criminal charges for perjury.

For the foregoing reasons, we decline to initiate criminal proceedings against Officer Cervantes. We are closing our file and will take no further action in this matter.



Ruben Cavazos #55348-112
FCI La Tuna
Federal Correctional Institution
P.O. Box 3000
Anthony, Texas 88021

RECEIVED
CLERK, U.S. DISTRICT COURT
SOUTHERN DIVISION
AUG 20 2012
CENTRAL DISTRICT OF CALIFORNIA
BY

⇨ 55348-112 ⇦
Judge David O Carter
411 W 4TH ST
Santa ANA, CA 92701
United States

EL PASO TX 799
FRI 17 AUG 2012